## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| Masten Space Systems, Inc.,[1] | ) |
| | ) Case No. 22-10657 (BLS) |
| Debtor. | ) |
| | ) |

## DECLARATION OF DAVID MASTEN IN SUPPORT
## OF FIRST DAY MOTIONS AND RELATED RELIEF

I, David Masten, being duly sworn, declare under penalty of perjury as follows:

1.      I am the founder and Chief Technology Officer of Masten Space Systems, Inc. ("**Masten**" or the "**Debtor**"). As part of my job with Masten, I am familiar with Masten's history, day-to-day operations, business and financial affairs, and books and records, as well as Masten's restructuring efforts.

2.      On July 28, 2022 (the "**Petition Date**"), Masten filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). To minimize the adverse effects of filing for Chapter 11 protection while also preserving value for the benefit of its stakeholders, and concurrently with the filing of this declaration (the "**Declaration**"), Masten has filed a number of pleadings requesting various forms of "first day" relief (collectively, the "**First Day Motions**").

3.      The First Day Motions are intended to enable Masten to operate effectively and efficiently within this Case, as well as to avoid certain adverse consequences that might otherwise result from the commencement thereof. Among other things, the First Day Motions seek relief aimed at: (a) continuing progress on important U.S. Government contracts, including several

---

[1] The Debtor's mailing address is 1570 Sabovich St, Mojave, CA 93501. The last four digits of the Debtor's federal tax identification number is 7098.

unclassified contracts rated for national defense-related reasons under the Defense Priorities and Allocations System Program ("**DPAS**"); (b) maintaining the confidence and loyalty of Masten's customers, including the U.S. Government; (c) maintaining the confidence of Masten's stakeholders, including Masten's vendors and creditors; (d) maintaining the morale and continued employment of Masten's employees; and (e) maintaining the enterprise value of the business. Gaining and retaining the support of these key constituencies is critical to Masten's efforts to maximize the value of its estate for all parties-in-interest.

4.      Masten is also filing a motion to effectuate an expedited sale of substantially all its assets for the reasons explained below.

5.      I am over the age of 18 and am authorized by Masten to submit this Declaration. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of Masten's management team, my discussions with Masten's employees or advisors, my review of relevant documents and information concerning Masten's operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would competently testify to the facts set forth in this Declaration.

6.      This Declaration is divided into four parts. Part I summarizes Masten's history and operations. Part II summarizes Masten's current corporate and capital structure. Part III sets forth Masten's plan for this Case. Part IV affirms and incorporates the facts that support the relief requested in the First Day Motions.

# PART I:
## Masten's History and Operations

7. Masten is a rocket and spacecraft company headquartered in Mojave, California. It has gained a strong reputation within the space industry as an innovator and pioneer in rocket technologies.

8. I founded Masten in 2004 in Santa Clara, California, to reduce the barriers to space by making rockets and spacecraft more cost efficient through reusability based upon the belief that rockets should operate more like airplanes than expendable ballistic missiles. Masten was founded to make this vision a reality by emphasizing reusable technologies, autonomous systems, and small operational teams.

9. Masten was incorporated as a Delaware corporation on February 1, 2005.

10. Masten relocated its headquarters to the Mojave Air and Space Port in Mojave, California, in 2006.

### A. Description of Current Business

11. Masten's current business can be roughly divided into three units: vertical takeoff and vertical landing ("**VTVL**") rockets, research and development ("**R&D**"), and lunar landers.

### i. VTVL Rockets

12. Masten initially made its mark by developing reusable suborbital vertical takeoff and landing rocket vehicles. Unlike conventional expendable rockets, Masten's rockets could be— and have been—reused for hundreds of flights. Additionally, unlike virtually all rocket vehicles flown until that time, which were either expended (i.e., allowed to burn up in the earth's atmosphere or crash into the earth's surface) or recovered via parachute, Masten's VTVL rockets land softly back on the earth in an upright position using the thrust produced by their rocket engines.



**Fig. 1**. Xodiac vehicle during descent.

13.     As of the Petition Date, Masten had flown over 600 successful VTVL flights across five different rocket vehicles—more than any other company in the industry. Masten is currently developing a next-generation VTVL rocket called "Xogdor" under a NASA contract, which will be capable of greatly improved flight performance.

14.     Masten's first two successful VTVL rocket vehicles, Xombie and Xoie, entered service in 2009. Xombie has flown 227 times—more than any other rocket-powered vehicle in history—and Xoie flew approximately 25 times before being retired from service.

15.     In 2009, Masten competed for the Northrop Grumman Centennial X Prize Lunar Lander Challenge. Masten won second prize with Xombie in the level one competition, earning a $150,000 prize. Masten then went on to win first prize with Xoie in the level two competition, earning a $1 million prize.



**Fig. 2**. Xoie's Lunar Lander Challenge winning flight.

16.     On May 26, 2010, Masten successfully performed an in-air engine shutoff and relight using its Xombie vehicle.[2]   During that flight, Xombie flew to an altitude, shut off its engine, began to descend in free fall, reignited its engine, and made a controlled landing back on the launch pad. That flight is believed to be the first successful execution of an in-air shutoff and relight in history. This maneuver is now standard for rockets that land vertically and is regularly employed by larger companies like SpaceX and Blue Origin.



**Fig. 3**. Xombie after in-air engine shutoff (May 26, 2010).

---

[2] *See* Masten Space Systems, *Xombie in-air relight view from the ground*, YOUTUBE (May 27, 2010), https://www.youtube.com/watch?v=H2Yt5L5TlGM.

17.     Masten's specialized expertise in developing rapidly reusable[3] VTVL rocket vehicles, as well as its industry-leading proprietary avionics and guidance, navigation, and control software, have allowed Masten to carve out a niche for itself as a preferred provider of terrestrial testbed flights for space technologies, particularly technology utilized on a spacecraft's approach, descent, and landing ("**ADL**") on the Moon or another planet.

18.     For example, from 2012 to 2016, Masten performed multiple flight test campaigns to mature the NASA Jet Propulsion Laboratory (JPL) G-FOLD algorithm and Lander Vision System that enabled NASA's Mars 2020 mission to land in Mars's Jezero crater, a rocky dried lake that would have been inaccessible without the Lander Vision ADL system. Landing in Jezero crater positioned the Perseverance rover and Ingenuity helicopter near their desired science objectives, thereby avoiding a nearly two-year drive for Perseverance.

19.     Masten has also used its VTVL rockets to validate and mature important space technologies for commercial customers. For example, Masten helped Honeybee Robotics validate its PlanetVac regolith sampler technology with Xodiac flight campaigns in 2018 and 2020. PlanetVac is now scheduled to be flown to the Moon as a payload on an upcoming lunar mission to Mare Crisium.

20.     Masten has built a stable and reliable business around its terrestrial testbed service. Masten flies government and commercial customer payloads as part of NASA's Flight Opportunities program and also uses its VTVL vehicles for internal research and development testing.

21.     In 2014 DARPA selected Masten to scale up Masten's vehicle technologies for the XS-1 Spaceplane. The XS-1 Spaceplane was to be a vehicle that could fly to Mach 10, fly ten

---

[3] Masten VTVL rockets have flown as many as six times in a single day.

times in ten days, be a booster for an orbital launch system that could put 3,000-5,000 lbs in low Earth orbit, and cost less than $5 million per flight. Masten passed the Preliminary Design Review but was not selected to continue development due to Masten's small size and lack of matching funds.

22.     To further evolve its suborbital testbed capabilities, Masten is currently developing a sixth generation VTVL rocket called "Xogdor" under a NASA Tipping Point[4] contract. Xogdor is a much larger vehicle that will be capable of significantly enhanced performance as compared to its predecessors. Xogdor is designed to exceed the speed of sound and will be capable of much higher altitude flights. It also utilizes a pump-fed liquid oxygen-methane engine and active aerodynamic controls to help steer the rocket to its intended landing site.

23.     Masten's Xogdor development team is preparing for initial engine testing and will begin vehicle assembly in early 2023. Xogdor is expected to begin flights in 2024.

**ii.      Research and Development**

24.     Outside of VTVL flights, Masten has historically supplemented its revenue through a robust, diverse research and development program.

25.     This R&D program has been largely driven and funded by NASA, U.S. Air Force, and National Science Foundation Small Business Innovation Research ("**SBIR**") awards, which

---

[4] NASA's Tipping Point program supports space technologies that can contribute to the growth of commercial space capabilities and provide future benefit to NASA. Tipping Point contracts help fund the development of technologies that are close to the point of commercialization. The program requires the industry partner to contribute a portion of the overall value of the contract (10% for small businesses).

are contracts granted through a competitive award process to U.S. companies having fewer than 500 employees and affiliated employees.[5]

26.     Most of Masten's current R&D work has progressed beyond the preliminary proof-of-concept phase and is well into concept refinement. Several Masten programs are ready to move into a commercialization phase, including its NITE metal oxidation warming system, PermiAM additive manufacturing technology, and electric pump.

27.     Masten's R&D has generated an intellectual property portfolio that includes one issued patent and six pending patent applications. Masten has identified licensing opportunities for several of these patented or patent-pending technologies, both within the space industry and in other industries.

28.     Many of Masten's R&D programs are developing critical technologies that will enable a sustained human and robotic presence on the Moon for NASA's Artemis Program.

29.     Masten's current and recently completed R&D includes the following programs:

       a.     **Plume-Surface Interactions** ("**PSI**"): Masten's unique test capabilities with its VTVL rockets and rocket test stands has allowed it to develop an advanced understanding of cratering and surface particle dynamics when a rocket engine interacts with the surface. This understanding is important to the design of lunar and planetary landers.

       b.     **Metal Oxidation Warming System** ("**MOWS**"): Masten's patent pending MOWS technology is an innovative warming and power generation system

---

[5] There are three tiers of SBIR awards: Phase I, which is limited to six months in duration and $150,000, and is intended to establish technical merit and feasibility; Phase II, which is limited to two years in duration and $750,000, and is intended further develop the results of a Phase I; and Phase III, which is unlimited in scope and duration but requires funding from non-SBIR sources (i.e., other agency programs).

that allows electronics to survive the extreme cold of the lunar night, which can reach temperatures as low as -424° F at the Moon's poles.[6] Masten's technology, which has been awarded two NASA SBIR contracts and a Tipping Point contract, will allow spacecraft, instruments, and rovers to operate for extended missions beyond fourteen earth days and avoids the drawbacks of conventional radioisotope thermoelectric generators and lithium ion batteries.

      c.      **PermiAM Additive Manufacturing**: Masten's patent pending PermiAM technology allows a manufacturer to control the porosity throughout a component. This technology, which has been tested in rocket engine igniters through NASA SBIR Phase I and II contracts, has shown tremendous potential to improve rocket engine performance and may have crossover application to other industries.

      d.      **Electric Pump** ("**E-Pump**"): In collaboration with industry partners, Masten is developing a high performance additively manufactured electric fuel pump for rocket engines.



**Fig. 4**. E-Pump system during cryogenic testing.

---

[6] Tim Sharp, *What is the temperature on the moon?*, Space.com (Feb. 28, 2022), https://www.space.com/18175-moon-temperature.html.

e.     **SkyMage PNT System**: Masten is developing a lunar position, navigation, and timing ("**PNT**") system that is intended to provide GPS-like capabilities for the Moon (and may be applicable for other GPS-denied environments). Masten has completed an Air Force SBIR Phase I contract and is preparing to test SkyMage beacons via a Xodiac test campaign to complete its Phase II contract.

f.     **FAST Landing Pads**: Masten has developed an innovative solution for controlling lunar dust by injecting alumina particles into a rocket plume to deploy an instant landing pad. This patent pending technology was awarded a NASA Innovative Advanced Concepts ("**NIAC**") grant.



**Fig. 5**. Rendering of XL-1 lander deploying FAST Landing Pad

g.     **Rocket Mining**: To address the anticipated needs for a sustained human presence on the Moon, Masten has developed a high-performance system for extracting volatile compounds, including water, from the lunar surface. This technology recently won honorable mention in NASA's Lunar Break the Ice Challenge and received a NASA SBIR Phase I award.

h. **Low Energy Additive Construction**: Masten is working with the Pacific International Space Center for Exploration Systems to develop an extrusion-based construction system using resources available on the Moon and Mars.

30. Several of Masten's R&D contracts, including PSI, MOWS, PermiAM, and Low Energy Additive Construction, have been DPAS rated as priority contracts for national defense.

31. Masten recently received three new SBIR Phase I awards: one from the Air Force for landing rockets on unimproved surfaces and two from NASA for rocket mining and the development of a rotating detonation rocket engine. Due to delays related to Masten's financial circumstances, one of those awards has since been defunded, but Masten intends to deliver on the remaining awards during and after its restructuring.

### iii. Lunar Lander Development

32. Masten's unparalleled experience with rocket-powered landings, as well as the recognition it received for its Lunar Lander Challenge win, presented Masten with opportunities to help develop new lunar lander technologies.

33. In 2010, Masten partnered with the United Launch Alliance—a joint venture between Boeing and Lockheed Martin—to develop a lunar lander concept called "XEUS" which would allow delivery of over 15 metric tons of payload to the lunar surface.



**Fig. 6**. Rendering of XEUS lunar lander.

34.     Masten was later awarded a NASA CATALYST contract to mature lunar lander technologies in 2014. As part of the CATALYST program, Masten and NASA did development work on the original XL-1 lunar lander—a test vehicle known as XL-1T—and a novel propellant combination that performs similarly to common spacecraft propellants but is much safer to handle and less costly to acquire. The XL-1 lander was developed to the point of being ready for a critical design review with several subsystems having prototypes made and tested. The XL-1T test vehicle was a near identical prototype for XL-1 with minor differences to account for flying on Earth instead of at the Moon. XL-1T was being assembled at the end of the CATALYST program, with structures and main propellant tanks integrated. The novel propellant combination was being tested in two engine sizes for XL-1 and XL-1T. The CATALYST Program was completed in 2019.

35.     NASA's Commercial Lunar Payload Services program ("**CLPS**") was launched in April 2018 to contract with commercial companies for payload delivery services to the lunar surface to help lay the foundation for human exploration under NASA's Artemis Program. CLPS contracts are awarded to commercial contractors as task orders under an indefinite duration, indefinite quantity base contract vehicle ("**IDIQ**").

36.     Masten was awarded a CLPS IDIQ in 2018. Masten is one of 14 contractors under an IDIQ that is currently eligible to bid on CLPS task orders.

37.     Following a successful bid, NASA issued Task Order 19C ("**TO 19C**") to Masten on April 8, 2020. Under this task order, NASA has contracted Masten to deliver a suite of NASA-sponsored payloads to the lunar south pole. The lunar south pole is a location of high interest to NASA and others because of the expected presence of water ice and its potential for human settlement.

38.     As part of its successful TO 19C proposal, Masten proposed a configuration of its XL-1 lander to deliver the suite of commercial payloads to the lunar surface.



**Fig. 7**. XL-1 lander as proposed for TO 19C.

**B. Company Organization**

**i.      Corporate Structure**

39.     Masten Space Systems, Inc. is a Delaware corporation owned by 15 stockholders and primarily by Joel Scotkin (51.67%), David Masten (18.65%), and Sean Mahoney (13.97%). There are twelve additional stockholders—primarily founders, early-stage investors, and employees who exercised their stock options—none of whom own more than 2.5% of the company.

40.     Masten does not have any subsidiaries or related entities.

**ii.     Pre-Petition Capital Structure**

41.     Masten has primarily funded its operations using the revenue generated from government and commercial contracts, but it has taken on financing from a few key investors, as described below.

42.     Between April and May 2006, Masten issued a total of 8,206,000 shares of common stock in exchange for cash and certain assigned assets.

43.     In May 2007, Masten sold 375,000 total shares of Series A-1 preferred stock to Ian Kluft and Sean Lynch for a combined purchase price of $150,000.

44.     Between May 2007 and June 2009, Masten sold a total of 6,254,784 shares of Series A preferred stock to Joel Scotkin, Ian Kluft, and Sean Lynch for a combined purchase price of $1,200,163.64.

45.     In December 2011, Masten sold a total of 9,805,434 shares of Series B preferred stock to Joel Scotkin for a total purchase price of $2,118,084.58.

**iii.     Personnel and Organizational Structure**

46.     Masten has been a very small company (fewer than 25 employees) for most of its existence.

47.     Until recently, and for most of Masten's work on TO 19C, Masten was organized with a nominally flat structure, and titles and formal job descriptions were expressly de-emphasized. The company management in place at the time sought to create a less rigid business environment and avoided formal job functions and descriptions, management structure, and managerial processes. Masten did not regularly engage in formal or consistent organizational or program planning.

48.     Historically, Masten has also eschewed a formal managerial hierarchy. Rather than an organizational chart, Masten implement a "function chart" in 2020, which identified various subject areas and the individual(s) within the company who were primarily and secondarily responsible for those subject areas. Masten did not hire its first experienced project manager until May 2021.

49.     In July 2021, at the direction of Masten's Board of Directors (the "**Board**"), Masten implemented a more vertically structured organizational chart that established lines of reporting for all employees.

**PART II:**
**Recent Financial Performance and Events Leading to the Chapter 11 Case**

**A.  Masten Mission 1 Created Significant Liabilities**

50.     Masten submitted its proposal for TO 19C on March 8, 2020. Masten proposed a mission, designated "Masten Mission 1" ("**MM1**"), to complete the requirements of TO 19C for $75.9 million. As originally contracted, MM1 would land at the lunar south pole in December 2022. In February 2022, NASA completed a contract modification to adjust the schedule for TO 19C, shifting the anticipated landing to no later than January 2024.

51.     As more fully set forth herein, Masten was, and may continue to be, a successful company by every qualitative and quantitative measure. Unfortunately, MM1 directly and indirectly lead to numerous costs and liabilities, many of which were unforeseeable due to, among other things, COVID-19 and supply chain problems, that ultimately led to Masten's bankruptcy filing.

**i.  Masten Incurred Greater Costs from Scaling Up**

52.     Masten was a very small company. At the time of the award of TO 19C, Masten had just 14 employees and occupied a total of four buildings at the Mojave Air and Space Port

("**MASP**"). Masten also leased—and continues to lease—test site and launch pad space at MASP for its VTVL rocket launches and other test operations.

53.     Masten had to quickly scale up its workforce and facilities to support MM1. At the time of the award, Masten did not have any clean room facilities, facilities for supporting space mission operations, or facilities appropriate for assembling a spacecraft. Masten also had few, if any, employees with experience building or operating spacecraft.

54.     Masten quickly began to hire employees to scale up its workforce. Masten's efforts to increase its workforce capabilities were significantly hindered by the COVID-19 pandemic. COVID-19 effectively eliminated Masten's ability to conduct in-person interviews and hindered its ability to find staff to work onsite, and Masten was forced to compete for engineering talent in a crowded national market.

55.     To limit the impact of hiring delays and talent shortages, Masten relied heavily on independent contractors and outside consultants to supplement its workforce.

56.     Masten's headcount reached a peak of 97 full time employees in March 2022. Those employees were also supported by numerous contractors.

57.     Perhaps most reflective of the impact this rapid growth had on the company is in viewing how Masten's payroll burdens changed as a result. In April 2020, Masten paid $107,000 in payroll expenses. In March 2022, Masten paid $776,000 in payroll and an additional $89,000 to contractors.

58.     Masten also began work to upgrade its facilities. Masten leased an additional building at MASP ("**Building 86**") to serve as its Mission Operations Center and avionics clean room and an additional plot of land at MASP for the construction of a new Vehicle Assembly Building ("**VAB**").



**Fig. 8**. Masten VAB under construction in Mojave, CA.

59.     In July 2021, Masten also leased an office in Atlanta, Georgia, to support its approximately ten employees in the Atlanta area.

60.     As with payroll costs, a comparison of rent shows the financial impacts of rapid scaling. In April 2020, Masten paid $18,500 in rent for its four buildings and test sites. In June 2022, Masten paid $39,000 in rent for its facilities and test sites and had paid $1,017,463 in construction costs for the new VAB.

61.     Building 86 also required significant renovations to make it suitable for its intended purposes as a mission operations center and clean room. The clean room requirements were initially mis-scoped, resulting in extended delays and substantial costs. It later became apparent that the ceiling and HVAC system had to be replaced and several additional renovations were required for compliance reasons. These issues resulted in further programs delays and cost overruns.

62.     COVID-19 was a major obstacle for these facilities upgrades. Masten did not start construction on the VAB until May 2021, after requirements were finalized. Construction was originally scheduled to be completed in Fall 2021, but was repeatedly delayed and is only now nearing completion.

63. COVID-19 also created significant delays with the local permitting office, which has still not issued final permits for either the VAB or Building 86. These delays have, in turn, delayed MM1 because Masten has not had access to critical facilities.

### iv. Organizational Costs Exceed Revenue, Driven by MMI

64. Going to the Moon is expensive, and no commercial company has ever softly landed a spacecraft on the Moon.[7] Indeed, NASA has not even soft landed a craft on the Moon since Apollo 17 in December 1972.[8]

65. MM1 entailed expenses far greater than any previous Masten Mission. Masten struggled to manage these expenses, at least partly because it lacked experienced project managers, did not have a sophisticated approach to managing expenses or program planning, and was struggling to rapidly scale its workforce and facilities in the midst of a historic pandemic.

66. Masten's bid for TO 19C did not cover the full cost of the mission because Masten believed it could supplement the costs through commercial payload sales. At the time it submitted its proposal, Masten believed it had an arrangement with a commercial customer to fly its payload for a substantial price that would have covered most of the price gap. Unfortunately, that payload was selected to be competed among members of the CLPS pool, and the payload was awarded to another CLPS provider, denying Masten that revenue to defray the expense of the overall mission.

67. MM1's already inadequate budget was further overcome by cost overruns resulting from design changes. In its attempt to meet NASA's aggressive launch timeline, Masten needed to change its initial design to incorporate more advanced technologies and was forced to choose

---

[7] The United States, Soviet Union, China, and India have successfully soft-landed on the Moon. An Israeli company called SpaceIL unsuccessfully attempted a landing with its Beresheet lander in 2019. Beresheet was destroyed when it impacted the lunar surface.

[8] NASA executed an impactor mission in 2009 that deliberately crashed into the lunar surface.

vendors whose quotes committed to the quickest deliveries. One of these design changes required a $10M change to the XL-1 propulsion design (an unexpected additional cost beyond its proposal price), requiring subsequent changes to the structure and avionics. These costs and schedule impacts were compounded by the impacts of COVID-19 on the supply chain.

68.     To date, Masten has spent approximately $40.5 million on procurement for hardware and services for MM1. The company has spent an additional $1.5 million on new facilities and facility upgrades to support MM1. In addition to payments made, Masten has approximately $12 million in accounts payable and contractual commitments for MM1.

69.     In addition to direct procurement expenses, new overhead expenses were added to the organization to support Masten's lunar lander efforts. For example, these expenses included adding overhead staff for marketing and business development, conference sponsorships and attendance, travel for remote workers, IT software and hardware for new employees, and more. To help cover potential revenue gaps to pay for the mission, Masten invested in its business development team to identify and contract commercial payloads to be included on its lander.

70.     By early 2021, it was clear to Masten that the cumulative impacts of COVID-19 necessitated a schedule delay. MM1 could not launch on its original schedule, as neither the XL-1 vehicle nor some of its payloads were on track for a December 2022 launch.

71.     Rescheduling the landing for TO 19C was more complicated than simply launching a few months later. Due to specific requirements at the landing site, which are only present during a short window once per year, any significant delay effectively requires the mission schedule to slip by nearly an entire year.

72.     Masten first began discussions with NASA about changing its contract schedule for TO 19C in early Spring 2021, officially presenting a new proposed schedule in late March 2021.

NASA approved a one-year schedule delay in the summer of 2021, which required an official contract modification to complete.

73.     Although the launch delay gave Masten much needed schedule margin, it also required Masten to support its expanded payroll costs for an additional year, which greatly increased the labor costs associated with MM1.

74.     In July or August 2021, NASA informed Masten that it could submit a COVID-19 Impact Proposal, designed to allow CLPS companies to request funding relief related to cost impacts caused by the COVID-19 pandemic. When Masten signaled it intended to submit a proposal, NASA informed Masten that rather than completing the schedule modification to the contract first, it would handle these two contract modifications in tandem; both the schedule delay and the addition of new COVID-19 relief funds would be part of a single contract modification. Until that modification was finished, Masten was unable to submit invoices for completed program milestones, as they were tied to the new contract schedule rather than the then-current contract. Invoices from September 2021 and December 2021 (approximately $10 million of revenue) were tied to completion of this contract modification.

75.     There was significant internal disagreement within Masten about how to approach the proposal for COVID relief. These internal discussions led to delays in submitting a COVID relief proposal, with Masten not submitting an initial proposal until November 29, 2021. This first proposal was rejected for lack of sufficient documentation, and Masten was invited to submit a new proposal.

76.     Masten submitted its second COVID-19 relief proposal in early December. This proposal was ultimately accepted after review, requests for additional documentation, and further discussion which lasted through early January.

77.     The final contract modification for both the schedule change and additional funding was sent to Masten on February 4, 2022, and the outstanding invoices were received by Masten on February 23, 2022. The delays in the contract modification and ability to invoice led to Masten's first period of non-payment to vendors to conserve funds.

78.     To get the XL-1 spacecraft to the Moon, Masten contracted with SpaceX in July 2020 to provide launch services on one of its launch vehicles (the "**SpaceX Launch Agreement**"). These services would boost Masten's spacecraft out of Earth orbit and into a translunar injection orbit ("**TLI**"), at which point Masten's spacecraft would maneuver itself to a landing site at the lunar south pole. The SpaceX Launch Agreement was Masten's single largest vendor contract for MM1.

79.     When Masten received indications that a schedule slip would be approved in the summer of 2021, it began related discussions with SpaceX about changing its launch services agreement to shift the launch schedule to 2022. The significant delays in completing the TO 19C contract modification had two key impacts: (i) Masten was unable to paper the launch schedule change from 2021 to 2022; and (ii) Masten was unable to pay the full amount of a December 2021 milestone payment to SpaceX.

80.     Unfortunately, due to its adverse financial circumstances, Masten has not been able to catch up on its payments due to SpaceX. As a result, SpaceX officially terminated the launch contract on June 30, 2022, due to Masten's failure to make timely payments.

**v.      Efforts to Raise Capital**

81.     Recognizing the need to raise additional capital to cover the costs of MMI and the facility and payroll costs associated therewith and to continue to grow the company, Masten began to explore the possibility of a new fundraising round in early 2021.

82.     Despite beginning the process in early 2021, the process was severely delayed due to management inaction and an ineffective organizational structure. Masten spent several months attempting to assemble a story deck in advance of hiring an investment banker and corporate counsel for the capital raise. During this process, it became obvious that the company lacked a clear concise strategy that could easily be conveyed to a potential investor. The process of assembling the story deck, which required close interaction from the management team, also revealed critical flaws in the company's flat organizational structure.

83.     After weeks of interviews and pitches with investment banks and law firms, Masten engaged Stifel, Nicolaus & Company ("**Stifel**") to serve as Masten's financial advisor and exclusive financing agent on September 8, 2021, and the law firms of Skadden, Arps, Slate, Meagher & Flom LLP and Gunderson Dettmer to serve as Masten's counsel throughout its fundraising process on September 17 and 21, 2021, respectively.

84.     Based on information received from its advisors and industry comparisons, Masten sought to raise $60 million through a Series C fundraising round.

85.     Masten officially launched its capital raise efforts on November 29, 2021. Stifel marketed Masten to approximately 235 prospective investors. Twenty-two investors requested and executed nondisclosure agreements with Masten to evaluate the opportunity in greater detail.

86.     Masten initially struggled to gain traction with its fundraising efforts, apparently due to market conditions and timing. Masten's timing was particularly poor because it kicked off its efforts between the Thanksgiving and Christmas holidays.

87.     Masten's fundraising efforts also came on the heels of a special purpose acquisition company ("**SPAC**") trend in the space industry. Between April and December 2021, nine space companies went public through SPAC mergers. Private investment in space companies broke

records in 2021,[9] but many investors interested in making substantial investments in space companies had already done so by the time Masten entered the market late in the year.

88.     Masten's fundraising efforts were also hindered by messaging issues. Masten was difficult to categorize: it was not a startup in the conventional sense, as it had existed for over seventeen years and sustained itself on the revenue it generated, but it was not yet an established company. Moreover, Masten's business did not have a clear or strategic focus; it generated the majority of its revenue (but also the bulk of its costs) from MM1, but it also conducted suborbital VTVL and test operations and was engaged in numerous R&D projects.

89.     Despite its initial setbacks and obstacles, Masten ultimately presented its pitch to nine prospective investors. Additional investors met separately with Stifel about the opportunity. Several investors expressed significant interest in Masten, particularly in early 2022, and some stated their intent to invest in the company, but Masten was not able to secure a lead investor to lead the diligence process.

90.     The Board, management team, and Masten's advisors became concerned that the fundraising round would not close in time if a lead investor did not emerge by the end of March 2022.

91.     Masten's Board increased its engagement with the daily operations of the organization to begin to address the management and organizational issues. In January 2022, the Board directed Masten's then-CEO to step back from day-to-day operations. In April 2022, he was formally separated from Masten. During this time, Masten's Executive Chairman stepped into a daily executive leadership role primarily focused on the fundraising efforts.

---

[9] Michael Sheetz, *Investment in Space Companies Hit Record $14.5 Billion in 2021, Report Says*, CNBC (Jan. 18, 2022), available at https://www.cnbc.com/2022/01/18/space-investing-q4-report-companies-hit-record-14point5-billion-in-2021.html.

92.     Around the same time, Masten was approached by another space company ("**Company A**") about a potential acquisition. At some time in March 2022, Company A presented Masten with a letter of intent to acquire Masten, which included an exclusivity provision that prohibited Masten from pursuing other financing or acquisition options for at least one month.

93.     No lead investor emerged in March 2022.

94.     On March 31, 2022, the Board and leadership team convened to determine the best path forward for the company. The Board and leadership team unanimously agreed that the best option at that stage was to pursue an acquisition by Company A.

95.     The Board executed a letter of intent with Company A on March 31, 2022, triggering the exclusivity provision.

96.     Masten and Company A engaged in a thorough diligence process, including: a buildout and review of a comprehensive data room; numerous interviews with Company A's advisors; responses to inquiries from Company A's advisors, outside counsel, and insurance provider; a site visit to Company A's facilities; team integration meetings; and a lengthy meeting between Masten's project and systems leads and Company A's senior technical leadership.

97.     Masten and Company A exchanged a draft stock purchase agreement and comments related thereto in late April 2022.

98.     On April 29, Company A informed Masten that it did not plan to proceed with a deal because of the substantial liabilities recognized to date and additional future projected losses associated with MM1.

99.     On May 1, 2022, Masten representatives met with a representative from Company A to better understand Company A's reasons for pulling out of the deal. Company A's

representative cited excessive liabilities associated with an acquisition of Masten, in particular the vendor costs associated with MM1.

100.    Masten continued to discuss options with Company A but also notified Company A on May 6 that Masten considered the period of exclusivity over.

101.    Following the termination of the exclusivity period, Masten immediately reached out to numerous companies in the space industry about investment and acquisition options. Between May 9 and 11, Masten contacted at least eight other space companies and investment funds. Several of these companies initially expressed interest but all ultimately decided not to move forward. Masten representatives also spoke with several venture capital funds about investment and short-term financing options.

102.    Another space company ("**Company B**") emerged as the most promising option of this group. Masten had multiple meetings with Company B's executive management, and Company B stated an interest in acquiring Masten's assets, including TO 19C. Although Company B expressed some concern about the liabilities associated with MM1, it was receptive to alternative acquisition options, including a Section 363 sale. Company B indicated it had access to the funds needed to acquire Masten and TO 19C. Unfortunately, on May 23, Company B informed Masten that it could not complete the transaction on Masten's short timeline.

103.    Masten continued to pursue all known options for acquisition, including with several new companies. It also explored the possibility of assigning Masten Mission 1 and certain associated subcontracts to another lander provider ("**Company C**"). Masten and Company C completed significant diligence on this transaction, but it ultimately did not move forward, presumably due to Company C's concerns that NASA might not approve a novation agreement for TO 19C.

# PART III:
## The Path Forward

### B. Pre-Petition Steps Taken

104.    In early May 2022, Masten engaged the firm of Gavin/Solmonese to serve as its financial advisor and to provide various services, including advising Masten on turnaround and restructuring options.

105.    Gavin/Solmonese undertook a detailed study of Masten's operations to identify the appropriate process to effect a transaction and the various potential parties to a transaction. Concurrently, Gavin/Solmonese prepared marketing materials that provided an overview of Masten and its operations, intellectual property, key strengths, and investment highlights that potential investors or acquirers should consider when evaluating a transaction.

106.    Gavin/Solmonese developed a broad list of over 800 potential buyers and investors. Gavin/Solmonese began marketing Masten and its assets to those potential buyers, funders, and investors in early June.

107.    Of the over 800 parties contacted, nine executed a confidentiality agreement and began to undertake due diligence. Masten and its professionals established a virtual data room with thousands of documents about Masten's current and past financial and operational performance, legal status and associated issues, and related information. Masten received an indication of interest from one party on June 19, 2022, but the terms of the contemplated offer did not provide Masten a feasible path forward. Conversations with this party continue.

108.    Masten has continued to have investment and acquisition related conversations with several parties throughout the months of June and July to expand the potential pool of parties interested in some or all of its assets.

109.    In mid-June 2022, SpaceX informed Masten that it intended to terminate the SpaceX Launch Agreement but would provide some form of consideration for the amounts paid to date if Masten purchased a new launch contract. Masten's representatives requested that SpaceX memorialize a specific value that could be applied to a future launch and which could be assigned to certain other parties so that Masten would have a marketable asset. SpaceX agreed to this arrangement.

110.    On June 30, 2022, SpaceX sent Masten a notice of termination of the SpaceX Launch Agreement, which also provided an assignable credit (the "**SpaceX Credit**") that could be applied to a new launch contract if assigned to certain parties within the CLPS vendor pool. This enabled Masten to potentially recoup some value from the SpaceX Launch Agreement, but Masten's ability to market the SpaceX Credit was limited to a finite pool of potential purchasers.

111.    Ultimately, Masten was able to reach an agreement for a loan (the "**DIP Loan**") with Astrobotic Technology, Inc. ("**Astrobotic**") by and through which Astrobotic agreed to serve as a postpetition lender that will provide Masten funding for a sale process for substantially all of Masten's assets. Further, Astrobotic has entered into a separate agreement under which Astrobotic will serve as the stalking horse for substantially all of Masten's business. Significantly, as part of this contemplated sale, Astrobotic would purchase the SpaceX Credit  During the Chapter 11 case, Masten intends to pursue acquisition opportunities for any remaining portions of its business.

112.    As Masten continued its negotiations with a potential lender and with potential purchasers, in order to reduce expenditures to allow for more time and runway to reach a sale agreement and DIP loan agreement, Masten laid off 22 employees as of July 1, 2022, and furloughed 56 employees with the intention of bringing them back to full time status before the end of July if financing was secured. The six remaining employees had their salaries significantly

reduced to further manage costs. The furloughed employees have not yet returned to work but are expected to do so if Masten's DIP motion is granted and the requested DIP Credit Facility is made available to Masten.

### C. Post-Petition Path Forward

113.    Masten intends to use this Chapter 11 case to sell substantially all of the company's assets, including the SpaceX launch credit, as a means of funding the company through the sale process. As more fully set forth above, the Debtor has marketed some or all of its programs and assets, and ultimately, after speaking with a number of parties, the Debtor has tentatively entered into a stalking horse agreement with Astrobotic for $4.5 million, which will be subject to a postpetition marketing process and higher and better bids, and ultimately approval by this Court.

**PART IV:**
**<u>The First Day Motions</u>**

114.    I am familiar with the content and substance of the First Day Motions. I believe that the relief sought in each of the First Day Motions is necessary to enable Masten to operate in Chapter 11 with minimal disruption to its business operations and constitutes a critical element in successfully restructuring Masten's business.

115.    In conjunction with their bankruptcy petitions, contemporaneously herewith, Masten filed various motions to be heard at the first day hearing (collectively, the "**First Day Motions**") seeking relief to smooth the entry into Chapter 11. Among other things, the First Day Motions seek authority to, among other things, obtain debtor-in-possession financing and use of cash collateral on an interim basis, honor certain employee-related wage and benefit obligations, pay prepetition accounts payable claims in the ordinary course of business, and ensure the continuation of Masten's cash management systems and other business operations without interruption. The relief requested in the First Day Motions is also necessary to allow Masten to

successfully implement its goals, including prompt sales of the SpaceX Launch Credit and its other assets via Section 363 of the Bankruptcy Code. The First Day Motions include the following:[10]

**a.** **Debtor's Motion for Entry of Order Authorizing Debtor to (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Granting Related Relief**

116. The Debtor seeks pursuant to sections 105, 345, and 363 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 2015-2, the entry of an order authorizing the Debtor, in its discretion, to (a) continue operating the Cash Management System, (b) open a new "DIP Funding Account" (as defined herein), (c) honor and pay the Bank Fees (as defined herein) in the normal course, and (d) maintain existing business forms.

**b.** **Motion of the Debtor for Entry of Interim and Final Orders (A) Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees and (B) Granting Related Relief**

117. In the ordinary course of its business, the Debtor is subject to a wide variety of taxes, including sales and use tax, excise tax, income tax, franchise tax, property tax and any additional taxes, as well as business, permit, license, certification and clearance fees and related expenses (collectively, the "**Taxes and Fees**"). The Debtor pays the Taxes and Fees to various federal, state, local and, occasionally, foreign governments, including taxing, licensing and clearing authorities (collectively, the "**Taxing Authorities**"). On a periodic basis (depending on their nature and incurrence), Masten pays the Taxes and Fees through checks and electronic fund transfers that are processed through its Bank.

---

[10] Masten is not seeking authority at the first day hearing for entry of bid procedures for the sale substantially all of the Debtor's assets, but will file a Motion for entry of bid procedures to be heard at the second hearing in this case. Further, the Debtor will be seeking interim and final authority to approve the DIP Loan (the "**DIP Motion**") which will be the subject of the Declaration of Ted Gavin.

118. The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay the prepetition tax obligations up to $15,000 on an interim basis and up to $15,000 on a final basis. The Taxes and Fees include the following:

    i. Income Taxes. The Debtor incurs federal and various state taxes on the income that it earns (the "**Income Taxes**"). The Income Taxes are remitted to the applicable Taxing Authorities periodically, either quarterly or annually. The Debtor pays the Income Taxes to continue conducting its business in accordance with applicable federal and state law. As of the Petition Date, the Debtor estimates that the aggregate amount of accrued and unpaid Income Taxes is $0.00.

    ii. Property Taxes. The Debtor incurs personal property taxes (the "**Property Taxes**") owed to certain state and local Taxing Authorities. Property Taxes are assessed based on a statutorily mandated percentage of property value and become payable in the ordinary course of business. Property Taxes are typically assessed and become due annually, although the precise timing varies by jurisdiction. To avoid the imposition of statutory liens on its properties, the Debtor seeks authority, but not direction, to pay the Property Taxes in the ordinary course of business. As of the Petition Date, the Debtor estimates that the aggregate amount of accrued and unpaid Property Taxes is approximately $7,800.

    iii. Franchise Tax. The Debtor incurs franchise taxes (the "**Franchise Taxes**") owed to the state of Delaware. Franchise Taxes are typically assessed and become due annually on March 1. To maintain its corporate existence and good standing, the Debtor seeks authority, but not direction, to pay the Franchise Taxes in the ordinary course of business. As of the Petition Date, the Debtor estimates that the aggregate amount of accrued and unpaid Franchise Taxes is approximately $0.00.

119. The Debtor's books and records reflect that it is substantially current with the Taxes and Fees that were due and payable prior to the Petition Date. Nonetheless, after the commencement of this Chapter 11 Case, the Taxing Authorities will continue to invoice the Debtor for Taxes and Fees relating to periods before the Petition Date. The Debtor estimates that approximately $7,800 in Taxes and Fees may be outstanding as of the Petition Date, in addition to other amounts that will become due and owing to the Taxing Authorities after the Petition Date in the ordinary course of business.

120.     The Debtor seeks authority, but not direction, to continue paying all Taxes and Fees, whether arising before or after the Petition Date, to ensure uninterrupted business operations during the sale process and thereafter. The continued payment of the prepetition Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtor's estate. If such obligations are not timely paid, the Debtor's business operations may be suspended by certain licensing authorities and the Debtor will be required to expend time and money to resolve issues related to such obligations. The Debtor seeks the relief requested to minimize the impact that this Chapter 11 Case may have on the Taxing Authorities and avoid unnecessary delay to the Debtor's emergence from bankruptcy.

121.     Moreover, certain of the Taxes and Fees may not be property of the estate, as they are held in trust for payment to various Taxing Authorities. The federal government and states in which the Debtor operates have laws providing that the Debtor's officers, directors or other responsible employees could, under certain circumstances, be held personally liable for the nonpayment of such Taxes and Fees. To the extent that any accrued Taxes and Fees of the Debtor were unpaid as of the Petition Date in these jurisdiction, the Debtor's officers and directors could be subject to lawsuits during the pendency of this Chapter 11 Case. In such event, collection efforts by the Taxing Authorities would be extremely distracting for the Debtor and its directors and officers in their efforts to bring this Chapter 11 Case to an expeditious, successful conclusion.

     **c.**     **Debtor's Motion for Interim and Final Orders (A) Approving Adequate Assurance of Payment for Future Utility Services, (B) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (C) Approving Procedures for Resolving Adequate Assurance Requests, and (D) Granting Related Relief**

122.     The Debtor seeks entry of interim and final orders pursuant to sections 105(a) and 366 of the Bankruptcy Code, and Bankruptcy Rule 6003, the Debtor (a) approving the Proposed

31

Adequate Assurance of payment for future utility services; (b) prohibiting Utility Companies from altering, refusing, or discontinuing services; (c) approving the Adequate Assurance Procedures; and (d) granting related relief.

123.    In connection with the operation of its business, the Debtor obtains various services (collectively, the "**Utility Services**") from approximately eight utility companies (each a "**Utility Company**" and, collectively, the "**Utility Companies**"). Uninterrupted Utility Services are essential to the Debtor's ongoing business operations.

124.    To the best of the Debtor's knowledge, as of the Petition Date, the Debtor was not in defaults or had arrearages on account of the Debtor's undisputed invoices for prepetition Utility Services in connection with the Debtor's active accounts. On average, the Debtor pays approximately $8,094.17 per month month for Utility Services.

125.    The Debtor intends to pay postpetition obligations owed to the Utility Companies in a timely manner, subject to any order approving the Debtor's use of cash collateral and/or any postpetition financing facility, the documentation in respect of any such postpetition financing facility and/or use of cash collateral, and the budget governing any such postpetition financing and/or use of cash collateral. To provide additional assurance of payment, the Debtor proposes to deposit into a segregated account $4,047.09 (the "**Adequate Assurance Deposit**"), which represents an amount equal to approximately one-half of the Debtor's average aggregate monthly cost of Utility Services, and such deposits will be held in the segregated account for the duration of the Chapter 11 Case.

126.    Any Utility Company that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment (each an

"**Adequate Assurance Request**") pursuant to the adequate assurance procedures set forth below

(the "**Adequate Assurance Procedures**"):

(i) Any Utility Company that objects to the Proposed Adequate Assurance must serve an Adequate Assurance Request on: (i) proposed counsel to the Debtor, Morris James, LLP, Attn: Jeffrey R. Waxman (jwaxman@morrisjames.com), 500 Delaware Avenue, Suite 1500, Wilmington, DE 19801 (ii) the Office of the United States Trustee, Attn: Hannah Mufson McCollum (hannah.mccollum@usdoj.gov), 844 King Street, Suite 2207, Wilmington, DE 19801; and (iii) counsel to the DIP Lender, Whiteford Taylor Preston LLP, Attn: David Gaffey (dgaffey@wtplaw.com) and Michael Roeschenthaler (mroeschenthaler@wtplaw.com) (collectively, the "**Notice Parties**").

(i) Any Adequate Assurance Request must: (i) be made in writing; (ii) identify the location for which Utility Services are provided; (iii) include a summary of the Debtor's payment history relevant to the affected account(s), including any deposits or other prepetition security provided; and (iv) explain why the Utility Company believes the Proposed Adequate Assurance is not sufficient adequate assurance of future payment.

(ii) The Debtor is authorized to resolve, in its sole discretion, any Adequate Assurance Request by mutual agreement with a Utility Company and without further order of the Court and, in connection with any such agreement, in its sole discretion, provide a Utility Company with alternative adequate assurance of payment, including cash deposits, payments of prepetition balances, prepayments, or other forms of security, without further order of the Court, if the Debtor believes such alternative assurance is reasonable.

(iii) If the Debtor is unable to consensually resolve an Adequate Assurance Request by mutual agreement within fourteen (14) days of receipt of the Adequate Assurance Request, the Debtor will seek a hearing with the Court (the "**Determination Hearing**") to determine the appropriate amount of adequate assurance required with respect to such Adequate Assurance Request. Pending resolution of such Adequate Assurance Request at the Determination Hearing, the Utility Company shall be prohibited from altering, refusing, or discontinuing services to the Debtor on account of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

(iv) The Utility Companies are prohibited from requiring additional adequate assurance of payment other than pursuant to the Adequate Assurance Procedures.

(v) All Utility Companies who do not file an objection or serve an Adequate Assurance Request shall be: (i) deemed to have received adequate assurance of payment "satisfactory" to such Utility Company in compliance with

section 366 of the Bankruptcy Code; and (ii) forbidden to discontinue, alter, or refuse services to, or discriminate against, the Debtor on account of any unpaid prepetition charges, or require additional assurance of payment other than the Proposed Adequate Assurance.

(vi)     The Debtor may add or remove any Utility Company from the Utility Services List, and the Debtor shall add to or subtract from the Adequate Assurance Deposit an amount equal to one-half of the Debtor's average monthly cost for each subsequently-added or removed Utility Company as soon as practicable. For Utility Companies that are added to the Utility Services List, the Debtor will cause a copy of the order granting this Motion, including the Adequate Assurance Procedures, to be served on such subsequently added Utility Company. Any Utility Company subsequently added to the Utility Services List shall be bound by the Adequate Assurance Procedures.

(vii)    The Debtor submits that the Adequate Assurance Procedures establish a streamlined process for Utility Companies to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtor to continue its business operations uninterrupted.

127.    The Debtor submits that the Adequate Assurance Procedures establish a streamlined process for Utility Companies to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtor to continue its business operations without interruption.

**d.     The Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing the Debtor to (I) Maintain Its Existing Insurance Policies and Pay Prepetition and Postpetition Obligations Related Thereto and (II) Renew, Amend, Revise, Supplement or Purchase New Insurance Policies, (B) Modifying Automatic Stay with Respect to Workers' Compensation Program and (C) Granting Related Relief**

128.    Pursuant to sections 105, 363, 1107(a) and 1108 of title 11 of the United States Code (the "**Bankruptcy Code**"), the Debtor seeks entry of Interim and  Final Orders, (a) authorizing, but not directing, the Debtor to (i) maintain its existing Insurance Policies (as defined below); (ii) pay on an uninterrupted basis, whether arising prior to or after the Petition Date (as defined below), all obligations arising under or in connection with the Insurance Policies, including, but not limited to, premiums, claims, deductibles, taxes, charges, administrative fees,

capital contributions and broker fees (collectively, the "**Insurance Obligations**"); (iii) renew, replace, revise, extend, supplement, change or purchase new insurance coverage, as needed in the ordinary course of business and in the Debtor's business judgment without further order of this Court, after the Petition Date; and (b) modifying the automatic stay, if necessary, to permit the Debtor's employees to proceed with any workers' compensation claims they may have under the Debtor's workers' compensation and employer liability policy (the "**WC Policy**").

129.    The Debtor also requests that the Court (a) authorize and direct all applicable banks and other financial institutions (each a "**Bank**" and, collectively, the "**Banks**"), when requested by the Debtor, to receive, process, honor and pay any and all checks and fund transfers on account of the Insurance Obligations that had not been honored and paid as of the Petition Date, if any, and authorize the Banks to rely on the representations of the Debtor as to which checks and fund transfers should be honored and paid in respect of the Insurance Obligations, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and that any such Bank shall not have any liability to any party for relying on such direction by the Debtor; (b) authorize, but not direct, the Debtor to issue new post-petition checks or effect new post-petition fund transfers to replace any checks, drafts and other forms of payment, including fund transfers, which may be inadvertently dishonored or rejected; and (c) authorize, but not direct, the Debtor to continue in its ordinary course to make payments on account of the Insurance Obligations.

130.    The Debtor maintains many insurance policies, a current list of which is attached to this Motion as Schedule 1 to the motion (each an "**Insurance Policy**" and collectively the "**Insurance Policies**"),  through various insurers (each an "**Insurer**" and together the "**Insurers**") that provide coverage to the Debtor for, among other categories, the following types of liability: business and management, workers' compensation, property, professional liability, aviation

commercial general liability, crime and automobile. The Debtor incurs approximately $93,313 in monthly premiums relating to the Insurance Policies, most of which are prepaid on a monthly basis. The health insurance policies are not financed, but the commercial insurance policies are financed.

131.     The Debtor believes that, as of the Petition Date, the Debtor is substantially current with its Insurance Obligations. Although the Debtor has made an extensive and good faith effort to identify all prepetition Insurance Obligations, certain amounts may have been inadvertently omitted or will come to light in the coming days. Therefore, because the Debtor believes that timely payment of the Insurance Obligations is necessary to ensure continued coverage under the Insurance Policies and to maintain good relationships with the Insurers—which is critical to ensuring the continued availability of insurance coverage and reasonable pricing for future policy periods—the Debtor requests authority to pay, in its sole discretion, any prepetition amounts for the Insurance Policies that are determined to remain outstanding.

132.     Certain of the Insurance Policies require the Debtor to pay a per-incident or per-claim deductible, accrued deductibles and/or retention limits (collectively, "**Deductibles**"). Generally, if a claim is made under the Insurance Policies, the Debtor's applicable administrator or insurance carrier will administer the claim and make payments in connection therewith. The Deductible, if any, is offset against such payments. If the Debtor does not honor the Deductibles, the coverage under the applicable Insurance Policies may lapse to the detriment of the Debtor and its estate. The Debtor seeks authority, but not direction, to continue honoring the Deductibles, whether arising before or after the Petition Date, in the ordinary course of business to ensure uninterrupted coverage under the Insurance Policies and protect the value of the Debtor's estate.

The Debtor estimates that the amount of such pre-petition Deductibles owed during this case will be minimal and does not expect any to come due during the Interim Period.

133. The Debtor believes that, to the extent that any amounts are due on account of any Insurance Policy, it is imperative that any obligations in connection with the Insurance Policies are paid so that the Debtor's insurance does not lapse.

> **e.** **Motion of Debtor for the Entry of Interim and Final Orders Authorizing the Debtor to (A) Pay Wages and Salaries, (B) Honor and Maintain Employee Benefits, and (C) Pay Reimbursable Employee Expenses.**

134. Debtor employs 53 full-time employees, after taking into account certain reductions in force that have been necessary over the past months and days. However, in order to reduce expenditures to allow for more time and runway to finalize entry into an asset purchase agreement and secure debtor in possession financing, Debtor made a series of difficult decisions: reducing salaries, laying off additional employees, and furloughing other employees. Specifically, on July 1, 2022, the Debtor (i) laid off 22 employees, effective that day; (ii) furloughed 52 employees with the intention of bringing them back to full-time status on or around July 28, 2022; and (iii) reduced the salaries of the six remaining employees to $66,560[11] each. Based on the current status of resignations and ending of internships, the Debtor anticipates a return of 47 employees when the current furlough period ends (each an "**Employee**" and, collectively, the "**Employees**").

135. The Debtor currently utilizes its six full-time, non-furloughed employees in the following positions to perform the functions necessary to efficiently and effectively operate the Debtor's business: CTO/President/Founder; Chief Financial Officer; General Counsel; Vice President of Operations; Business Operations Manager, and IT/Information Security Lead.

---

[11] The reduction of the salaries ranged from a 39% reduction to a 62% reduction.

136.     The Employees are full time Employees. No Employees belong to a union nor are subject to any collective bargaining agreements.

137.     To minimize the personal hardships that the Employees will suffer if prepetition employment-related obligations are not paid or honored, to maintain the morale of the Employees during the critical time of this Chapter 11 Case, and to minimize disruptions to the Debtor's ongoing business operations and the administration of the estate, the Debtor, by this Motion, seeks authority in its sole discretion, to: (i) pay unpaid prepetition claims for wages, salaries, and other compensation (collectively, the "**Unpaid Wages**") to the Employees up to the statutory cap of $13,650 per employee; (ii) pay and remit the Withholding Obligations (as defined below) to the proper third parties; (iii) pay any prepetition fees and charges owed to the Payroll Administrators (as defined below); (iv) honor and maintain certain Employee related benefits and programs (as more fully set forth herein) offered by the Debtor (collectively, the "**Benefits**"); (v) reimburse certain business Expense Reimbursement Obligations (as defined below) incurred prepetition; and (vii) pay all costs incidental to the foregoing, as more fully set forth below.

138.     The prepetition accrued amounts that the Debtor is seeking authority to pay are summarized as follows, exclusive of any *di minimis* amounts more fully set forth herein below:

| Wages or Benefits | Amount |
|---|---|
| Wages | $11,885 |
| Withholding Obligations | $950 |
| Expense Reimbursement Obligations | $3,200 |
| Payroll Administrators | $200 |
| Life & Disability Insurance | $0 |
| 401(k) Plan Obligations | $1,170 |

| Wages or Benefits | Amount |
|---|---|
| TOTAL: | $17,405 |

139.     The Debtor requests authority, but not direction, to pay such prepetition amounts on a post-petition basis, provided that no Employee will be paid a total distribution of more than the $13,650 statutory cap, except as otherwise required by applicable non-bankruptcy law.

      **f.     Debtor's Motion for the Entry of Interim and Final Orders Authorizing Debtor to Pay or Honor Prepetition Claims of Critical Vendors**

140.     As more fully set forth above, Masten intends to pursue acquisition opportunities for its business, which includes projects of high value to the U.S. Government and several programs that can be made profitable in the relative near term. The Debtor has a number of parties who are critical to the continuation of those projects.

141.     By the motion for approval to pay certain critical vendors, the Debtor seeks entry of interim and final orders, pursuant to sections 105(a), 362(a), 363(b), 541(a), 1107(a), and 1108 of the Bankruptcy Code, and Bankruptcy Rules 6003 and 6004: (a) authorizing, but not directing, the Debtor to pay, in the ordinary course of business, the prepetition claims of certain Critical Vendors, up to $150,000 in the aggregate on an interim basis prior to the date of a final hearing on the Motion and up to $275,000 in the aggregate (inclusive of the authority approved on an interim basis) on a final basis; (b) authorizing and directing the applicable banks and financial institutions to honor all related checks and electronic payment requests; and (d) granting related relief.

142.     Masten believes that this Case and the strategy outlined above represent the best and only way to provide a meaningful return to Masten's creditors and to maintain Masten's mission to deliver on its important U.S. Government contracts and serve its creditors, vendors, customers, and employees. Masten respectfully requests that the First Day Motions be granted,

that a hearing to consider the proposed Bidding Procedures Order be scheduled within twenty days of the Petition Date, and that the Court provide such other and further relief as is just and proper.

143.    For the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of this Case, I respectfully request that each of the First Day Motions be granted, together with such other and further relief as this Court deems just and proper.

Executed this 10th day of August, 2022.

David Masten
Founder and Chief Technology Officer