## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MASTEN SPACE SYSTEMS, INC.,[1] | Case No. 22-10657 (BLS) |
| Debtor. | |

## MOTION OF THE DEBTOR AND DEBTOR-IN-POSSESSION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING USE OF CASH COLLATERAL, (C) GRANTING LIENS AND SUPERPRIORITY CLAIMS, AND (D) GRANTING RELATED RELIEF

Masten Space Systems, Inc. (the "Debtor" or "Masten"),[2] hereby files this motion (the "Motion") for the entry of an interim order (the "Interim DIP Order") and a final order (the "Final DIP Order") authorizing the Debtor to obtain postpetition financing in accordance with the Superpriority Senior Secured Debtor-In-Possession Term Credit Facility Credit Agreement between the Debtor and Astrobotic Technology, Inc. or its designee ("Astrobotic" or the "DIP Lender"), a copy of which is attached hereto as **Exhibit 1** (the "Credit Agreement") in the principal amount of $1,400,000, including $600,000 on an interim basis, pursuant to sections 105(a), 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (a) to obtain postpetition financing in the form of the DIP Credit Facility (defined below), as such relief is more particularly described herein, (b) to use cash

---

[1] The Debtor's mailing address is 1570 Sabovich St, Mojave, CA 93501. The last four digits of the Debtor's federal tax identification number is 7098.

[2] All capitalized terms not otherwise defined in this section shall have the meaning ascribed to same in the Credit Agreement.

collateral pursuant to sections 362 and 363, (c) granting liens and superpriority claim, (d) modifying the automatic stay, (e) scheduling a final hearing, and (f) granting related relief.

In support of this Motion, the Debtor relies upon the Declaration of David Masten in Support of First Day Motions and Related Relief (the "Masten Declaration"), and the Declaration of Edward T. Gavin, CTP, In Support of Motion of the Debtor and Debtor-In-Possession for Interim and Final Orders (A) Authorizing Debtor to Obtain Postpetition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Liens and Superpriority Claims, and (D) Granting Related Relief (the "Gavin Declaration," and together with the Masten Declaration, the "Declarations"), and the first day pleadings (the "First Day Pleadings"), all of which are being filed substantially contemporaneously herewith and incorporated by reference as if set forth herein, and in further support of this Motion, the Debtor respectfully state as follows:

**JURISDICTION, VENUE, AND STATUTORY PREDICATE**

1.    On July 28, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing this case (the "Chapter 11 Case"). The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

2.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtor confirms its consent pursuant to Local Rule 9013-l(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13735707/2

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 4001 and 9014, and Local Rule 4001-2.

## BACKGROUND

5.      Masten is a rocket and spacecraft company headquartered in Mojave, California. It has gained a strong reputation within the space industry as an innovator and pioneer in rocket technologies. Masten's current business can be roughly divided into three units: vertical takeoff and vertical landing ("VTVL") rockets, research and development ("R&D"), and lunar landers.

6.      As more fully set forth in the Masten Declaration, Masten has won a number of prizes and government contract awards in connection with its developing, building, and flying reusable suborbital vertical takeoff and landing rocket vehicles.

7.      As of the Petition Date, Masten has flown over 600 successful VTVL flights across five different rocket vehicles—more than any other company in the industry.   Outside of VTVL flights, Masten has historically supplemented its revenue through a robust, diverse R&D program. Masten has a number of projects in development and is party to a number of contracts that are expected to be profitable.

8.      Most of Masten's current R&D work has progressed beyond the preliminary proof-of-concept phase and is well into concept refinement.  Several Masten programs are ready to move into a commercialization phase, including its NITE™ metal oxidation warming system ("MOWS"), PermiAM ™ additive manufacturing technology, and electric pump.

9.      Masten's R&D has generated an intellectual property portfolio that includes one issued patent and six pending patent applications.  Licensing opportunities have been identified

for several of these patented or patent-pending technologies, both within the space industry and in other industries.

      a.     **MM1- The Lunar Landing Contract**

     10.     On April 8, 2020, following a successful bid, NASA issued Task Order 19C ("<u>TO 19C</u>") to Masten. Under this task order, NASA contracted Masten to deliver a suite of NASA-sponsored payloads to the lunar south pole.  The lunar south pole is a location of high interest to NASA and others because of the expected presence of water ice and its potential for human settlement.

     11.     Masten proposed a mission, designated "Masten Mission 1" ("<u>MM1</u>"), to complete the requirements of TO 19C for $75.9 million.  As originally contracted, MM1 would land at the lunar south pole in December 2022.   In February 2022, NASA completed a contract modification to adjust the schedule for TO 19C, shifting the anticipated landing to no later than January 2024. As more fully set forth in the Masten Declaration, Masten was, and may continue to be, a successful company by every qualitative and quantitative measure. Unfortunately, MM1 directly and indirectly created numerous costs and liabilities, many of which were unforeseeable due to, among other things, COVID-19 and supply chain problems, that ultimately led to Masten's bankruptcy filing.

      b.     **The SpaceX Launch Agreement and SpaceX Credit**

     12.     To get Masten's spacecraft to the Moon, Masten contracted with Space Exploration Technologies Corp. ("<u>SpaceX</u>") in July 2020 to provide launch services on one of its launch vehicles (the "<u>SpaceX Launch Agreement</u>").  These services would boost Masten's spacecraft out of Earth orbit and into a translunar injection orbit ("<u>TLI</u>"), at which point Masten's spacecraft

13735707/2

would maneuver itself to a landing site at the lunar south pole. The SpaceX Launch Agreement was Masten's single largest vendor contract for MM1.

13.     When Masten received indications that a schedule slip would be approved in the summer of 2021, it began related discussions with SpaceX about changing its launch services agreement to shift the launch schedule to 2022. The significant delays in completing the TO 19C contract modification had two key impacts on Masten's inability to paper the launch schedule change from 2021 to 2022 and Masten's inability to pay the full value of a December 2021 milestone payment to SpaceX. Unfortunately, Masten was not able to catch up on its payments due to SpaceX.

14.     In mid-June 2022, SpaceX informed Masten that it intended to terminate the SpaceX Launch Agreement (due to Masten's failure to make timely payments) but would provide some form of consideration for the amounts paid to date if Masten purchased a new launch contract. Masten's representatives proposed a more formal arrangement in which SpaceX would document a specific value that could be applied to a future launch, which amount could be assigned to certain other parties, so that Masten would have a marketable asset in order to recover the value of that credit for the benefit of Masten's creditors. SpaceX agreed to this arrangement.

15.     On June 30, 2022, SpaceX sent Masten a notice of termination of the SpaceX Launch Agreement, which also provided an assignable credit (the "SpaceX Credit"). The Space X Credit is structured such that it can be applied to a new launch contract if it is assigned to certain specified parties. Accordingly, this enabled Masten to potentially recoup some value from the SpaceX Launch Agreement, but the ability to market the SpaceX Credit is limited to a finite pool of potential purchasers.

### c.    The Debtor's Prepetition Indebtedness and Status of Operations

16.    As of the Petition Date, Masten owed creditors a total of approximately $16 million all of which are unsecured other than one prepetition creditor, Agile Space Industries, Inc. ("Agile"),[3] which has asserted a security interest.[4]

17.    As Masten continued its negotiations with a potential DIP lender and a potential stalking horse, in order to reduce expenditures to allow for more time and runway to finalize a sale agreement and secure a DIP loan, Masten laid off 22 employees as of July 1, 2022, and furloughed 56 employees with the intention of bringing them back to full time status before the end of July if financing was secured. The six remaining employees had their salaries significantly reduced to further manage costs. The furloughed employees have not yet returned to work but are expected to do so if this Motion is granted and the requested DIP Credit Facility is made available to Masten.

### d.    Proposed Sale of the SpaceX Credit

18.    After discussing the launch credit with the potential assignees, on or about August 8, 2022, Masten entered into a tentative agreement to assign the SpaceX Credit to Astrobotic.

---

[3] Agile filed a UCC financing statement on July 19, 2022, and its security interest is subject to avoidance as a preferential transfer pursuant to section 547 of the Bankruptcy Code. The Debtor has conferred with Agile's counsel, and Agile has no opposition to the proposed financing sought by and through this Motion. Further, Agile has agreed that the UCC-1 Financing Statement filed by Agile on or about July 22, 2022, is hereby terminated, without any need for any further action to be taken by Agile. Agreed-upon language is contained in the Interim DIP Order.

[4] There is another prepetition creditor, Nuspace, Inc. ("Nuspace"), who filed an Ex Parte Application for Right to Attach Order and for Writ of Attachment in the Superior Court of California, County of Kern Bakersfield Division and through which it sought "an order prohibiting a transfer by Masten of any of its personal property, inventory, money, instruments, negotiable instruments of title, equipment, and general intangibles and any other property subject to a lien of attachment in California." The Debtor understands that on June 29, 2022, Nuspace obtained a prejudgment temporary protective order which precludes Masten from disposing of the proceeds "of any transfer of inventory or farm products held for sale except under" (the "Prejudgment Attachment"). Even if the Prejudgment Attachment was entered, the creditor does not have a security interest, and any such interest is a navoidable transfer pursuant to section 547 of the Bankruptcy Code. Further, the continued sequestration of any assets of the Debtor constitutes a violation of the automatic stay. Copies of the Debtor's chapter 11 petition and related "first day" motions are being sent to Nuspace, which is one of the Debtor's twenty largest prepetition unsecured creditors.

Although Astrobotic was willing to serve as a stalking horse bidder for the SpaceX Credit, Masten needed to obtain postpetition financing.

### e.    The Debtor's Search for Postpetition Financing

19.    As more fully set forth in the Gavin Declaration, in addition to the parties that Gavin/Solmonese contacted with respect to being a stalking horse purchase for the SpaceX Credit, Gavin/Solmonese contacted more than sixty additional parties to solicit their interest in providing postpetition financing.  Substantially all of those potential lenders would not agree to provide a postpetition loan to Masten.  As more fully set forth in the Gavin Declaration, Mr. Gavin's understanding from speaking with the potential lenders is that there was limited interest because of (i) the small size of the loan, (ii) the short duration of the loan, and (iii) the non-traditional collateral for the loan.

20.    Ultimately, the Debtor reached an agreement with a potential lender for postpetition financing in the amount of $1,100,000 (with an initial $600,000 to be funded on an interim basis) to the Debtor (the "DIP Credit Facility") that would have allowed the Debtor to continue to operate in the normal course on a postpetition basis and would provide sufficient liquidity to pay the administrative costs through the sale of the SpaceX Credit in accordance with an approved budget, which is attached hereto as **Exhibit 2** (the "DIP Budget").

21.    The proposed postpetition financing was premised upon the need for the Debtor to enter into a noncontingent agreements for the sale of the SpaceX Credit, as well as other assets of the Debtor's estate in an aggregate amount of $4 million, pursuant to asset purchase agreements that were expressly subject to the lender's approval of terms and conditions to the asset purchase agreement.  Unfortunately, based upon conversations that the Debtor had with the anticipated lender and Astrobotic, it appeared unlikely that the Debtor would be able to reach an agreement

with Astrobotics for the purchase of substantially all of the Debtor's assets that would be satisfactory to the anticipated lender.

22.     Ultimately, the Debtor was able to reach an agreement with Astrobotic, by and through which it agreed to be the stalking horse (the "Stalking Horse APA") to purchase substantially all of the Debtors' assets, and Astrobotic agreed to serve as the lender under a postpetition credit facility (the "DIP Credit Facility") that would enable the Debtor to continue marketing its assets through a sale process during the bankruptcy.   Additionally, the DIP Credit Facility seeks fees and expenses that are significantly less expensive that what the originally anticipated lender had sought from the Debtor in exchange for providing financing to the Debtor through the sale process.

23.     The DIP Lender is not an "insider" of the Debtor, as that term is defined in section 101 of the Bankruptcy Code.  Further, the DIP Credit Facility and the Stalking Horse APA were the product of arm's-length negotiations between the parties.

24.     Based on the facts and circumstances of the case, the Debtor believes, as a sound exercise of its business judgment, that the DIP Credit Facility and consensual use of cash collateral represents the best (and likely only) financing option available under the circumstances, particularly given the duration and amount of the proposed loan and the Debtor's assets.

25.     Therefore, the Debtor believes that, under the circumstances: (a) no alternative reasonable and actionable debtor-in-possession financing would be available to the Debtor on economic terms more favorable than those of the proposed DIP Credit Facility; (b) the terms of the proposed DIP Credit Facility are customary for this type of financing; and (c) access to the DIP Credit Facility and the consensual use of cash collateral is necessary for the Debtor to continue to

operate its business during the Chapter 11 Case and to fund chapter 11 administrative expenses in accordance with the DIP Budget.

26.     It is also the Debtor's belief, as a sound exercise of its business judgment, that the economic terms of the DIP Credit Facility are superior to customary terms for debtor-in-possession financings of this type, particularly considering the length of the duration, the amount of the proposed loan, and the collateral to be received under the loan.

> **f.     Summary of the Material Terms of the Approval of the Credit Agreement to be Approved**

27.     As more fully set forth in the Gavin Declaration, the Debtor negotiated the Credit Agreement with the DIP Lender at arm's-length.  Pursuant to and in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Bankruptcy Rule ("Local Rule") 4001-2, the material provisions of the DIP Credit Facility,[5] and the location of such provisions in the relevant source documents, are as follows:

| | |
|---|---|
| **The Debtor**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Credit Agreement, p.1 | Masten Space Systems, Inc. |
| **DIP Lender**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Credit Agreement, p .1 | Astrobotic Technology, Inc. or its respective assigns. |
| **Commitment/Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>Credit Agreement, p .1<br><br>Interim DIP Order, ¶2(b) | $1,400,000 on a final basis, with up to $600,000 to be provided on an interim basis |

---

[5] The following is a summary.  In the event of a conflict between the Credit Agreement and this summary, the terms of the Credit Agreement shall control.

13735707/2

| | |
|---|---|
| **Collateral**<br><br>Credit Agreement, p. 5<br><br>Interim DIP Order, Preamble 4(b) | Collateral shall include all presently owned or hereafter acquired assets and property of the Debtor and its chapter 11 estate of any nature or type whatsoever, whether real or personal, tangible or intangible, or otherwise, and any and all proceeds therefrom, including, without limiting the generality of the foregoing, all cash, accounts, accounts receivable, inventory, property, plant and equipment, real estate, leaseholds, intellectual property, general intangibles, personal property, commercial tort claims, all intercompany claims, any and all proceeds arising from insurance policies (including, without limitation, policies for the benefit of directors and officers of the Debtor (collectively, "<u>D&O Insurance Policies</u>")), all claims and causes of action of the Debtor or its estate and any and all proceeds therefrom; provided, that, subject to entry of the Final DIP Order.<br><br>The collateral shall include proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. |

| | | |
|---|---|---|
| **Milestones**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Credit Agreement, Annex A | Filing of the following<br><br>(a)    The DIP Motion<br><br>(b)    all other "first day" papers. | By no later than August 10, 2022 |
| | Filing of the Sale Motion | On or prior to August 12, 2022 |
| | Entry by the Bankruptcy Court of the Interim DIP Order | On or prior to August 15, 2022 |
| | Entry by the Bankruptcy Court of the Bid Procedures Order | On or prior to August 26, 2022 |
| | Entry by the Bankruptcy Court of the Final DIP Order | On or prior to twenty-five days after the entry of the Interim DIP Order |
| | Bid Deadline | September 2, 2022 |
| | Auction, in accordance with the Bid Procedures | On or prior to September 6, 2022 |
| | Hearing on the Sale Motion (the "<u>Sale Hearing</u>") and entry by the Bankruptcy Court of the Sale Order | On or prior to September 8, 2022 |
| | Closing of the Sale | September 9, 2022 |

10

| Interest Rates Interest, Fees and Expenses | Interest Rate: |
|---|---|
| | Twelve percent (12%) per annum. |
| Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c) | Default Interest Rate: |
| | six percent (6%) above the interest rate applicable immediately prior to the occurrence of an Event of Default. |
| Credit Agreement, pp 3-5 | |
| | Closing Fee |
| | A fee equal to One Hundred Thousand Dollars ($100,000.00) shall be fully earned by DIP Lender on the date the Interim DIP Loan is paid to the Debtor and shall be payable to DIP Lender on the Maturity Date. |
| | Commitment Fees |
| | An initial commitment fee equal to Seventy-Five Thousand Dollars ($75,000.00) shall be fully earned by DIP Lender on the date of entry of the Interim DIP Order and shall be payable to DIP Lender on the Maturity Date (the "Initial Commitment Fee").  A final commitment fee equal to Seventy-Five Thousand Dollars ($75,000.00) shall be fully earned by DIP Lender on the date of entry of the Final DIP Order and shall be payable to DIP Lender on the Maturity Date (the "Final Commitment Fee," and, with the Initial Commitment Fee, the "Commitment Fees"). |
| | Exit Fee |
| | A fee equal to One Hundred Thousand Dollars ($100,000.00) shall be fully earned by DIP Lender on the date on which the Bankruptcy Court enters the Interim DIP Order and shall be payable to DIP Lender on the Maturity Date (the "Exit Fee"). |
| | DIP Fees |
| | The aggregate of the Closing Fee, the Commitment Fees, and the Exit Fee. |
| | DIP Lender Expenses |
| | The Debtor shall reimburse DIP Lender for all reasonable out-of-pocket costs and expenses incurred in any way related to or in connection with the due diligence, documenting, and closing of the DIP Credit Facility, the enforcement thereof, and the collection of all DIP Obligations, including, without limitation, costs, fees, and expenses of counsel (including, without |

| | |
|---|---|
| | limitation, Delaware counsel) and any other third-party expenses, including, without limitation, advisory fees, consulting fees, audits or valuations of the Collateral, lien searches, and filing fees (collectively, the "DIP Lender Expenses"); provided, however, that the amount of DIP Lender Expenses required to be reimbursed by the Debtor hereunder for amounts incurred shall not exceed One Hundred Thousand Dollars ($100,000.00), which limitation shall not apply to DIP Lender Expenses incurred related to (i) responding to an action or inaction that DIP Lender reasonably believes will be lead to an Event of Default; (ii) an Event of Default that has occurred; or (iii) any exercise of Remedies Upon Event of Default. |
| | Subject to the cap set forth in the paragraph above, whether or not the DIP Credit Facility is consummated, DIP Lender shall have the right to reimbursement of all DIP Lender Expenses as an administrative expense of the Debtor's chapter 11 estate pursuant to section 503(b) of the Bankruptcy Code, and The Debtor hereby acknowledges and agrees that such amount shall constitute an administrative expense of The Debtor's estate. |
| **Term/Maturity**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>Credit Agreement, pp. 5-6 | The DIP Loans shall mature on the earliest to occur of the following or as set forth under "Mandatory Prepayment" herein with respect to the amounts set forth therein (such date, the "Maturity Date"):<br><br>(i)    sixty (60) calendar days after the entry of the Interim DIP Order (the "Outside Date");<br><br>(ii)    twenty-five (25) calendar days after the Petition Date if the Final DIP Order has not been entered;<br><br>(iii)    the date upon which the Bankruptcy Court enters an order approving financing between the Debtor and a person or entity other than DIP Lender;<br><br>(iv)    the closing of any sale of any of the Debtor's assets in accordance with section 363(b) of the Bankruptcy Code that indefeasibly satisfies the DIP Obligations in full; |

12

| | | |
|---|---|---|
| | (v) | the "substantial consummation" (as defined in section 1101 of the Bankruptcy Code and which, for purposes hereof, shall be no later than the effective date of a confirmed chapter 11 plan) of a chapter 11 plan in the Chapter 11 Case; |
| | (vi) | the date upon which the acceleration of any of the DIP Loans or the termination of the commitments to make the DIP Loans occurs following an Event of Default; |
| | (vii) | the filing of a motion by the Debtor seeking dismissal of the Chapter 11 Case, the dismissal of the Chapter 11 Case, the filing of a motion by the Debtor seeking to convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; and |
| | (viii) | the Debtor's failure to use its best efforts to contest, object to, or seek withdrawal of any motion by any person or entity seeking to convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. |
| **Use of DIP Credit Facility**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br><br>Credit Agreement, ¶ 5.18(c)<br><br>Interim DIP Order, ¶ 2 | The Debtor shall use the of the DIP Loans in accordance with the DIP Budget (subject to any permitted budget variances) and the Orders entered in connection with the Chapter 11 case exclusively. | |
| **Borrowing Conditions**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>Credit Agreement, pp. 7-8 | The obligations of DIP Lender to make the Interim DIP Loan or the Final DIP Loan are subject to satisfaction, or waiver by DIP Lender, of the following conditions precedent: | |
| | (ix) | execution and delivery by the Parties of the DIP Documentation, satisfactory in form and substance to DIP Lender; |

(x)     no Event of Default shall have occurred and, to the extent allowed to be cured under the DIP Documentation, be continuing;

(xi)    the applicable Chapter 11 Milestones shall have been satisfied by the applicable Specified Deadline;

(xii)   the Interim DIP Order or the Final DIP Order, as applicable, shall have been entered by the Bankruptcy Court and shall not have been reversed, modified, amended, stayed, or vacated, or, in the case of any modification or amendment, without the consent of DIP Lender and the Borrower shall not have sought such relief;

(xiii)  The Debtor shall be in compliance in all respects with the Interim DIP Order or the Final DIP Order, as applicable;

(xiv)   The Debtor shall have implemented, with Bankruptcy Court approval, a cash management system reasonably acceptable to DIP Lender;

(xv)    The Debtor shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the Collateral in such amounts and scope as is acceptable to DIP Lender, and DIP Lender shall have received additional insured and loss payee endorsements, as applicable, with respect thereto, in form and substance reasonably acceptable to DIP Lender;

(xvi)   DIP Lender shall have received the results of a recent lien, tax, and judgment search in each relevant jurisdiction with respect to the Debtor, and such search shall reveal no liens on any of the assets of the Debtor other than Permitted Liens;

(xvii)  no Event of Default shall have occurred and be continuing on the Interim Closing Date or the Final Closing Date, as applicable, or

14

|  | after giving effect to the Interim DIP Loan or the Final DIP Loan, as applicable; |
|  | (xviii)  A motion seeking approval of the Astrobotic APA shall have been filed with the Bankruptcy Court, and such motion shall not have been withdrawn by Borrower or denied by the Bankruptcy Court; |
|  | (xix)  subject to Bankruptcy Court approval, (i) the Debtor shall have the corporate power and authority to make, deliver, and perform its obligations under the DIP Documentation, and (ii) no consent or authorization of, or filing with, any person or entity (including, without limitation, any governmental unit) shall be required in connection with the execution, delivery, or performance by the Debtor, or for the validity or enforceability in accordance with its terms against the Debtor, of the DIP Documentation except for consents, authorizations, and filings that shall have been obtained or made and are in full force and effect and except for such consents, authorizations, and filings, the failure to obtain or perform, could not be reasonably expected to cause a Material Adverse Change; and |
|  | (xx)  since the Petition Date, there shall not have been any material adverse change, individually or in the aggregate, in the validity or enforceability of any of the DIP Documentation, the DIP Loans, the DIP Liens, or the rights and remedies of DIP Lender under the DIP Documentation, or in the operations, assets, revenues, financial condition, profits, or prospects of the Debtor, taken as a whole (other than as a result of the filing of the Chapter 11 Case or the assertion of prepetition claims against the Debtor) (a "<u>Material Adverse Change</u>"). |
| **Approved Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Budget contains project of sources and uses of cash for the Debtor for the six (6) calendar weeks following the Petition Date, including the anticipated |

| | |
|---|---|
| Credit Agreement, p. 2-3<br><br>Interim DIP Order, ¶ 2 | uses for the advances for each week during such period, which is subject to DIP Lender's review and approval in form and substance on a line-by-line-basis. The DIP Budget shall be subject to certain variances. |
| **Other Covenants**<br><br>Credit Agreement, pp. 10-12 | No later than two (2) business days after the end of the part or whole of the work week following the Petition Date, the Debtor shall deliver to DIP Lender a variance report in form and substance acceptable to DIP Lender showing comparisons of actual results for each line item against such line item in the DIP Budget (a "<u>Variance Report</u>"). Thereafter, the Debtor shall deliver to DIP Lender, by no later than two (2) business days after the close of each weekly period after the Petition Date, a Variance Report for the trailing four (4) week period (or, if fewer than four weeks have lapsed since the Petition Date, then for the trailing one, two, or three week period, as applicable). |
| **Liens and Superpriority Claims** Bankruptcy<br><br>Rule 4001(c)(1)(B)(i), (xi); Local Rule 4001-2(c)<br><br><br>Credit Agreement, pp 4-5<br><br>Interim DIP Order, ¶¶ 3, 4 | All liabilities and obligations of the Debtor to DIP Lender under or in connection with the DIP Documentation, including, without limitation, the DIP Loans, Interest, the DIP Fees, and the DIP Lender Expenses (collectively, the "<u>DIP Obligations</u>") shall be:<br><br>(i)    pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Case with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kinds specified in or arising or ordered under sections 105, 326, 328, 330, 331, 364, 503, 503, 506, 507, 546, 726, 1113, or 1114 of the Bankruptcy Code (the "<u>DIP Facility Superpriority Claims</u>");<br><br>(ii)    pursuant to sections 364(c)(2), secured by a perfected first- priority lien on the Collateral, to the extent that such Collateral is not subject to valid, perfected, and non-avoidable liens as of the Petition Date (the "<u>Senior DIP Liens</u>");<br><br>(iii)    pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected junior lien on the Collateral, to the extent that such Collateral is subject to valid, |

perfected, and non-avoidable liens in favor of third parties in existence as of the Petition Date, or to valid liens in existence as of the Petition Date that are (a) perfected subsequent to such date as permitted by section 546(b) of the Bankruptcy Code and (b) to the extent such liens are expressly permitted in writing by DIP Lender (the "Second Priority DIP Liens"); and

(iv)     pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected first priority, priming and senior security interest and lien granted to DIP Lender on the Collateral over all existing liens, rights and interests granted to or for the benefit of any existing prepetition secured creditors of Borrower (the "Priming DIP Liens").

The Priming DIP Liens and the Senior DIP Liens shall not be subject to being treated *pari passu* with or subordinated to any other liens or security interests (whether currently existing or hereafter created), subject in each case only to permitted exceptions to be expressly agreed upon in writing by DIP Lender or imposed by applicable non-bankruptcy law (the items set forth in clause (i)-(iv), collectively, the "Permitted Liens"). All liens granted in this Credit Agreement shall be automatically perfected without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action to validate or perfect (in accordance with applicable non-bankruptcy law) the liens granted herein or to entitle the DIP Lender to the priorities granted herein.

| | |
|---|---|
| **Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii); Local Rule 4001-2(c)<br><br>Credit Agreement, ¶5.18<br><br>Interim DIP Order, ¶¶ 2, 4 | Nothing in the Credit Agreement limits the Debtor's use of cash collateral, other than permitting the DIP Lender to set-off any amounts held as cash collateral (including, without limitation, in any cash collateral account held for the benefit of DIP Lender) in the event of default |
| **Carve-Out**<br><br>Local Rule 4001-2(b)(6) and (c) | None |
| **Waivers under Sections 506(c) and 552(b) and the Equitable Doctrine of Marshaling.**<br><br>Credit Agreement, p. 15<br><br>Interim DIP Order, ¶ 7__ | No administrative costs or expenses shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code<br><br>Subject to entry of the Final DIP Order, the "marshalling" doctrine and the "equities of the case" exception set forth in section 552(b) of the Bankruptcy Code are waived. |
| **Determination Regarding Prepetition Claim; Stipulations of the Debtor, Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | None. Inapplicable. |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii) | None |

| | |
|---|---|
| **Waiver or Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Credit Agreement, p. 15<br><br>Interim DIP Order, ¶ 16 | The automatic stay of section 362 of the Bankruptcy Code shall be modified to the extent necessary to effectuate the provisions of the DIP Orders |
| **Release, Waivers or Limitation on any Claim or Cause of Action**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii); Local Rule 4001-2(b)(3)<br><br>Credit Agreement, p. 16. | The Debtor, for itself and for its current and former employees, directors, officers, managers, members, partners, owners, shareholders, affiliates, and successors and predecessors in interest, agents, representatives, professionals, advisors, consultants, accountants, and legal advisors and attorneys forever and irrevocably release, discharge, and acquit DIP Lender and its current and former employees, directors, officers, managers, members, partners, owners, shareholders, affiliates, and successors and predecessors in interest, agents, representatives, professionals, advisors, consultants, accountants, and legal advisors and attorneys, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type related to actions taken or omissions in its capacity as DIP Lender under the DIP Documentation arising at any time prior to the date of entry of the DIP Orders, including, without limitation, all claims and causes of action arising under chapter 5 of the Bankruptcy Code. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>Credit Agreement, pp. 13-14<br><br>Interim DIP Order, ¶ -16_ | Each of the following shall be deemed an event of default under the DIP Credit Facility (collectively, "Events of Default"):<br><br>(i) the failure of any of the Chapter 11 Milestones to be satisfied timely;<br><br>(ii) the failure by the Debtor to be in compliance in all respects with any provision of the DIP Documentation (including, without limitation, the covenants specified in "DIP Budget and Variance Reports," "Affirmative Covenants," or "Negative Covenants" herein) or a breach of any of the "Representations and Warranties"; |

19

|  | (iii) | the reversal, modification, amendment, stay, or vacatur of the Interim DIP Order or the Final DIP Order, as applicable, as entered by the Bankruptcy Court, without the prior written consent of DIP Lender; |
|  | (iv) | the failure of the Interim DIP Order to be entered on or before August 15, 2022; |
|  | (v) | the filing with the Bankruptcy Court of a chapter 11 plan of reorganization or liquidation in the Chapter 11 Case that does not provide for indefeasible payment in full in cash to DIP Lender of all of the DIP Obligations on the effective date of such plan; |
|  | (vi) | the appointment in the Chapter 11 Case of: a responsible officer with enlarged powers relating to the operation of the business of the Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code); a trustee; a receiver; or an examiner; |
|  | (vii) | the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or person or entity in the Chapter 11 Case; |
|  | (viii) | the failure to pay any amounts due and owing to DIP Lender under, in respect of, or in connection with the DIP Credit Facility; |
|  | (ix) | the ceasing of any provision in the DIP Documentation to be binding on or enforceable against the Parties; and |
|  | (x) | the occurrence of a default by Borrower under the Astrobotic APA, which default is not timely cured by any applicable cure period, and |
|  | (xi) | the termination by any counterparty of any material contract that would constitute a Material Adverse Change or the termination |

| | by any party of any Stalking Horse Agreement. |
|---|---|
| **Remedies Upon Event of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>Credit Agreement, pp. 14-15<br><br>Interim DIP Order, ¶ 17 | Upon the occurrence and during the continuance of any Event of Default, subject to three (3) business days' written notice to the Debtor and an opportunity to seek an expedited hearing before the Bankruptcy Court (at which hearing the sole issue shall be limited to whether or not an Event of Default has occurred), DIP Lender may take all or any of the following actions without further order of or application to the Bankruptcy Court or any other court without interference from the Debtor or any other person or entity, and notwithstanding the automatic stay<br><br>(i)    declare any or all of the DIP Obligations to be immediately due and payable;<br><br>(ii)    terminate any further commitment to lend to the Debtor;<br><br>(iii)    set-off any amounts held as cash collateral (including, without limitation, in any cash collateral account held for the benefit of DIP Lender); or<br><br>(iv)    take any other action or exercise any other right or remedy (including, without limitation, with respect to the DIP Liens, and all or any portion of the Collateral) permitted under the DIP Documentation or under applicable law, including, without limitation, exercising any and all rights and remedies with respect to the Collateral or any portion thereof. |
| **Indemnification; Exculpation**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix)<br><br>Credit Agreement, p. 16<br><br>Interim DIP Order, ¶ 14 | DIP Lender and its current and former employees, directors, officers, managers, members, partners, owners, shareholders, affiliates, and successors and predecessors in interest, agents, representatives, professionals, advisors, consultants, accountants, and legal advisors and attorneys (each, an "<u>Indemnified Party</u>") have no liability for, and will be indemnified by the Debtor and held harmless against, any loss, liability, cost, or expense incurred in respect of the DIP Loans or the use or the proposed use of proceeds thereof; <u>provided that</u> the Debtor has no obligation to indemnify |

any Indemnified Party against any such loss, liability, cost, or expense to the extent such Indemnified Party is found by a final judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of such Indemnified Party. DIP Lender shall not be responsible or liable to the Debtor or any other person or entity for consequential or punitive damages

The Debtor, for itself and for its current and former employees, directors, officers, managers, members, partners, owners, shareholders, affiliates, and successors and predecessors in interest, agents, representatives, professionals, advisors, consultants, accountants, and legal advisors and attorneys forever and irrevocably release, discharge, and acquit DIP Lender and its current and former employees, directors, officers, managers, members, partners, owners, shareholders, affiliates, and successors and predecessors in interest, agents, representatives, professionals, advisors, consultants, accountants, and legal advisors and attorneys, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type related to actions taken or omissions in its capacity as DIP Lender under the DIP Documentation arising at any time prior to the date of entry of the DIP Orders, including, without limitation, all claims and causes of action arising under chapter 5 of the Bankruptcy Code.

## **RELIEF REQUESTED**

28.    The Debtor has determined that, in order to operate its business during the Chapter 11 Case, it will need more cash over the next approximately thirteen weeks (or until the closing of sales of the SpaceX Credit or substantially all of the Debtor's assets, which the Debtor anticipates closing within the next sixty days) than the Debtor can reasonably expect to be generated from its business operations. The Debtor has undertaken an analysis of the minimum funding necessary to maintain its business operations and has limited the amount of the postpetition loan to such amount as reflected in the DIP Budget. To obtain the use of the

necessary funds, the Debtor has negotiated with the DIP Lender with respect to it providing the necessary funds in the form of the DIP Credit Facility premised upon the sale of the SpaceX Credit and the sale of substantially all of its assets to separate buyer.  The Debtor and the DIP Lender have reached an agreement on the terms of the DIP Credit Facility, as set forth herein.

29.     The Debtor seeks, pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of an interim and final order authorizing the Debtor to obtain postpetition financing pursuant to the terms of the Credit Agreement.

30.     The relief sought herein is the product of good faith, arms'-length negotiations by and between the Debtor and the DIP Lender.  Approval of this Motion is necessary because, without the ability to borrow funds from the DIP Lender, the Debtor will lack the cash to operate its business during the pendency of the Chapter 11 Case.

## BASIS FOR RELIEF REQUESTED

### A.     The Bankruptcy Court May Approve Postpetition Financing

31.     Section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
>> (1) with priority over any and all administrative expenses of the kind specified in section 503(b) and 507(b) of this title;
>>
>> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>>
>> (3) secured by a junior lien on property of the estate that is subject to a lien.

32.     Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g. In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D.

13735707/2

Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *In re Simasko Production Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate).

33.     The Debtor is in need of an immediate additional infusion of liquidity to, among other things, pay employee wages and benefits, procure goods and services integral to the Debtor's ongoing business operations, fund certain operational expenses, maintain ordinary course relationships with vendors, suppliers, and customers, and satisfy working capital needs in the ordinary course through the sale of the Debtor's assets.  On the Petition Date, the Debtor only had approximately $21,600.11 in cash on hand with which to operate its business and fund its Chapter 11 Case.   Therefore, the Debtor, together with its advisors, undertook an analysis of the incremental liquidity that would be necessary to maintain operations in connection with the filing of the Chapter 11 Case.  Based on the Debtor's cash flow forecast, the Debtor determined that it will need approximately $600,000 to get through the first three weeks of the case, and approximately $1,400,000 to get through a sale process culminating on September 9, 2022.

34.     As discussed below, the requirements of section 364 of the Bankruptcy Code are satisfied because the Debtor cannot sustain operations without the infusion of additional postpetition funds by way of a debtor-in-possession loan.  In order to do so, the Debtor must obtain financing from the DIP Lender; however, the only way for the Debtor to obtain such financing is

to grant to the DIP Lender the protections provided in the Interim DIP Order, Final DIP Order and the Credit Agreement.

> **B.**    **Authority to Grant Liens and Superpriority Claims in Connection with the DIP Credit Facility Should Be Provided**

35.    The DIP Credit Facility requires the Debtor to provide the Senior DIP Liens, the Second Priority DIP Liens and the Priming DIP Liens (collectively, the "DIP Liens"), including the DIP Superpriority Claims pursuant to section 364(c) and (d) of the Bankruptcy Code. Section 364(c) of the Bankruptcy Code provides, among other things, that, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

36.    Section 364(d) of the Bankruptcy Code, in turn, allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, after notice and a hearing, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d). As discussed below, section 364(d) of the Bankruptcy Code is satisfied because the Debtor has reached a resolution with the only party with an existing lien on the Debtor's property.

37.    As set forth herein and in the Gavin Declaration, despite the efforts of the Debtor and its advisors, the Debtor has been unable to (i) procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(1), or (b) as an administrative expense under section 364(a) or (b); or (ii) obtain postpetition financing or other financial accommodations from

any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

38.    Specifically, and as noted above, Agile is the only party who has asserted a prepetition security interest in the Debtor's assets, and Agile has agreed that its UCC financing statement will be terminated by operation of the Interim DIP Order.

39.    Having determined that the type of financing it could receive would be available only in accordance with the sections 364(c) and (d) of the Bankruptcy Code, the Debtor commenced arm's-length negotiations with the DIP Lender regarding the DIP Credit Facility. The DIP Lender was only willing to provide the DIP Credit Facility, if, among other things, it was granted the DIP Liens on the Collateral and the Superpriority Claims.

40.    Further, as indicated above, section 364(c) of the Bankruptcy Code enumerates certain incentives that a bankruptcy court may grant to postpetition lenders. Such incentives are not exhaustive. Bankruptcy courts frequently have authorized the use of inducements not specified in the statute. See, e.g., *In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order that prohibited any challenges to the validity of already existing liens); *In re Defender Drug Stores*, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to postpetition lender), aff'd, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) ("[b]ankruptcy courts…have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364"); *In re Antico Mfg. Co.*, 31 B.R. 103 (Bankr. E.D.N.Y. 1983) (authorizing lien on prepetition collateral to secure postpetition indebtedness).

41.    Section 364 of the Bankruptcy Code does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *Bray v. Shenandoah Fed. Sav. & Loan*

*Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *L.A. Dodgers*, 457 B.R. at 313 <u>citing</u> *Ames Dep't Store*, 115 B.R. at 37 (noting the court "may not approve any credit transaction under subsection (c) [of section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b)"); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 197 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming loan was necessary if debtor were to obtain funding); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (section 364(d)(1)(A) of the Bankruptcy Code satisfied where two banks refused to provide unsecured credit to debtor).

42.     In this case, even with the diligent efforts of the Debtor and its professionals, working capital was not available absent the proposed DIP Liens and DIP Superpriority Claims to be provided to the DIP Lender. The Debtor believes it is required to obtain financing under sections 364(c) and (d) of the Bankruptcy Code and, accordingly, the DIP Credit Facility reflects the exercise of the Debtor's sound business judgment. The DIP Lender is only willing to extend financing in accordance with the terms of the Credit Agreement and the protections set forth in the Interim DIP Order and Final DIP Order. As such, the Debtor was not able to obtain alternative sources of financing upon more favorable terms. The Debtor's ability to continue to operate its business pending a sale of its assets pursuant to section 363 of the Bankruptcy Code and to maximize value to all stakeholders depends upon its ability to obtain the loans to be provided pursuant to the DIP Credit Facility. Without the proposed financing, the Debtor would not have sufficient funds to

operate, jeopardizing the Debtors' ability to consummate a sale of the balance of its assets, and thereby diminishing recoveries for its stakeholders.

### C.    The Debtor's Proposed Use of Cash Collateral Should Be Approved

43.    In relevant part, section 363(c)(2) of the Bankruptcy Code provides that a debtor "may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless – (A) each entity that has an interest in such cash collateral consents."

44.    Section 363(e) of the Bankruptcy Code provides that on request by an entity that has an interest in property, the court, with or without a hearing, shall prohibit or condition the use, sale, or lease of such property as necessary to provide adequate protection of such interest.  The DIP Lender will require adequate protection of its interests in existing collateral as a condition to its consent to such use of cash collateral, and then only on the terms reflected in this Motion and in the proposed form of Interim DIP Order.

45.    The Debtor's business judgment as to the provision of adequate protection here is evident in the terms of the Interim DIP Order – all of which are customary in connection with the use of collateral in operating Chapter 11 cases of this scale and consistent with the broad flexibility inherent in the concepts of adequate protection.  *See, e.g., In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) ("[a]dequate protection will take many forms, only some of which are set forth in section 361…"); *In re Reading Tube Indus.*, 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987) ("[t]he absence of a definition of adequate protection in the Code coupled with the 'flexibility' of Section 361(3) suggests that adequate protection may be shown in a variety of ways"); *In re Wilson*, 30 B.R. 371, 373 (Bankr. E.D. Pa. 1983) ("[w]hile 'adequate protection' is not defined in the Bankruptcy Code, the legislative history of § 361 reflects the intent of Congress to give the

13735707/2

courts the flexibility to fashion the relief in light of the facts of each case and general equity principles").

46.     The relief granted in the Interim DIP Order is otherwise authorized and warranted pursuant to section 363(c)(2) of the Bankruptcy Code given the core function of adequate protection to protect secured parties against diminution or decrease as a result of the proposed use of their collateral. *See In re Gasel Transp. Lines, Inc.*, 326 B.R. 683 (6th Cir. B.A.P. 2005).

47.     As noted above, there are no secured creditors who hold an interest in the Debtor's "cash collateral", other than Agile, who has agreed that its UCC financing statement will be deemed voluntarily withdrawn by and through the Interim DIP Order, without a need for Agile to file a UCC-3 financing statement.   Accordingly, upon approval of the proposed DIP Credit Facility, there will be only one secured party, the DIP Lender, who has consented to the Debtor's proposed use of "cash collateral" in accordance with the DIP Budget, subject to the Permitted Variances.  For the foregoing reasons, the Debtor submits that granting the relief requested herein is appropriate and in the best interests of its estate.

### D.     The DIP Lender Is Entitled to the Protections Afforded to a Good Faith Lender Under Section 364(e)

48.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

49.    As more fully set forth in the Gavin Declaration, the Credit Agreement is the product of (i) the Debtor's reasonable and informed determination that the DIP Lender offered the most favorable terms available on which to obtain needed postpetition financing, and (ii) extended arm's-length, good faith negotiations between and among the Debtor and the DIP Lender.

50.    The Debtor submits that the terms and conditions of the DIP Documents are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, are supported by reasonably equivalent value and fair consideration, and are in the best interests of the Debtor, its estate, and its creditors.  As set forth in the DIP Budget, the proceeds under the DIP Credit Facility will be used only for purposes that are permissible under the Bankruptcy Code and no consideration is being provided to any party to the DIP Documents other than as described herein.  The DIP Lender is providing the DIP Credit Facility in reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  Section 364(e) provides a lender with a presumption of good faith.  *Weinstein, Eisen, Weiss LLP v. Gill (In re Cooper Common, LLC)*, 424 F.3d 963, 969 (9th Cir. 2005).

51.    Accordingly, the Debtor requests that the Court find that the DIP Lender has acted as a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

E.    **The Automatic Stay Should Be Modified on a Limited Basis**

52.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to grant the DIP Liens and DIP Superpriority Claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.  In addition, the Interim DIP Order and Final DIP Order

30

provides for a mechanism to permit the DIP Lender to modify the automatic stay in order to allow for the enforcement of rights and remedies by the DIP Lender under the DIP Documents upon the occurrence of an Event of Default.

53.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

**F.     Waiver under Sections 506(c) and 552(b) of the Bankruptcy Code**

54.     Further, as set forth in the DIP Credit Agreement, the Debtor will seek entry of a final Order approving the DIP Motion waivers under Sections 506(c) and 552(b) of the Bankruptcy Code and the Equitable Doctrine of Marshaling.  No waivers of such estate rights are being sought by and through the Interim DIP Order.

55.     The Debtor respectfully submits that such waivers are ordinary and standard features of postpetition debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

**G.     <u>The Court Should Schedule a Final Hearing on This Motion as Soon as Possible in Accordance with the Requirements of the Bankruptcy Rules</u>**

56.     The Debtor also requests that the Court schedule a final hearing on this Motion as soon as possible in accordance with the requirements of the Bankruptcy Rules and Local Rules. Bankruptcy Rule 4001(c)(2) provides that the Court may commence a final hearing on this Motion no earlier than 14 days after service of the Motion.  The Debtor needs to obtain as promptly as possible final authorization to obtain postpetition financing consistent with the DIP Credit Facility in order to ensure the Debtor's employees and vendors that the Debtor will be able to pay, its ordinary operating expenses including, without limitation, payroll and the expenses of

13735707/2

maintenance and operation of its business, at least through the closing of the sale of the sale of substantially all of the Debtor's assets.

57.     Therefore, the Debtor respectfully submits that a final hearing on this Motion should be held as soon as possible after the expiration of the 14-day period provided for by Bankruptcy Rule 4001(c)(2), in order to prevent the substantial damage to the Debtor's business which would result from any loss of support of the Debtor's customers, employees, and vendors.

**H.     Request for Immediate Relief and Waiver of Stay**

58.     Pending a final hearing, the Debtor requires immediate financing and use of existing collateral. The Debtor's interim request represents the Debtor's good faith projection of the cash necessary to operate during the period prior to a final hearing.  It is essential that the Debtor maintain stability and continue paying ordinary operating expenses postpetition to facilitate the sale process and maximize the value of its assets.  Absent immediate access to financing and the use of existing collateral, the Debtor will not have any funding to pay expenses and therefore will be unable to avoid an immediate liquidation pending a final hearing.

59.     Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ." Fed. R. Bankr. P. 6003(b).  The Debtor submits that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

60.     Bankruptcy Rule 4001 has the same standard with respect to interim relief.  Fed. R. Bankr. P.  4001(b)(2); Fed. R. Bankr. P.  4001(c)(2) ("If the motion so requests, the court may conduct a hearing before such 14-day period [after service of the motion] expires, but the court

may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." The Debtor submits that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth herein, and that Bankruptcy Rules 6003 and 4001 have been satisfied.

61.    In addition, in order to implement the foregoing successfully, the Debtor respectfully requests a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above, the payments proposed herein are essential to prevent potentially irreparable damage to the operations, value, and ability of the Debtor to reorganize.

62.    Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

## **NOTICE**

63.    Notice of this Motion has been given by the Debtor to (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtor's twenty largest unsecured creditors; (ii) counsel to the DIP Lender; (iii) all known holders of liens upon the Debtor's assets, including Agile Space Industries; (iv) the attorneys general in the states of Delaware, California, and Georgia; (v) the Internal Revenue Service; (vi) the United States Attorney; and (vi) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002; by email, overnight courier and/or hand delivery.

33

64.    Further, as the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtor will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-l(m).

65.    The Debtor respectfully submits that, under the circumstances, such notice of the Interim Hearing and the Motion constitutes adequate and sufficient notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 400, and the Local Rules, and in light of the nature of the relief requested, no other or further notice need be given.

## <u>NO PRIOR REQUEST</u>

66.    The Debtor has not previously sought the relief requested herein from this or any other Court.

**WHEREFORE**, the Debtor respectfully request entry of orders on interim and final bases, granting the relief requested in this Motion and such other and further relief as may be appropriate and proper.

Dated:  August 10, 2022
Wilmington, Delaware

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Brya M. Keilson (DE Bar No. 4643)
Sarah M. Ennis (DE Bar No. 5745)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: bkeilson@morrisjames.com
E-mail: sennis@morrisjames.com

*Proposed Counsel to the Debtor and Debtor
in Possession*

13735707/2