**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MASTEN SPACE SYSTEMS, INC.,[1] | Case No. 22-10657 (BLS) |
| Debtor. | |

**DECLARATION OF EDWARD T. GAVIN, CTP, IN SUPPORT OF**
**MOTION OF THE DEBTOR AND DEBTOR-IN-POSSESSION FOR INTERIM AND**
**FINAL ORDERS (A) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION**
**FINANCING, (B) AUTHORIZING USE OF CASH COLLATERAL, (C) GRANTING**
**LIENS AND SUPERPRIORITY CLAIMS, AND (D) GRANTING RELATED RELIEF**

I, Edward T. Gavin, CTP, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a Managing Director of the firm Gavin/Solmonese LLC ("Gavin/Solmonese"), with offices at 919 N. Market Street, Suite 600; Wilmington, DE 19801 and other locations. I am authorized to submit this declaration (the "Declaration") on behalf of the Debtors. If I were called upon to testify, I would testify competently to the facts set forth herein.

2.      I submit this Declaration in the above-captioned chapter 11 case in support of the Motion of the Debtor and Debtor-In-Possession for Interim and Final Orders (A) Authorizing Debtor to Obtain Postpetition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Liens And Superpriority Claims, and (D) Granting Related Relief (the "DIP Motion").

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, and/or my opinion based upon my experiences, knowledge, and information concerning the Debtor and provided to me by the

---

[1] The Debtor's mailing address is 1570 Sabovich St, Mojave, CA 93501. The last four digits of the Debtor's federal tax identification number is 7098.

Debtor's management team, my colleagues at Gavin/Solmonese, and/or the Debtors' other professionals. directors, management or advisors, my discussions with potential lenders.

## BACKGROUND

4.     In early May 2022, the above-captioned debtor ("Masten" or the "Debtor") engaged the firm of Gavin/Solmonese to serve as its financial advisor and to provide various services, including advising Masten on turnaround and restructuring options.

5.     As detailed in the First Day Declaration of David Masten which is being filed substantially contemporaneously herewith, the Debtor commenced the chapter 11 case to preserve value for its stakeholders, including its vendors, customers, and employees and to seek maximize the value of its estate through a continued marketing and sale process for its assets as a going concern, or alternatively, to seek an investor who will provide exit financing to enable the Debtor to reorganize.

6.     Shortly after being retained, Gavin/Solmonese undertook a detailed study of Masten's operations to identify the appropriate process to effect a transaction and the various potential parties to a transaction.  In early June 2022 at the Debtor's request, Gavin/Solmonese prepared marketing materials that provided an overview of Masten and its operations, intellectual property, key strengths, and investment highlights that potential investors or acquirers should consider when evaluating a transaction.

7.     Gavin/Solmonese developed a broad list of over 800 potential buyers, funders and investors.  Gavin/Solmonese began marketing Masten and its assets to those potential buyers and investors in early June. In connection with that process, Gavin/Solmonese established a virtual data room with thousands of documents about Masten's current and past financial and operational performance, legal status and associated issues, and related information.   It was originally

anticipated by Masten that a potential buyer, funder or investor would provide postpetition secured financing to Masten if a chapter 11 case was ultimately required. Specifically, the Debtor required at least $1,100,000 to get through at least thirty days for a sale process to liquidate enough of its assets where it would have funds remaining after repayment of the postpetition financing to liquidate the remainder of its assets, thereby creating a pool of cash for distribution to creditors.

8. To that end, in addition to the parties it had already contacted about purchasing the assets, Gavin/Solmonese contacted more than sixty additional parties to solicit their interest in providing postpetition financing. Substantially all of those potential lenders would not agree to provide a postpetition loan to Masten. My understanding from speaking with the potential lenders is that there was limited interest because of (i) the small size of the loan, (ii) the short duration of the loan, and (iii) the non-traditional collateral for the loan.

A.    The Debtor's Search for Postpetition Financing

9. Ultimately, the Debtor was able reach a tentative agreement with a potential lender for up to $1,100,000 in postpetition financing for the Debtor (with an initial $600,000 to be funded on an interim basis). The postpetition financing was subject to certain conditions, including that the Debtor enter into an unconditional asset purchase agreement (or purchase agreements) for some or all of the Debtor's assets, in an aggregate amount of at least $4,000,000. Significantly, any such sale agreement (or agreements) would be subject to the approval of the potential lender.

10. After discussing the Debtor's assets with several parties, on or about August 8, 2022, Masten entered into a tentative agreement with Astrobotic Technology, Inc. ("Astrobotic") to assign to Astrobotic the debtor's right to a certain $14,000,000 credit (the "SpaceX Credit") from Space Exploration Technologies Corp. ("SpaceX") through which SpaceX would provide a launch on a SpaceX vehicle to the assignee.

11.     Although Astrobotic was willing to serve as a stalking horse bidder for the SpaceX Credit, the amount was insufficient to reach the threshold amount necessary for the lender. The Debtor continued to discuss sale options for the remainder of the Debtor's assets with Astrobotic, however, there were a number of significant issues that prevented the parties from being able to reach an agreement whereby Astrobotic would be a stalking horse purchaser for substantially all of the Debtor's assets, while still satisfying the requirements of the potential lender. The shortfall meant that there would be no postpetition financing and, therefore, no chapter 11 case and, in all likelihood, a greatly diminished recovery to creditors of the Debtor's estate.

12.     Ultimately, the Debtor and Astrobotic were able to reach an agreement by and through which Astrobotic would be a stalking horse bidder for substantially all of the Debtor's assets for a purchase price of (i) $4,500,000 plus; (ii) a waiver of its claims, plus; (iii) payment of cure costs for any executory contracts or leases assumed and assigned to Astrobotic. Further Astrobotic or its assignee agreed to provide secured postpetition financing in the amount of $1,400,000, which will allow the Debtor to continue its postpetition marketing and provide for the case to be properly administered and an expected distribution to unsecured creditors. Astrobotic will be permitted to credit bid its loan to the Debtor, including all fees and reimbursable expenses in connection with its loan, in connection with its stalking horse bid.

13.     Significantly, the DIP Credit Facility with the DIP Lender is significantly less expensive than the fees and expenses sought by originally anticipated lender in exchange for providing financing to the Debtor through the sale process.

14.     The DIP Lender is not an "insider" of the Debtor, as that term is defined in section 101 of the Bankruptcy Code. Further, the DIP Credit Facility and the Stalking Horse APA were the product of arm's-length negotiations between the parties.

15.     Based on the facts and circumstances of the case, the Debtor believes, as a sound exercise of its business judgment, that the DIP Credit Facility and consensual use of cash collateral represents the best (and likely only) financing option available under the circumstances, particularly given the duration and amount of the proposed loan and the Debtor's assets.

16.     Therefore, the Debtor believes that, under the circumstances: (a) no alternative reasonable and actionable debtor-in-possession financing would be available to the Debtor on economic terms more favorable than those of the proposed DIP Credit Facility; (b) the terms of the proposed DIP Credit Facility are customary for this type of financing; and (c) access to the DIP Credit Facility and the consensual use of cash collateral is necessary for the Debtor to continue to operate its business during the Chapter 11 Case and to fund chapter 11 administrative expenses in accordance with the DIP Budget.

17.     It is also the Debtor's belief, as a sound exercise of its business judgment, that the economic terms of the DIP Credit Facility are superior to customary terms for debtor-in-possession financings of this type, particularly considering the length of the duration, the amount of the proposed loan, and the collateral to be received under the loan.

18.     I have reviewed search results for security interests against the Debtor's property in Delaware and California, and the Debtor has one prepetition creditor[2] asserting a security interest, Agile Space Industries, Inc.[3]

19.     Based on the foregoing, the Debtor believes, and I agree, that the DIP Facility and consensual use of cash collateral represents the best (and likely only) financing option available under the circumstances, particularly given the duration and amount of the proposed loan and the Debtors' assets.  It is also my belief that the economic terms of the DIP Facility are customary for debtor-in-possession financings of this type.

20.     In sum, based on the foregoing, I believe, based on my experience advising similarly situated companies, that under the circumstances: (a) no alternative reasonable and actionable debtor-in-possession financing would be available to the Debtor on economic terms more favorable than those of the proposed DIP Facility; (b) the terms of the proposed DIP Facility are customary for this type of financing; and; (c) access to the DIP Facility and the consensual use of Cash Collateral is necessary for the Debtor to continue to operate its business during the Chapter 11 Case and to fund chapter 11 administrative expenses.

---

[2] There is a prepetition creditor, Nuspace, Inc., who filed an Ex Parte Application for Right to Attach Order and for Writ of Attachment in the Superior Court of California, County of Kern Bakersfield Division and through which it sought "an order prohibiting a transfer by Masten of any of its personal property, inventory, money, instruments, negotiable instruments of title, equipment, and general intangibles and any other property subject to a lien of attachment in California."  The Debtor understands on June 29, 2022, Nuspace, Inc., obtained a prejudgment temporary protective order which precludes Masten from disposing of the proceeds "of any transfer of inventory or farm products held for sale except under" (the "Prejudgment Attachment").  Even if the Prejudgment Attachment was entered, the creditor does not have a security interest, and any such interest is a voidable transfer pursuant to Section 547 of the Bankruptcy Code.  Further, the continued sequestration of any assets of the Debtor constitutes a violation of the automatic stay.  A copy of the first day motions is being sent to Nuspace, Inc., which is one of the Debtor's twenty largest prepetition unsecured creditors.

[3] The Debtor has conferred with counsel for Agile, and the parties have reached agreement set forth in the Interim DIP Order, by and through which, among other things, the UCC-1 Financing Statement filed by Agile on or about July 22, 2022, shall be terminated and no other act shall be required by Agile.  Further, the release of the security interest shall be without prejudice to Agile and will not waive or release any defenses of Agile under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, Agile's defenses related to any avoidance actions under chapter 5 of the Bankruptcy Code, all of which are expressly reserved.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

August 10, 2022

_____
Edward T. Gavin, CTP

**Error! Unknown document property name.**