**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MASTEN SPACE SYSTEMS, INC., | Case No. 22-10657 (BLS) |
| Debtor.[1] | **Hearing Date:  August 31, 2022 at 10:00 a.m.**<br>**Objection Deadline: August 24, 2022 at 4:00 p.m.** |

**DEBTOR'S MOTION FOR AN ORDER APPROVING (I)(A) THE
DEBTOR'S ENTRY INTO STALKING HORSE AGREEMENT AND
RELATED BID PROTECTIONS; (B) THE BIDDING PROCEDURES IN
CONNECTION W ITH THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTOR'S ASSETS, (C) THE FORM AND MANNER OF NOTICE OF THE SALE
HEARING AND AUCTION RESULTS, AND (D) DATES FOR AN AUCTION AND
SALE HEARING, (II) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S
ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, LIABILITIES, RIGHTS,
INTERESTS AND ENCUMBRANCES, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "Debtor") hereby moves (the

"Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the

"Bidding Procedures Order") (a) authorizing the Debtor to enter into and perform under an asset

purchase agreement between the Debtor and the Stalking Horse Bidder (as defined herein), subject

to the solicitation of higher or otherwise better offers for the substantially all of the Debtor's assets

(the "Assets"); (b) approving the Bid Protections (defined below) granted to the Stalking Horse

Bidder; (c) approving the proposed bidding procedures attached as **Exhibit 1** to the Bidding

Procedures Order (the "Bidding Procedures"); (d) approving the form and manner of notice of the

Auction (defined below) and Sale Hearing (the "Sale Notice"), attached as **Exhibit 2** to the Bidding

Procedures Order; (e) establishing dates and deadlines in connection with the sale (the "Sale") of

substantially all of the Debtor's assets, including the SpaceX Credit (as defined below), including

---

[1]  The Debtor's mailing address is 741 Monroe Drive Atlanta, GA 30308.  The last four digits of the Debtor's federal tax identification number is 7098.

the Bid Deadline (as defined in the Bidding Procedures), and the dates of the auction (the "Auction") for the Assets (as defined herein), if needed, and the hearing with respect to the approval of the sale (the "Sale Hearing"); and (f) granting related relief, and in support of the Motion, the Debtor incorporates the Declaration of David Masten in Support of First Day Motions and Related Relief [Docket No. 11] (the "Masten Declaration"), and the Declaration of Edward T. Gavin, CTP, in Support of Motion of the Debtor and Debtor-in-Possession for Interim and Final Orders (A) Authorizing Debtor to Obtain Postpetition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Liens and Superpriority Claims, and (D) Granting Related Relief [Docket No. 13] (the "Gavin Declaration," and together with the Masten Declaration, the "Declarations") and states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b), and, under Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue of this case and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rule

2002, 6004, 6006, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1 and 9006-1.

## BACKGROUND

### A.    The Debtor's History and Operations

4.    As more fully set forth in the Masten Declaration, the Debtor is a leading innovator in the commercial rocket and spaceflight industry.  As of the Petition Date, the Debtor has flown over 600 successful vertical takeoff and landing ("VTVL") flights across five different rocket vehicles—more than any other company in the industry.  The Debtor won the Lunar Lander X-Prize Challenge in 2009 and has been awarded numerous Small Business Innovation Research contracts by NASA, the Air Force, and the National Science Foundation.  The Debtor currently holds one patent and has several pending patent applications for which the company believes there are significant licensing opportunities both within and outside the space industry.  Many of the Debtor's R&D programs are developing critical technologies that will enable a sustained human and robotic presence on the Moon for NASA's Artemis Program.

5.    Although the Debtor successfully developed innovations necessary for advancing humanity's man's exploration of space, from a business perspective, the company was less successful financially.

6.    The Debtor had traditionally been a small company with less than 25 employees, which had a nominally flat structure with deemphasized titles and formal job descriptions.  It was proud of its well-earned gritty, non-corporate reputation in the industry, but this presented problems when the company needed to scale up rapidly.

7.    The size of the company changed with the award of Masten Mission 1 ("MM1"), a mission to land on the Moon to deliver on NASA's Commercial Lunar Payload Services Task Order 19C.  This task order required the Debtor to deliver eight payloads to the lunar surface at

the south pole of the Moon in 2023 and operate them for at least 12 days. The Debtor was selected to provide the launch, lander, and support services for this lunar mission -- one of the first U.S. landers since the end of the Apollo program.

8.      As more fully set forth in the Masten Declaration, the contract for MM1 created financial pressures from which the company could not recover.  Specifically, the Debtor incurred tremendous costs from scaling up, both in terms of the number of employees as well as facilities, necessary for the success of MM1.  This included new facilities, a much larger workforce needed to perform MM1, and significant new organizational costs.

9.      These growing pains were complicated at every turn by COVID-19, including logistical issues, staffing difficulties, and necessary contract rescheduling.  The Debtor submitted its proposal for Task Order 19C in early March 2020, and it was awarded in April 2020.  As a result, MM1 was planned in the pre-COVID world, but it was implemented entirely within the new reality presented by COVID, which includes massive supply chain issues.

10.      To get its spacecraft to the Moon, the Debtor contracted with Space Exploration Technologies Corp. ("SpaceX") in July 2020 to provide launch services on one of its launch vehicles (the "SpaceX Launch Agreement"). These services would boost the Debtor's spacecraft out of Earth orbit and into a translunar injection orbit, at which point the Debtor's spacecraft would maneuver itself to a landing site at the lunar south pole. The SpaceX Launch Agreement was the Debtor's single largest vendor contract for MM1.

11.      When the Debtor received indications that a schedule slip would be approved by NASA in the summer of 2021, it began related discussions with SpaceX about changing its launch services agreement to shift the launch schedule to 2022. The significant delays in completing the TO 19C contract modification had two key impacts: (i) the Debtor was unable to paper the launch

schedule change from 2021 to 2022; and (ii) the Debtor was unable to pay the full amount of a December 2021 milestone payment to SpaceX. Additionally, and as more fully set forth in the Masten Declaration, despite extensive efforts starting in early 2021, the company was unable to raise additional capital through fundraising and investors to cover the costs for MM1.

### A.    Prepetition Efforts for Fundraising and Investments

12.    Starting approximately one year ago, after weeks of interviews and pitches with investment banks and law firms, the Debtor engaged Stifel, Nicolaus & Company ("Stifel") to serve as the Debtor's financial advisor and exclusive financing agent on September 8, 2021, and the law firms of Skadden, Arps, Slate, Meagher & Flom LLP and Gunderson Dettmer to serve as the Debtor's counsel throughout its fundraising process on September 17 and 21, 2021, respectively.

13.    Based on information received from its advisors and industry comparisons, the Debtor sought to raise $60 million on a post-money valuation that was based on similar deals involving other space companies.

14.    The Debtor officially launched its capital raise efforts on November 29, 2021. Stifel marketed Masten to approximately 235 prospective investors. Twenty-two investors requested and executed nondisclosure agreements with the Debtor to evaluate the opportunity in greater detail.

15.    The Debtor initially struggled to gain traction with its fundraising efforts, apparently due largely to market conditions and timing. The Debtor's timing was particularly poor because it kicked off its efforts between the Thanksgiving and Christmas holidays.

16.    The Debtor's fundraising efforts also came on the heels of a special purpose acquisition company ("SPAC") trend in the space industry. Between April and December 2021, nine space companies went public through SPAC mergers. Privately held space companies also

raised significant funds in 2021. When the Debtor entered the market late in the year, many investors interested in making substantial investments in space companies had already done so.

17.     The Debtor's fundraising efforts were also hindered by messaging issues. The Debtor was difficult to categorize: it was not a startup in the conventional sense, since it had existed for over seventeen years and sustained itself on the revenue it generated, but it was not yet an established company. Moreover, the Debtor's business did not have a clear or strategic focus; it generated most of its revenue (but also the bulk of its costs) from MMI, but it also conducted suborbital VTVL and test operations and was engaged in numerous R&D projects.

18.     Despite its initial setbacks and obstacles, the Debtor ultimately presented its pitch to nine prospective investors. Seven additional investors met with Stifel about the opportunity. Several investors expressed significant interest in the Debtor, particularly in early 2022, and some stated their intent to invest in the company, but the Debtor was not able to secure a lead investor to lead the diligence process.

19.     The Board, management team, and the Debtor's advisors became concerned that the fundraising round would not close in time if a lead investor did not emerge by the end of March 2022.

20.     During this time period, the Debtor's Board increased its engagement with the daily operations of the organization to begin to address the management and organizational issues. In later January 2022, the Board directed the CEO to step back from day-to-day operations. In April 2022, he was formally separated from Masten. During this time, the Debtor's Executive Chairman stepped into a daily executive leadership role primarily focused on the fundraising efforts.

21.     Around the same time, the Debtor was approached by another space company ("Company A") about a potential acquisition. At some time in March 2022, Company A presented

the Debtor with a letter of intent to acquire the Debtor, which included an exclusivity provision that prohibited Masten from pursuing other financing or acquisition options for at least one month.

22.     No lead investor emerged in March 2022.

23.     On March 31, 2022, the Board and leadership team convened to determine the best path forward for the company.  The Board and leadership team unanimously agreed that the best option at that stage was to pursue an acquisition by Company A.

24.     The Board executed a letter of intent with Company A on March 31, 2022.

25.     The Debtor and Company A engaged in a thorough diligence process, including: a buildout and review of a comprehensive data room; numerous interviews with Company A's advisors; responses to inquiries from Company A's advisors, outside counsel, and insurance provider; a site visit to Company A's facilities; dinner between the representatives of the Debtor and Company A; team integration meetings; and a lengthy meeting between the Debtor's project and systems leads and Company A's senior vice president.

26.     The Debtor and Company A exchanged a draft stock purchase agreement and comments related thereto in late April 2022.  On April 29, Company A informed the Debtor that it did not plan to proceed with a deal because of the substantial liabilities recognized to date and additional future projected losses associated with MM1.

27.     On May 1, 2022, the Debtor representatives met with a representative from Company A to better understand Company A's reasons for pulling out of the deal.  Company A's representative cited excessive liabilities associated with an acquisition of the Debtor, in particular the vendor costs associated with Masten Mission 1, for the deal to close.

28.     The Debtor continued to discuss options with Company A, but on May 6, 2022, the Debtor formally notified Company A that the period of exclusivity was over.

29.    Following the termination of the exclusivity period, the Debtor immediately reached out to numerous companies in the space industry about investment and acquisition options. By May 11, the Debtor contacted at least eight other space companies and investment funds. Several of these companies initially expressed interest but all ultimately decided not to move forward.    The Debtor's representatives also spoke with several venture capital funds about investment and short-term financing options.

30.    Another space company ("Company B") emerged as the most promising option of this group.    The Debtor had three meetings with Company B's executive management, and Company B expressed an interest in acquiring all the Debtor's assets, including TO 19C. Company B expressed some concern about the liabilities associated with MM1 but was receptive to alternative acquisition options, including through a Section 363 sale.  Company B indicated that it had access to the funds needed to pursue a deal to acquire Masten and TO 19C. Unfortunately, on May 23, Company B informed Masten that it could not complete the transaction on the Debtor's short timeline, a timeline necessitated by the fact that the Debtor would run out of cash to fund payroll and operations on June 30, 2022.

31.    The Debtor continued to pursue all known options for acquisition, including with several new companies.  It also explored the possibility of assigning MM1 and certain associated subcontracts to another CLPS provider ("Company C").  This assignment appeared possible but would require novation by a NASA contracting officer.  Masten and Company C completed significant diligence on this transaction but it ultimately did not move forward, presumably due to Company C's concerns about the uncertainty of novation by NASA.

32.    Unfortunately, due to its adverse financial circumstances, the Debtor has not been able to catch up on its payments due to SpaceX, and as a result, SpaceX officially terminated the

launch contract on June 30, 2022, however SpaceX agreed to provide an assignable credit (the "SpaceX Credit") to the Debtor that could be applied to a new launch contract if assigned to certain parties within the CLPS vendor pool, which is a very small pool of potential assignees.

33.    Ultimately, the Debtor was unable to close a fundraising round, execute the sale of its assets, or obtain financing by July 28, 2022. On July 28, the Debtor had less than $22,000 on hand, and all but six of its employees had been furloughed.

**B.    The Debtor's Prepetition Marketing Process**

34.    In early May 2022, the Debtor was close to agreement on the sale of the company to Company B, which was contemplated to be effected through a bankruptcy petition and subsequent sale under section 363 of the Bankruptcy Code. To facilitate this path, the Debtor engaged the firm of Gavin/Solmonese to serve as its financial advisor and to provide various services, including advising the Debtor on turnaround and restructuring options.

35.    Gavin/Solmonese undertook a detailed study of the Debtor's operations to identify the appropriate process to effect a transaction and the various potential parties to a transaction.  In late May 2022, the contemplated sale opportunity ended when the potential buyer declined to continue – the second such buyer to do so in less than three months. Shortly thereafter, in early June 2022, the company asked Gavin/Solmonese to commence a sale process for all of the company's assets.   Concurrently, Gavin/Solmonese prepared marketing materials that provided an overview of the Debtor and its operations, intellectual property, key strengths, and investment highlights that potential investors or acquirers should consider when evaluating a transaction.

36.    Gavin/Solmonese began marketing the Debtor and its assets to those potential buyers, funders, and investors, their representatives, and bankruptcy industry professionals in early June 2022. Recognizing that the Debtor would run out of cash at the end of June,  Gavin/Solmonese

quickly moved to develop a broad list of over 4,300 potential buyers, funders, and investors, their representatives, and bankruptcy industry professionals for all of the Debtor's assets and ultimately exchanged contact with more than 800 of them.  The Debtor has continued to have investment and acquisition related conversations with several parties throughout the months of June and July to expand the potential pool of parties interested in some or all of its assets.

37.     More specifically, from these efforts, the Debtor received a Letter of Intent to acquire all of the Debtor's assets from an investment fund with holdings in the space industry ("Company D").  Company D's offer was unworkable as proposed, but the Debtor and Company D continued to explore options through which an acquisition could occur, including through a chapter 11 case, an Article IX sale, and through a voluntary composition of creditors in conjunction with a recapitalization, but none proved possible with the Debtor's imminent liquidity crisis.

38.     In addition to operating a sale and marketing process for the entire company, Gavin/Solmonese also sought to market the SpaceX Credit once that asset became available to the Debtor in late June 2022.  As noted above, because the SpaceX Credit is limited to a specified temporal window and a finite pool of potential purchasers, there is a very small universe of potential buyers of the SpaceX Credit.  Gavin/Solmonese and the Debtor's management contacted each of those purchasers in order to monetize for the benefit of the Debtor's estate some cognizable value from the SpaceX Launch Agreement.  As of the date of this Motion, three of the five potential purchasers expressed interest; one of the parties could not reach an agreement satisfactory to them with SpaceX for how the credit would be used, and two of the parties signed asset purchase agreements with the Debtor. One, Astrobotic, was selected as the stalking horse bidder for the SpaceX Credit.

39.     On July 28, 2022 (the "Petition Date"), the Debtor filed a voluntary bankruptcy petition.  Prior to and after the Petition Date, it was negotiating with a lender (the "Potential Lender"), the only party to have offered to provide post-petition financing to the Debtor, and the two potential purchasers for the SpaceX Credit.   It wasn't until approximately August 3, 2022 – after the Petition Date – that the Debtor was seriously engaged in conversations with Astrobotic Technology, Inc. ("Astrobotic").

## B.     The Debtor's Postpetition Marketing Efforts

40.     The Debtor's path to realizing value for this asset and funding a chapter 11 case was frought with difficulty.  After reaching an agreement documented in a letter of intent with a potential purchaser, that potential purchaser significantly reduced the price of the SpaceX Credit for reasons having nothing to do with the Debtor. This resulted in the Prospective Lender refusing to lend against the reduced collateral, resulting leaving the debtor with no options other than a likely chapter 7 case and disastrous results for the employees and creditors of the Debtor because the Potential Lender required that, in order to obtain financing of $1,100,000, the Debtor would need to enter into asset purchase agreements totaling at least $4,000,000, and the terms of the asset purchase agreements would be subject to the Potential Lender's approval. The Debtor and Gavin/Solmonese spent the two weeks following this event, which include the first twelve days of this chapter 11 case, trying to piece together buyers for enough value to satisfy the lender's requirements for collateral.

41.     After discussing the launch credit with several potential assignees, the Debtor entered into a tentative agreement by and through which it would assign the SpaceX Credit to Astrobotic, however the Debtor could not reach an agreement with the Potential Lender because, among other things, the Potential Lender required that, in order to obtain financing of $1,100,000,

11

the Debtor would need to enter into asset purchase agreements totaling at least $4,000,000, and the terms of the asset purchase agreements would be subject to the Potential Lender's approval.

42.     The Debtor and Astrobotic tentatively reached an agreement that expanded the potential sale to include substantially all of the Debtor's assets, including the SpaceX Credit, however, the Potential Lender required terms in the asset purchase agreement to which Astrobotic would not agree, and it appeared that the Chapter 11 case would convert to Chapter 7 imminently.

43.     On Wednesday, August 10, 2022, in order to facilitate a sale process in Chapter 11, Astrobotic agreed to serve as the stalking horse bidder for substantially all of the Debtor's assets, and Astrobotic agreed to provide financing of up to $1,400,000, plus any fees and expenses, that it could credit bid toward the purchase of the Assets.  Further, Astrobotic proposed terms of postpetition financing that were significantly less expensive to the estate than the terms that had been required by the Proposed Lender, which had exceeded $500,000, plus the lender's expenses. On August 10, 2022, the Debtor filed a Motion to Approve Debtor in Possession Financing [Docket No. 14]

44.     Attached hereto as **Exhibit B** is an asset purchase agreement (the "Stalking Horse Agreement") between the Debtor and Astrobotic or its assignee (the "Stalking Horse Bidder") by and through which Astrobotic agreed to purchase the Assets, subject to higher and better bids and Court approval (the "Stalking Horse Bid").

1.     In order to ensure that the Debtor receives the maximum achievable value of the estate, the Debtor is continuing its efforts to market the Assets, and in the event that it receives multiple bids, it will conduct a fair and open auction, including for lots of assets less than the whole company and the SpaceX credit.

### C.     Proposed Bidding Procedures

2.      45.      By this Motion, the Debtor seeks authority to sell substantially all of the

Assets, including the SpaceX Credit, and for approval of certain bidding and sale procedures,

including (i) approving Astrobotic as a stalking horse bidder, (ii) approving certain bid protections

and setting the Bidding Procedures set forth as Exhibit 1 to the Bidding Procedures Order (the

"Bidding Procedures") and (iii) requesting approval of the following deadlines:

(i)      **Bid Deadline: September 2, 2022 at 4:00 p.m.** (prevailing Eastern Time),[2] as the deadline by which all Qualified Bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline");

(ii)      **Sale Objection Deadline: September 3, 2022 at 4:00 p.m.** (the "Sale Objection Deadline"), as the deadline for all objections other than the (i) the conduct of the Auction, or (ii) the choice of Successful Bidder and/or Back-Up Bidder(s).

(iii)      **Auction**: **September 6, 2022 at 10:00 a.m.**, as the date and time of the Auction, if one becomes necessary, which will be held at the offices of the proposed counsel for the Debtor, Morris James LLP via Zoom, or such later time as the Debtor will timely notify all the Stalking Horse Bidder other Qualified Bidders and the official committee of unsecured creditors and their respective professionals (collectively, the "Consultation Parties");[3]

(iv)      **Auction Objection Deadline: September 7, 2022 at noon** as the deadline to object to (i) the conduct of the Auction, or (ii) the choice of Successful Bidder and/or Back-Up Bidder(s).

(v)      **Reply Deadline**: **September 7, 2022 at 5:00 p.m.**, as the deadline for the Debtor to file replies to any objections to the Sale.

**(vi)**      **Sale Hearing:** on or about **September 8, 2022** before the Honorable Brendan L. Shannon, Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware, at District of Delaware, which shall be held via Zoom pursuant to the Court's video hearing procedures;

(vii)      **Closing**: on or prior to **September 9, 2022 at 5:00 p.m.**

### THE PROPOSED SALE AND BIDDING PROCEDURES

---

[2]      Unless expressly stated otherwise, all times herein refer to prevailing Eastern Time.

[3]      In addition to the official committee of unsecured creditors and their respective professionals, who will be a Consultation Party for all purposes, SpaceX will be a Consultation Part with respect to the SpaceX Credit.

13731223/5

## I.    SUMMARY OF KEY TERMS OF THE STALKING HORSE BID

3.    By this Motion, the Debtor is requesting approval of the designation of the Stalking

Horse Bidder and the Stalking Horse Bid on the terms set forth in the Stalking Horse Agreement,

by and through which the Stalking Horse has offered to purchase the Assets, including but not

limited to, the SpaceX Credit, for a sale price of $4,200,000, plus all cure costs associated with

executory contracts and leases assumed by the Stalking Horse Bidder, plus a waiver of all of

Astrobotic's claims against the Debtor.  Further, by this Motion, the Debtor seeks approval of

reasonable and customary Bid Protections for the Stalking Horse Bidder, a breakup fee of

$126,000 (equal to 3% of the cash purchase price), plus up to $126,000 (equal to 3% of the cash

purchase price), of reimbursable expenses if the Successful Bidder is a party other than the Stalking

Horse Bidder (the "Bid Protections"). The Stalking Horse Bidder will receive the Bid Protections

only if it is not the Successful Bidder and subject to the terms of the Stalking Horse Agreement.

Given the extensive prepetition and postpetition marketing period and the need to maximize the

value of the Debtor's assets through a timely and efficient marketing and sale process, the ability

to designate a Stalking Horse Bid and offer Bid Protections is justified, appropriate and essential.

4.    In accordance with Local Rule 6004-1(b), the pertinent terms of the Stalking Horse

Agreement are summarized in the following table.[4] The Debtor respectfully submits that the terms

of the Stalking Horse Agreement, including those required to be highlighted under Local Rule

6004-1(b) are fair, reasonable, and appropriate under the circumstances, in light of the parties'

good faith, arm's-length negotiation of the Stalking Horse Bid, the Debtor's extensive prepetition

---

[4]    This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Stalking Horse Agreement, the latter governs in all respects. Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Stalking Horse Agreement.

and postpetition marketing process, and the substantial benefits the Debtor and its estate will

realize as a result thereof, including the establishment of a baseline price Debtor's assets

| TERM SHEET | |
|---|---|
| **Parties** | <u>Seller</u>:  The Debtor.<br><br><u>Buyer</u>: Astrobotic or its designee, or a party that submits a bid materially higher than the Stalking Horse's Bid in conformance with the Bidding Procedures..<br><br>*See* Stalking Horse Purchase Agreement |
| **Purchase Price** | <u>Purchase Price</u>" means (i) Four Million, Two Hundred Thousand Dollars ($4,200,000.00) in cash, (ii) a waiver of all claims of the Buyer against the Seller's bankruptcy estate other than those claims specifically created by this Agreement, and (iii) Cure Costs for Assigned Contracts, or such other amount as determined to be the highest and best bid for the Debtor's assets, which in no event shall be lower than the Stalking Horse Bid. |
| **Purchased Assets** | Substantially all of the Debtor's assets, including but not limited to the Space X Credit<br><br>*See* Stalking Horse Purchase Agreement |
| **Closing Conditions** | In addition to usual and customary terms and conditions for closing, with respect to the SpaceX Credit, any Potential Purchaser must be on the SpaceX' list of approved assignees and SpaceX shall have given its written consent to the transfer of the Credit to Buyer.<br><br>See Stalking Horse Purchase Agreement Article 10. |
| **"Insider" Status of Stalking Horse Bidder** Local Rule 6004-1(b)(iv)(A). | The Stalking Horse Bidder is not an insider of the Debtor. |
| **Agreements with Management or Key Employees** Local Rule 6004-1(b)(iv)(B) | The Stalking Horse Bidder has not entered into any agreements with management or key employees concerning compensation or future employment. |
| **Private Sale/No Competitive Bidding** Local Rule 6004-1(b)(iv)(D) | The Sale shall be implemented pursuant to a bid and auction process pursuant to section 363 of the Bankruptcy Code.<br><br>*See* Stalking Horse Purchase Agreement |

| TERM SHEET | |
|---|---|
| **Closing and Other Deadlines Local Rule 6004-1(b)(iv)(E)** | Closing shall take place on or prior to September 9, 2022. |
| **Tax Exemption** Local Rule 6004-1(b)(iv)(I) | The Debtor does not seek to have the sale of its assets declared exempt from taxes under section 1146(a) of the Bankruptcy Code. |
| **Requested Findings as to Successor Liability** Local Rule 6004-1(b)(iv)(L) | The Debtor expects the proposed Sale Order to include a customary finding concerning the absence of successor liability for the Buyer. |
| **Credit Bid** Local Rule 6004-1(b)(iv)(N) | The Stalking Horse Purchase Agreement permits the Stalking Horse to credit bid all DIP Facility Claims (including anticipated draws) pursuant to section 363(k) of the Bankruptcy Code. |
| **Releases** | In exchange for the right to permit the assignment of the SpaceX Credit, the Stalking Horse Purchase Agreement releases all estate claims against SpaceX. |
| **Relief from Bankruptcy Rule 6004(h)** Local Rule 6004-1(b)(iv)(O) | The Debtor is seeking a waiver of the Bankruptcy Rule 6004(h) stay in connection with the Bidding Procedures Order. *See* Proposed Bidding Procedures Order, ¶ ____ |

## II.    THE BIDDING PROCEDURES

5.      The Bidding Procedures are designed to facilitate a fair, robust and competitive sale process to ensure that the value of the Assets is maximized. The Bidding Procedures allow the Debtor to solicit and evaluate bids from potential bidders and determine the highest or otherwise best offer for the Debtor's assets on a timeline that is consistent with the timeline for the chapter 11 case.

6.      Specifically, and as more fully set forth in the Masten Declaration, the Debtor has already engaged in extensive marketing efforts of the Assets, including the SpaceX Credit. Additionally, the Debtor has engaged in significant marketing efforts since the Petition Date.

7.      The Debtor believes the Bidding Procedures will be sufficient to allow potential bidders to conduct diligence and formulate competing bids particularly given the limited universe of parties who can bid on the SpaceX credit and the Debtor's robust marketing of the Assets.

8.      Pursuant to Local Rule 6004-1(c), certain of the key terms of the Bidding Procedures are highlighted in the chart below:[5]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids**<br><br>Local Rule 6004-1(c)(i)(A)-(B) | **A.  Bid Deadline** – the Bid Deadline to submit a binding and irrevocable offer to acquire the Assets is **September 2, 2022 at 4:00 p.m.**<br><br>**B.  Diligence Access Requirements** – To access the Debtor's data room and participate in the sale process, a Potential Bidder must submit:<br><br>•   a confidentiality agreement on customary terms that are reasonably acceptable to the Debtor;<br><br>•   sufficient evidence, as reasonably determined by the Debtor, after consultation with the Consultation Parties, that the bidder intends to obtain due diligence and participate in the sale process for a bona fide purpose consistent with the Bidding Procedures; and<br><br>•   evidence of such Potential Bidder's financial capability to acquire the Assets, the adequacy of which will be assessed by the Debtor (with the assistance of its advisors).  (**Bid Procedures, Section B**)<br><br>**C.  Qualified Bid Requirements** - To be eligible to participate in the Auction, a Potential Bidder must deliver to the Debtor and its advisors, a written, irrevocable offer that must be determined by the Debtor, in its reasonable business judgment, and in consultation with the Consultation Parties, to satisfy each of the following conditions (collectively, the "Bid Requirements"): |

---

[5] This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Bidding Procedures, the Bidding Procedures govern in all respects. Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Bidding Procedures.

| | |
|---|---|
| **MATERIAL TERMS OF THE BIDDING PROCEDURES** | |
| | • **Purpose**. Each Potential Bidder must state that the Bid includes an offer by the Potential Bidder to purchase some or all of the Assets. |
| | • **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid for some or all of the Assets (the "Purchase Price"). |
| | • **No Contingencies**. A Bid must contain a clear statement that it is not conditioned on any contingency, including, among others, on obtaining any of the following (a) financing, (b) shareholder, board of directors, or other approvals (including regulatory approvals), and/or (c) the outcome or completion of a due diligence review by the Potential Bidder. Further, any Bid that the Debtor, after consultation with the Consultation Parties, is unlikely to be consummated prior to the Closing Deadline due to regulatory limitations under the laws enacted by the Committee on Foreign Investment in the United States (CIFIUS), including but not limited to the Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA), International Traffic in Arms Regulations (ITAR), and Export Administration Regulation (EAR), may be deemed to not be a Qualifying Bid. **All Bids are expressly conditioned upon a sworn declaration that the transfer of the Assets is not conditional upon governmental regulation and approval.** |
| | • **Minimum Bid**. The value of each Bid for the Assets as determined by the Debtor determines in its business judgment (in consultation with the Consultation Parties), must exceed (a) the Base Purchase Price, (b) the maximum amount of Bid Protections payable to the Stalking Horse Bidder, and (c) the minimum Bid increment of one hundred thousand dollars ($100,000.00). |
| | • **Bid Deposit.** Each Bid must be accompanied by a cash deposit (made by wire transfer or certified or cashier's check) equal to 10% of the aggregate value of the cash and non-cash consideration of the Bid (the "Good Faith Deposit"). |
| | • **Committed Financing**. Each Qualified Bid must be accompanied by evidence of the Potential Bidder's capacity to consummate the Sale transaction set forth in its Bid with cash on hand or committed financing documented to the Debtor's satisfaction (in consultation with the Consultation |

| **MATERIAL TERMS OF THE BIDDING PROCEDURES** |
| --- |

|  | Parties) that demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price under its Bid. Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants, conditions and term and termination provisions acceptable to the Debtor (in consultation with the Consultation Parties).<br><br>• **Good Faith Offer**. Each Bid must constitute a good faith, bona fide offer to purchase the Assets set forth in such Bid.<br><br>• **Marked Agreement**.  Each Bid must be accompanied by clean and duly executed transaction documents including, at a minimum, a draft purchase agreement, including the exhibits and schedules related thereto, and any related material documents integral to such Bid pursuant to which the Potential Bidder proposes to effectuate the Sale, along with redlines of such agreements marked to reflect any amendments and modifications from the Stalking Horse Agreement and any other applicable transaction documents relating to the Stalking Horse Bid, which amendments and modifications may not be inconsistent with these Bidding Procedures.   The documents contemplated by this Section shall herein be referred to as the "Qualified Bid Documents."<br><br>• **Binding and Irrevocable**.  A Potential Bidder's Bid must be irrevocable unless and until the Debtor and the Successful Bidder consummate the Sale.<br><br>• **Identity**.  Each Bid must fully disclose the identity of each entity that will be participating in connection with such Bid (including any equity owners or sponsors, if the purchaser is an entity formed for the purpose of consummating the acquisition of the Assets), and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties. A Bid must also fully disclose any connections or agreements with the Debtor, any known, potential, prospective bidder, or Qualified Bidder (as defined herein), or any officer, director, or equity security holder of the Debtor. |
| --- | --- |

| | |
|---|---|
| **MATERIAL TERMS OF THE BIDDING PROCEDURES** | |
| | • **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors and, if required, its shareholders (or a comparable governing body reasonably acceptable to the Debtor) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid. |
| | • **No Fees**. Except as otherwise provided in the Stalking Horse Agreement with respect to the Stalking Horse Bid: (a) each Potential Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction; (b) by submitting its Bid, each Potential Bidder agrees to waive its right to request or receive fees or reimbursement of expenses on any basis, including under section 503(b) of the Bankruptcy Code; and (c) each Bid must expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement. |
| | • **Adherence to Bidding Procedures**.  By submitting its Bid, each Potential Bidder is agreeing to (a) abide by and honor the terms of the Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction and (b) serve as Back-Up Bidder(s), if its Bid is selected as the next highest or next best bid after the Successful Bid with respect to the Assets. |
| | • **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its Bid, (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Potential Bidder's proposed purchase agreement for the Assets. |
| | • **Time Frame for Closing**.  A Bid by a Potential Bidder must be reasonably likely to be consummated, if selected as the |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | Successful Bid (as defined herein), within a time frame reasonably acceptable to the Debtor (in consultation with the Consultation Parties, but in no event later than **September 9, 2022.**

• **Consent to Jurisdiction**. The Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the Debtor's qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the Closing, as applicable.

Bids fulfilling all of the preceding requirements, as determined by the Debtor and its advisors, in the Debtor's reasonable business judgment (in consultation with the Consultation Parties) will be deemed to be "Qualified Bids," and those parties submitting Qualified Bids will be deemed to be "Qualified Bidders." All information disclosed by any Potential Bidder in connection with all of the preceding requirements will be made available by the Debtor; *provided* that the Debtor shall provide the Stalking Horse Bidder with the number of Qualified Bids received and the amount of each respective Qualified Bid. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder** Local Rule 6004-1(c)(i)(C) | If the Stalking Horse Bidder is not the Successful Bidder, it will receive a payment of a break-up fee equal to (i) $126,000 (3% of the cash purchase price), plus an expense reimbursement of up to $126,000 (3% of the cash purchase price). |
| **Modification of Bidding and Auction Procedures** Local Rule 6004-1(c)(i)(D) | • The Debtor reserves the right (in consultation with the Consultation Parties, to alter the $100,000 overbid increment under the Bidding Procedures. (**Bid Procedures, Section F**)

• In the event that the Debtor receives multiple bids that, in the aggregate, would be higher or otherwise better than the Stalking Horse Bid, the Debtor, after consultation with the Consultation Parties, may combine the bids to determine the highest and best bid. The right to combine bids shall be strictly limited to the Debtor, after consultation with the Consultation Parties, and shall not waive any restriction or prohibition by any Bidder against collusion without the Debtor's express permission.

• The Debtor reserves the right, in its reasonable business judgment (after consultation with the Consultation Parties) to |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | adjourn the Auction one or more times.  **(Bid Procedures, Section F)** |
| **Closing with Alternative Back- Up Bidders** <br> Local Rule 6004- 1(c)(i)(E) | If for any reason the Successful Bidder fails to consummate the Sale within the agreed upon time permitted as set forth in the order approving Sale to the Successful Bidder, then the Qualified Bidders or Qualified Bidders with the next-highest Bid or otherwise second-best Bid for the Assets (each, a "<u>Back-Up Bidder</u>"), will automatically be deemed to have submitted the highest or otherwise best Bid (each, a "<u>Back-Up Bid</u>"), and the Debtor will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid as soon as commercially reasonably practicable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court. <br><br> Upon designation of the Back-Up Bidder(s) at the Auction, the Back-Up Bid or Back-Up Bids must remain open until the Closing of the Successful Bid or Successful Bids, as applicable. **(Bidding Procedures, Section I)** |
| **Provisions Governing the Auction** <br> Local Rule 6004- 1(c)(ii) | If one or more Qualified Bids is received by the Bid Deadline, the Debtor will conduct the Auction with respect to the Assets. The Auction will commence on **September 6, 2022 at 10:00 a.m.** which will be held at the offices of the proposed counsel for the Debtor, Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, DE 19801, telephonically, or by video via Zoom, or such later time or other place as the Debtor will timely notify all other Qualified Bidders, after consultation with the Consultation Parties. <br><br> **Auction Procedures:** <br><br> • the Auction will be conducted openly; <br><br> • only the Qualified Bidders, including the Stalking Horse Bidder, will be entitled to bid at the Auction; <br><br> • the Qualified Bidders, including the Stalking Horse Bidder, must appear in person, telephonically, or by video via Zoom, or through duly-authorized representatives at the Auction; <br><br> • only the duly-authorized representatives of each of the Qualified Bidders (including the Stalking Horse Bidder) and the Consultation Parties will be permitted to attend the Auction; *provided* that any party in interest may request permission to attend the Auction, and the Debtor, after |

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

|  | consultation with the Consultation Parties, may permit such party to attend the Auction;<br><br>• prior to the Auction, the Debtor and its advisors, after consultation with the Consultation Parties, will evaluate Qualified Bids and identify the Qualified Bid that is the highest or otherwise best Bid (the "Starting Bid");<br><br>• the bidding at the Auction will begin at the Starting Bid;<br><br>• subsequent Bids at the Auction, including any Bids by the Stalking Horse Bidder, must be made in minimum increments of $100,000;[6]<br><br>• each Qualified Bidder will be informed of the terms of the previous Bids and the Debtor shall, during the course of the Auction, promptly inform each Qualified Bidder of which subsequent Bids reflect, in the Debtor's reasonable business judgment, after consultation with the Consultation Parties, the highest or otherwise best bid(s) for the Assets;<br><br>• the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;<br><br>• each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale<br><br>• the Auction will not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then prevailing highest or otherwise best Bid;<br><br>• the Debtor reserve the right, in its reasonable business judgment, after consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things, (a) facilitate discussions between the Debtor and Qualified Bidders, (b) allow Qualified Bidders to consider how they wish to proceed, and (c) provide Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor, in its reasonable business judgment and in consultation with the Consultation Parties, may require |

---

[6]     The Debtor reserves the right to alter the minimum Bid increments after consultation with the Consultation Parties.

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | to establish that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and<br><br>• the Auction will be governed by such other Auction Procedures as may be announced by the Debtor and its advisors, after consultation with the Consultation Parties, from time to time on the record at the Auction; provided that such other Auction Procedures are (a) not inconsistent with the Bidding Procedures Order, the Bankruptcy Code, or any other order of the Bankruptcy Court, (b) disclosed orally or in writing to all Qualified Bidders and other attendees at the Auction and recorded on the record, and (c) determined by the Debtor, in good faith and after consultation with the Consultation Parties, to further the goal of attaining the highest or otherwise best offer for the Assets.<br><br>To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, and (ii) to the extent a Qualified Bidder fails to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtor, in its reasonable business judgment and after consultation with Consultation Parties, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for the Assets |

9.      The Stalking Horse Bidder, shall be entitled to credit bid all or a portion of the outstanding obligations owed to Astrobotic to as of the Bid Deadline in accordance with section 363(k) of the Bankruptcy Code, and nothing herein or in the Sale Procedures shall prejudice or impair such credit bid rights. For the avoidance of doubt, every dollar of a credit bid shall be treated the same as a dollar from a cash bid. The Stalking Horse Bidder shall be deemed Qualified Bidder for all purposes under the Bidding Procedures.

A.       **No Bid May Be Subject to Restrictions on Transfer of Assets**

10.       Further, any Bid that the Debtor, after consultation with the Consultation Parties, determines is unlikely to be consummated prior to the Closing Deadline due to regulatory limitations under the laws enacted by the Committee on Foreign Investment in the United States (CIFIUS), including but not limited to the Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA), International Traffic in Arms Regulations (ITAR), and Export Administration Regulation (EAR), may be deemed to not be a Qualifying Bid.  **All Bids are expressly conditioned upon a sworn declaration that the transfer of the Assets is not conditional upon governmental regulation and approval.**

III.     **THE BID PROTECTIONS**

11.       To induce the Stalking Horse Bidder to expend the time, energy and resources necessary to negotiate and ultimately execute the Stalking Horse Agreement and to keep the Stalking Horse Bid memorialized therein open and irrevocable through the Debtor's competitive auction process, the Debtor has agreed to provide the Stalking Horse Bidder with, and seek this Court's approval of, certain protections pursuant to the terms of the Stalking Horse Agreement.

12.       Subject to the terms of the Stalking Horse Agreement, if the Successful Bidder is not Astrobotic or its designee, such Stalking Horse shall be entitled to a break-up fee equal to (i) $126,000 (3% of the cash purchase price), plus an expense reimbursement of up to $126,000 (3% of the cash purchase price).  The Stalking Horse Bidder shall be entitled to receive the break-up fee and expense reimbursement (if applicable) only if it is not the Successful Bidder. The Debtor asserts that the break-up fee and expense reimbursement proposed hereunder are in line with market rates and with sales routinely approved by this Court.

IV.     **FORM AND MANNER OF SALE NOTICE**

13.     As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtor will serve the Sale Notice upon the following parties or their respective counsel, if known (collectively, the "Notice Parties"): (a) the Committee (if appointed); (b) the U.S. Trustee for the District of Delaware; (c) SpaceX; (d) the Stalking Horse Bidder; (e) any parties known or reasonably believed to have expressed an interest in the Assets; (f) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in the Debtor's assets; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.

14.     The Debtor submits that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures and the dates and deadlines related thereto; (c) the dates and deadlines related to the Sale Hearing; and (d) instructions for promptly obtaining a copy of the Stalking Horse Agreement, Bidding Procedures, and Bidding Procedures Order. Accordingly, the Debtor requests that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction or Sale Hearing is required.

## BASIS FOR RELIEF

### I.      THE RELIEF SOUGHT IN THE BIDDING PROCEDURES ORDER, INCLUDING ENTRY INTO THE STALKING HORSE AGREEMENT IS IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE AND SHOULD BE APPROVED

15.     Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of a debtor's estate, courts have approved the authorization of a sale of a

debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g.,* *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

16.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was provided to interested parties, (c) whether the sale will produce a fair and reasonable price for the property, and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656.

17.     Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

18.     After an extensive prepetition and postpetition marketing process, the Debtor has carefully designed a post-petition process that it believes will maximize the value of its estate, produce maximum recoveries, and result in a successful restructuring of its estate. This process includes both entry into the Stalking Horse Agreement, to set a baseline bid for the Auction (if any), and the Bidding Procedures, which are designed to promote active bidding from seriously interested parties and to elicit the highest or otherwise best offers available for the Assets.  The Debtor is confident that the Bidding Procedures will allow the Debtor to solicit additional offers and conduct its sale process in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the highest and best consideration to be realized on account of Assets.  In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

19.     The Debtor respectfully submits that the Stalking Horse Agreement and the Bidding Procedures will encourage robust bidding for Assets and are appropriate under, and consistent with, the relevant standards governing overbid processes in bankruptcy proceedings.  Accordingly, the Debtor respectfully submits that the Stalking Horse Agreement and the Bidding Procedures should be approved.

## II.     APPROVAL OF THE BID PROTECTIONS IS APPROPRIATE

20.     The Debtor believes that the Bid Protections are fair and reasonable under the circumstances. The Bid Protections provided for in the Stalking Horse Agreement were negotiated at arms' length and in good faith and were a necessary inducement to the Stalking Horse Bidder's participation in the proposed sale transaction and willingness to subject its bid to a competitive auction process.  As discussed below, the Stalking Horse Bid sets a "floor" value for the Assets

that maximizes the likelihood that the Debtor will receive the highest or otherwise best offer for the Assets to the benefit of the Debtor's estate.

21.     Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two (2) instances in which bid protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533. Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *See id.; see also In re Reliant Energy Channel View LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

22.     In *O'Brien*, the Third Circuit reviewed the following nine (9) factors set forth by the lower court as relevant in deciding whether to award a termination fee:

(a)     the presence of self-dealing or manipulation in negotiating the break-up fee;

(b)     whether the fee harms, rather than encourages, bidding;

(c)     the reasonableness of the break-up fee relative to the purchase price;

(d)     whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

(e)     the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

29

(f)     the correlation of the fee to a maximum value of the debtor's estate;

(g)     the support of the principal secured creditors and creditors' committee of the break-up fee;

(h)     the benefits of the safeguards to the debtor's estate; and

(i)     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc*., 181 F.3d at 536.

23.     While none of the factors is dispositive, an application of the facts to several of such factors supports the approval of the Bid Protections.  In particular, the Bid Protections are necessary to preserve the value of the Debtor's estate because they will enable the Debtor to establish an adequate floor value for the Assets and to therefore insist that competing bids be materially higher or otherwise better than the Stalking Horse Bid—a clear benefit to the Debtor's estate.  The Stalking Horse Bidder would not agree to act as a stalking horse without the Bid Protections given the substantial time and expense it has incurred in connection with negotiating definitive documentation and the risk that it will be outbid at the Auction.  Without the Bid Protections, the Debtor might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder.  The bid of the Stalking Horse Bidder sends a message to all potential bidders that the Assets is at least worth the Purchase Price and puts pressure on potential competing bidders to "put their best foot forward" in formulating their bids.  Therefore, without the benefit of the bid of the Stalking Horse Bidder, the bids received at auction for the Assets could be substantially lower than the bid offered by the Stalking Horse Bidder.

24.     In addition, payment of the Bid Protections in the context of a sale to another purchaser will not diminish the Debtor's estate to the extent they become payable, as the Bidding

Procedures require that any competing bid must exceed the Stalking Horse Bid by an amount in excess of the Bid Protections.

25.     Accordingly, based on the foregoing, the Debtor submits that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved.

## III.    THE FORM AND MANNER OF THE SALE NOTICE SHOULD BE APPROVED

26.     Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with 21 days' notice of an auction. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the proposed auction and the deadline for filing any objections to such a sale.

27.     As soon as reasonably practicable following entry of the Bidding Procedures Order, the Debtor will cause the Sale Notice to be served upon the Notice Parties.

28.     The Debtor submits that the Sale Notice, which includes information concerning the "free and clear" nature of the Sale, the Bidding Procedures, the Stalking Horse Bid and other material information, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Rule 6004-1.  Accordingly, no further notice is necessary and the Debtor requests that this Court approve the form and manner of the notice of the Sale Notice.

## IV.    APPROVAL OF THE SALE IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE

### A.    The Sale Should Be Approved as an Exercise of the Debtor's Sound Business Judgment

29.     Bankruptcy Code section 363(b) provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have found that a debtor's sale or

31

use of its assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated business justification." *See In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Delaware & Hudson Railway Co*., 124 B.R. 169, 176 (D. Del. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc*., 788 F.2d 143 (3rd Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983).

30.    Once a debtor articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co*., 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc*., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp*., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

31.    The Debtor has a sound business justification for running a competitive bidding process for the sale of the Assets consistent with the Bidding Procedures. The competitive bidding process will ensure that the Debtor obtains the best possible value for the Assets, for the benefit of the Debtor's estate. As such, the Debtor's determination to run a competitive bidding process for the sale of the Assets as provided for in the Bidding Procedures is a valid and sound exercise of the Debtor's business judgment.

**B.    Adequate and Reasonable Notice of the Sale Will Be Provided**

32.    As set forth above, the Sale Notice (a) will be served in a manner that provides all parties with notice of the date, time and location of the Auction and the Sale Hearing, (b) informs interested parties of the deadlines for objecting to the Sale, and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding

Procedures Order, after notice and a hearing, before it is served on parties in interest, and, as such, the Debtor is confident that the Sale Notice will be properly vetted by the time of service thereof.

### C.     The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good Faith Buyer"

33.     Pursuant to Bankruptcy Code section 363(m), a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). (3d Cir. 1986) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995).

34.     In other words, a party would have to show fraud or collusion between the successful bidder and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith.  *See In re Pursuit Capital Mgmt.*, LLC, 874 F.3d 124, 135 (3d Cir. 2017) ("The good faith requirement speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Dura Auto. Sys., Inc.*, No. 06-11202 KJC, 2007 WL 7728109, at *96 (Bankr. D. Del. Aug. 15, 2007) (same).

35.     Notwithstanding the foregoing, the Debtor is seeking to maximize the value of the estate by obtaining the highest and best bid for the Assets, and it seeks the flexibility to structure bidding prior to or at the Auction that will best suit those goals.  Accordingly, if the Debtor receives multiple bids that, in the aggregate, would constitute an aggregate amount that is higher or otherwise better than the Stalking Horse Bid, the Debtor, after consultation with the Consultation Parties, may aggregate the bids and determine the highest and best bids.  The right to combine bids shall be strictly limited to the Debtor, after consultation with the Consultation Parties, and shall not waive any restriction or prohibition by any Bidder against collusion.

36.     The Debtor submits that the Successful Bidder arising from the Auction (if any), will be a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m) and the terms of any purchase agreement with any Successful Bidder will be negotiated at arms-length and in good faith without any collusion or fraud.[7] Accordingly, the Debtor will be prepared to show at the hearing to approve any such sale that the Successful Bidder is entitled to the full protections of Bankruptcy Code section 363(m).

### D.     The Sale Should Be Approved "Free and Clear" Under Bankruptcy Code Section 363(f)

37.     Bankruptcy Code section 363(f) permits a debtor to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities

---

[7] Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*See* 11 U.S.C. § 363(m).

therein as in the sold assets). As Bankruptcy Code section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f). *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same). The Debtor believes that it will be able to demonstrate at the Sale Hearing that it has satisfied one or more of these conditions.

     **E.**     **The Release of Estate Claims against SpaceX Should be Granted.**

     38.     Section 9.8 of the Stalking Horse Agreement, titled "Release of SpaceX by Seller" provides as follows:

> The Sale Order shall include a release of SpaceX by the Seller in the following form:
>
> Effective upon entry of the Sale Order, the Seller, on behalf of itself, its estate and any trustee, its predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates and assigns, and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, advisors, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting by, through, under, or in concert with them, and each of them (collectively, the ***"Seller Releasing Parties"***), hereby release and discharge SpaceX, together with its predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates and assigns and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, advisors, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting by, through, under, or in concert with them, and each of them (collectively, the ***"SpaceX Released Parties"***), from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, wages, of any nature whatsoever, known or unknown, which the Seller Releasing Parties have, or may have had, against the SpaceX Released Parties, whether or not apparent or yet to be discovered, or which may hereafter develop, for any acts or omissions from the beginning of time until present arising from or relating to (i) the LSA, (ii) the SpaceX Credit, (iii) the Credit, (iv) the Credit Letter, (v) the Purchased Assets, (vi) the SpaceX Contract or (vii) the

Bankruptcy Case.  Notwithstanding the foregoing, in the event SpaceX files a proof of claim or asserts an informal claim against the Seller or its bankruptcy estate, Seller retains the right to object to, resolve or settle any such claim.

39.     This provision was expressly required by SpaceX as consideration in exchange for permitting the SpaceX to be assumed and assigned to the Stalking Horse Bidder (and likely any other Bidder for the SpaceX Credit).  Even it were not included, Schedule 2.3 of the Stalking Horse Agreement provides that the all claims and causes of action of the Buyer, except as set forth in Section 7.7 of the Stalking Horse Agreement and the estate claims and causes of action against Agile Space Industries, Inc., are to be sold to the Stalking Horse Bidder.

40.     Accordingly, the release of the estate's claims against SpaceX, to the extent that there are any, would have no value.  The Debtor, after considering the <u>Martin</u> factors,[8] has determined, as an exercise of its business judgment, that the release of the estate's claims against SpaceX is in the best interest of the Debtor, the bankruptcy estate, and the Debtor's creditors.

## F.     <u>WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)</u>

41.     To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## <u>NOTICE</u>

42.     Notice of this Motion will be given to: (i) the Office of the United States Trustee, (ii) The United States Attorney, (iii) counsel for Astrobotic Technology, Inc., (iii) counsel for Space Exploration Technologies Corp., (iii) all parties known to have asserted a security interest

---

[8] In determining whether a settlement should be approved under Bankruptcy Rule 9019, the Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996).  In considering whether to approve a settlement, the Court should consider: "(i) the probability of success in the litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors." <u>Id</u>.

in the Debtor's assets, and (v) all parties having filed an entry of appearance and request for notice in this case.  The Debtor submit that, under the circumstances, no other or further notice is required.

WHEREFORE, the Debtor respectfully requests that the Court enter the Bidding Procedures Order, (i) granting the relief requested in this Motion and (ii) granting to the Debtor such other relief as may be just and proper.

Dated: August 14, 2022               MORRIS JAMES LLP
       Wilmington, Delaware

*/s/*      *Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Brya M. Keilson (DE Bar No. 4643)
Sarah M. Ennis (DE Bar No. 5745)
500 Delaware Avenue; Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: bkeilson@morrisjames.com
E-mail: sennis@morrisjames.com

*Proposed Counsel for Debtor and Debtor in Possession*

13731223/5