**Exhibit A**
**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**by and among**

**MASTEN SPACE SYSTEMS, INC.**
**a Delaware corporation,**

**as Seller,**

**and**

**ASTROBOTIC TECHNOLOGY, INC.**

**a Pennsylvania Corporation, as Buyer**

**Dated as of August 12, 2022**

# TABLE OF CONTENTS

I. DEFINITIONS; CERTAIN INTERPRETIVE MATTERS. .............................................. 1

    1.1    Definitions .................................................................................................. 1
    1.2    Interpretive Matters ................................................................................... 6

II. PURCHASE AND SALE. ........................................................................................... 7

    2.1    Purchase Price ........................................................................................... 7
    2.2    Purchased Assets ....................................................................................... 7
    2.3    Excluded Assets ........................................................................................ 7
    2.4    All Liabilities Excluded ............................................................................ 7

III. CLOSING. ................................................................................................................ 8

    3.1    Closing Date .............................................................................................. 8
    3.2    Payments on the Closing Date ................................................................... 8
    3.3    Tax Returns ............................................................................................... 8
    3.4    Allocation of Purchase Price ..................................................................... 8

IV. REPRESENTATIONS AND WARRANTIES OF SELLER. ......................................... 8

    4.1    Existence; Power ....................................................................................... 8
    4.2    Authorization; Enforceability ................................................................... 9
    4.3    Governmental Authorization; No Conflict ............................................... 9
    4.4    Finders' Fees ............................................................................................. 9
    4.5    Title to Assets ........................................................................................... 9
    4.6    Taxes ...................................................................................................... 10
    4.7    Compliance with Laws ........................................................................... 10
    4.8    Proceedings ............................................................................................. 10

V. REPRESENTATIONS AND WARRANTIES OF BUYER. .......................................... 10

    5.1    Existence; Power ..................................................................................... 10
    5.2    Authorization; Enforceability ................................................................. 10
    5.3    Governmental Authorization; No Conflict ............................................. 11
    5.4    Adequate Funds ...................................................................................... 11
    5.5    Finders' Fees ........................................................................................... 11

VI. BANKRUPTCY MATTERS. .................................................................................... 11

    6.1    Bankruptcy Court Approval .................................................................... 11
    6.2    Stalking Horse Status .............................................................................. 12
    6.3    Sale Procedures Order and Sale Order .................................................... 12
    6.4    Bidding Procedures ................................................................................. 12
    6.5    Conflicts ................................................................................................. 12

VII. ADDITIONAL AGREEMENTS. ............................................................................... 12

    7.1    Conduct of Business ............................................................................... 12
    7.2    Efforts; Cooperation ............................................................................... 13
    7.3    Access to Information; Reporting ............................................................ 13
    7.4    Further Assurances ................................................................................. 13

| | 7.5 | No Outside Reliance | 14 |
| | 7.6 | Pre-Closing Confidentiality | 14 |
| | 7.7 | Public Announcements | 14 |
| VIII. | | CLOSING DELIVERABLES. | 15 |
| | 8.1 | Closing Deliverables of Seller | 15 |
| | 8.2 | Closing Deliverables of Buyer | 15 |
| IX. | | CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE. | 16 |
| | 9.1 | Accuracy of Representations | 16 |
| | 9.2 | Buyer's Performance | 16 |
| | 9.3 | Buyer's Deliveries | 16 |
| | 9.4 | Government Orders | 16 |
| | 9.5 | No Injunction | 16 |
| | 9.6 | Entry of Sale Order | 16 |
| X. | | CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE. | 17 |
| | 10.1 | Accuracy of Representations | 17 |
| | 10.2 | Seller's Performance | 17 |
| | 10.3 | Seller's Deliveries | 17 |
| | 10.4 | Government Orders | 18 |
| | 10.5 | No Injunction | 18 |
| | 10.6 | Entry of Sale Order | 18 |
| | 10.7 | Financing | 11 |
| | 10.8 | No Material Adverse Effect | 18 |
| XI. | | TERMINATION AND REMEDIES. | 18 |
| | 11.1 | Termination Events | 18 |
| | 11.2 | Effect of Termination | 19 |
| | 11.3 | Injunctive Relief | 19 |
| | 11.4 | Damages and Limitation of Liability | **Error! Bookmark not defined.** |
| | 11.5 | Remedies Cumulative | 20 |
| XII. | | MISCELLANEOUS. | 20 |
| | 12.1 | Survival | 20 |
| | 12.2 | Notices | 20 |
| | 12.3 | Amendments and Waivers | 21 |
| | 12.4 | No Presumption Against Drafting Party | 21 |
| | 12.5 | Expenses | 22 |
| | 12.6 | Successors and Assigns | 22 |
| | 12.7 | Entire Agreement | 22 |
| | 12.8 | Severability | 22 |
| | 12.9 | No Third-Party Beneficiaries | 22 |
| | 12.10 | Governing Law | 23 |
| | 12.11 | Consent to Jurisdiction | 23 |
| | 12.12 | WAIVER OF JURY | 23 |
| | 12.13 | Counterparts | 23 |

12.14   Time of the Essence ............................................................................. 23

## LIST OF SCHEDULES

Schedule 2.2.1          Contracts to be Assumed and Assigned to Buyer

Schedule 2.3            Listed Excluded Assets

Schedule 4.3            Required Consents

Schedule 4.5            Specified Encumbrances

Schedule 4.8            Proceedings

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "***Agreement***") is dated as of August 12, 2022 by and among MASTEN SPACE SYSTEMS, INC., a Delaware corporation ("***Seller***"), and Astrobotic Technology, Inc. A Pennsylvania Corporation, (the "***Buyer***"). Seller and Buyer are each referred to individually as a "***Party***," and collectively as the "***Parties***."

## RECITALS

A.      Seller is the owner of certain assets, of which Buyer wishes to purchase those Purchased Assets as defined in Section 2.2.

B.      On July 28, 2022, Seller a filed a voluntary bankruptcy petition (the "***Bankruptcy Case***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") pursuant to Chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").

C.      Seller will file a motion (the "***Sale Motion***") seeking entry of an order (the "***Sale Procedures Order***"), which order shall be in form and substance reasonably satisfactory to Buyer, authorizing Seller, among other things, to conduct a sale process for the Purchased Assets (the "***Sale***"), and approving procedures with respect thereto (the "***Bidding Procedures***") including approval of the Break-Up Fee and Expense Reimbursement.

D.      Subject to and in accordance with the Sale Procedures Order (including the receipt of a higher or otherwise better bid), once entered, Seller intends to sell the Purchased Assets on the terms and conditions contained in this Agreement, including obtaining an order from the Bankruptcy Court pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Rules 2002, 6003, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedures (the "***Bankruptcy Rules***") authorizing the transactions contemplated hereunder, in form and substance reasonably satisfactory to Buyer (the "***Sale Order***").

NOW THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, the Parties hereby covenant and agree as follows:

## I.      DEFINITIONS; CERTAIN INTERPRETIVE MATTERS.

1.1      <u>Definitions</u>. For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"***Affiliate***" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of the foregoing definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Agreement***" has the meaning set forth in the introductory paragraph.

"***Allocation***" has the meaning set forth in <u>Section 3.4</u>.

1

"***Alternative Transaction***" means a sale of substantially all of the Purchased Assets to a Third Party, whether pursuant to the Auction or otherwise; provided, however, that any Alternative Transaction must comply with the Sale Procedures Order, including by providing for cash payment in full upon closing of the Break-Up Fee and Expense Reimbursement.

"***Applicable Law***" means, with respect to any Person, any transnational, domestic or foreign federal, state, provincial, municipal or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, Order, ruling or other similar requirement enacted, adopted, promulgated, enforced or applied by a Governmental Authority that is binding upon or applicable to such Person or its properties, as amended unless expressly specified otherwise.

"***Assigned Contracts***" has the meaning of those contracts and leases identified by Buyer and set forth on Schedule 2.2.1 to be assumed by the Seller and assigned to the Buyer pursuant to Section 365 of the Bankruptcy Code, to the extent allowed by the Bankruptcy Code and applicable nonbankruptcy law.

"***Auction***" has the meaning set forth in the Bidding Procedures.

"***Back-Up Bidder***" has the meaning set forth in the Bidding Procedures.

"***Bankruptcy Case***" has the meaning set forth in the Recitals.

"***Bankruptcy Code***" has the meaning set forth in the Recitals.

"***Bankruptcy Court***" has the meaning set forth in the Recitals.

"***Bankruptcy Rules***" has the meaning set forth in the Recitals.

"***Bidding Procedures***" has the meaning set forth in the Recitals.

"***Break-Up Fee***" means cash in the amount of $126,000, which is equal to 3% of the cash portion of the Purchase Price.

"***Business***" means Seller's commercial activities related to the design, manufacture, and operation of rockets, rocket-powered vehicles, spacecraft, and related technology.

"***Business Day***" means any day other than a Saturday or Sunday or a holiday in the State of Delaware.

"***Buyer***" has the meaning set forth in the introductory paragraph.

"***Claim***" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"***Closing***" has the meaning set forth in Section 3.1.

"***Closing Date***" has the meaning set forth in Section 3.1.

2

"***Code***" means the United States Internal Revenue Code of 1986 (as amended) and the regulations promulgated thereunder.

"***Confidentiality Agreement***" means that certain Non-Disclosure Agreement, dated as of August 3, 2022, by and between Buyer and Seller.

"***Contract***" means any agreement, contract, purchase order, lease, deed, license, instrument, commitment, undertaking or obligation (in each case, whether written or oral) that is legally binding, in each case as amended, supplemented, modified, restated, or extended from time to time, and including all exhibits, schedules, addenda, and other attachments thereto.

"***Cure Costs***" means that, for only the Assigned Contracts, all amounts that are determined by a Final Order of the Bankruptcy Court must be paid, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assigned Contracts to Buyer as provided herein.

"***Encumbrances***" means any mortgage, deed of trust, hypothecation, assignment, preemptive purchase right, charge, Judicial Lien, Claim, community property interest, right-of way, easement, covenant, condition, equitable interest, Lien, option, pledge, security interest, instrument, setoff or recoupment rights, right of first refusal or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"***Equitable Principles***" has the meaning set forth in <u>Section 4.2</u>.

"***Excluded Assets***" has the meaning set forth in <u>Section 2.3</u>.

"***Expense Reimbursement***" means cash in an amount of up to $126,000 (which is equal to 3% of the cash portion of the Purchase Price) on account of reasonable and out-of-pocket costs and expenses that may be incurred by the Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement or any previous versions thereof.

"***Final Order***" means an order of any court or tribunal, which has not been stayed, appealed, amended, reversed, modified, or vacated.

"***GAAP***" means generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis.

"***Governmental Authority***" means any court or tribunal in any jurisdiction (domestic or foreign) or any federal, tribal, state, parish, county, municipal or other governmental or quasi-governmental, administrative or regulatory body, agency, authority, department, board, commission, bureau, official or other authority or instrumentality, in each case, of competent jurisdiction.

"***Indebtedness***" of any Person means, without duplication, (a) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person

for money borrowed, and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (c) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transactions, and (d) all obligations of the type referred in clauses (a) through (c) of any Person for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations.

"*IRS*" means the United States Internal Revenue Services.

"*Judicial Lien*" has the meaning set forth in Section 101(36) of the Bankruptcy Code.

"*Knowledge of Seller*" and similar wording (e.g., "*Seller has no Knowledge*" or "*Seller's Knowledge*") means the actual knowledge of each of Dave Masten, Michael Adams, Jenna Edwards, and Sean Bedford after making reasonable inquiry with respect to the particular matter in question.

"*Law*" means any applicable federal, state, county, city, municipal, foreign, or other governmental statute, law, rule, regulation, ordinance, order, code, or requirement (including pursuant to any settlement agreement or consent decree) and any permit or license granted under any of the foregoing, or any requirement under the common law.

"*Liability*" means any and all Claims, debts, Indebtedness, Encumbrances, losses, damages, adverse claims, liabilities, fines, surcharges, penalties, duties, responsibilities, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind, character, or description, whether known or unknown, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due.

"*Lien*" has the meaning set forth in Section 101(37) of the Bankruptcy Code.

"*LSA*" means Launch Services Agreement between Seller and SpaceX for the Masten XL—1 mission, which was terminated by SpaceX pursuant to the Credit Letter.

"*Master Assignment*" means the Assignment, Bill of Sale, and Conveyance in the form to be mutually agreed by the Parties prior to the Closing (which mutual agreement shall not be unreasonably withheld, delayed or conditioned). For avoidance of doubt, the Master Assignment shall include terms necessary to effectuate the transfer/assignment of the SpaceX Credit free and clear of liens, claims, and encumbrances including any rights of setoff or recoupment.

"*Material Adverse Effect*" means any circumstance, condition, occurrence, event that, individually or in the aggregate (a) would be reasonably expected to materially impair

Seller's ability to consummate the transactions contemplated by this Agreement by the Outside Date; or (b) would be reasonably expected to have, a material adverse effect on the Purchased Assets; provided, however, that solely with respect to clause (b) of this definition "***Material Adverse Effect***" shall not include any circumstance, condition, occurrence, event directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Business operates; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (vi) any changes in Applicable Laws or accounting rules (including GAAP); (vii) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with Seller and the Business; (viii) any natural or man-made disaster or acts of God; (ix) any epidemics, pandemics, disease outbreaks, or other public health emergencies; (x) any failure by the Business to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded); or (xi) events giving rise to, or changes resulting from, the commencement and continuation of the Bankruptcy Case.

"***Order***" means any award, writ, injunction, judgment, stay, temporary restraining order, order, decree or other restraint entered, issued, made or rendered by any Governmental Authority.

"***Outside Date***" has the meaning set forth in Section 11.1.2.

"***Party***" or "***Parties***" has the meaning set forth in the introductory paragraph.

"***Person***" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"***Petition Date***" means July 28, 2022.

"***Proceeding***" means any Claim, action, arbitration, audit, appeal, petition, inquiry, investigation, complaint, hearing, litigation, suit, or other dispute (whether civil, criminal or administrative) commenced, brought, conducted, or heard by or before any Governmental Authority or arbitrator.

"***Purchase Price***" has the meaning set forth in Section 2.1.

"***Representatives***" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"*Retained Liabilities*" has the meaning set forth in <u>Section 2.4</u>.

"*Sale*" has the meaning set forth in the Recitals.

"*Sale Order*" has the meaning set forth in the Recitals.

"*Sale Motion*" has the meaning set forth in the Recitals.

"*Sale Procedures Order*" has the meaning set forth in the Recitals.

"*Seller*" has the meaning set forth in the introductory paragraph.

"*SpaceX*" means Space Exploration Technologies Corp., a Delaware corporation.

"*SpaceX Credit*" means a certain credit of $14,000,000 (the "*Credit*") provided to Seller by SpaceX, without rights of setoff or recoupment against Buyer by SpaceX, in connection with the now-terminated LSA in that certain "Notice of Termination" letter, dated June 30, 2022, from SpaceX to Seller (the "*Credit Letter*").

"*Stalking Horse*" has the meaning set forth in <u>Section 6.2</u>.

"*Successful Bidder*" has the meaning set forth in the Bidding Procedures.

"*Tax*" or "*Taxes*" (and with correlative meaning, "*Taxable*", "*Taxation*" "*Taxing*") means all federal, state, local or foreign taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real property, personal property, unclaimed property and estimated taxes or other tax of any kind whatsoever, including any interest, penalties and additions thereto and recapture or reimbursement obligations with respect to any tax abatement or other tax benefit, whether disputed or not, and including any amounts paid to any governmental entity and deemed by agreement with that entity to constitute taxes and any obligation to indemnify or otherwise assume or succeed to the tax liability of any other Person.

"*Tax Returns*" means any return, declaration, report, estimate, information return and statement filed or required to be filed in respect of any Taxes (including any attachment thereto or amendment thereof).

"*Third Party*" means any Person other than Seller, Buyer or any of their respective Affiliates.

"*Transfer Taxes*" has the meaning set forth in <u>Section 3.3</u>.

1.2    <u>Interpretive Matters</u>.  Unless the context requires otherwise, (i) all references to Sections, Articles, Exhibits, or Schedules are to Sections, Articles, Exhibits, or Schedules of or to this Agreement, with each Schedule being made a part of this Agreement for all purposes, (ii) each accounting term not otherwise defined in this Agreement has the meaning commonly applied to it

in accordance with GAAP, (iii) words in the singular include the plural and vice versa, (iv) all references to $ or dollar amounts are to lawful currency of the United States, (v) unless otherwise specified, the term "day" or "days" refers to calendar days, (vi) the pronoun "his" refers to the masculine, feminine, and neuter, (vii) the words "herein," "hereby," "hereof," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular Section, Article, or other subdivision, and (viii) the term "including" means "including without limitation."

## II.    PURCHASE AND SALE.

2.1    <u>Purchase Price</u>.  The purchase price for the Purchased Assets under this Agreement is an amount (the "***Purchase Price***") equal to (i) Four Million, Two Hundred Thousand Dollars ($4,200,000.00), (ii) a waiver of all claims of the Buyer against the Seller's bankruptcy estate other than those claims specifically created by this Agreement, and (iii) Cure Costs for Assigned Contracts.  The Purchase Price will be delivered by Buyer as set forth in <u>Section 3.2</u>.

2.2    <u>Purchased Assets</u>.  Subject to the terms and conditions set forth in this Agreement, at the Closing and in exchange for the Purchase Price, Seller agrees to sell, convey, assign, transfer and deliver to Buyer, and Buyer agrees to accept, purchase, acquire, assume and take delivery of, all right, title and interest in and to the all of the Debtor's assets, including the SpaceX Credit ("***Available Assets***"), however, the Buyer may elect to exclude any asset from the Purchased Assets by listing such excluded asset in Schedule 2.3 ("***Listed Excluded Assets***") up to two (2) Business Days before Closing (the Available Assets less the Listed Excluded Assets are hereinafter referred to as the "***Purchased Assets***").

2.2.1    <u>Executory Contracts and Leases</u>.  To the extent permitted by the Bankruptcy Code and applicable nonbankruptcy law, Purchased Assets shall include the Assigned Contracts, a complete list of which is contained on Schedule 2.2.1, however the Buyer may elect to exclude any Assigned Contracts from Schedule 2.2.1 up to two (2) Business Days before Closing.

2.3    <u>Excluded Assets</u>.  Except for the Purchased Assets, all other assets, properties and rights of Seller, including without limitation, the Listed Excluded Assets, the rights of Seller under this Agreement and the Master Assignment (collectively, the "***Excluded Assets***") are hereby and shall be retained by Seller, and are not being sold or assigned to Buyer hereunder.

2.4    <u>All Liabilities Excluded</u>.  Notwithstanding any provision in this Agreement to the contrary, Buyer does not and shall not assume and does not agree to pay, perform, fulfill or discharge, and shall not be responsible to pay, perform, fulfill or discharge any of Seller's Liabilities, or any of Seller's Affiliates' Liabilities, of any kind or nature whatsoever (the "***Retained Liabilities***"), and Seller shall be solely and exclusively liable for all such Liabilities, <u>however</u> Buyer shall be liable for all Cure Costs related to or arising under an Assigned Contract pursuant to Section 365 of the Bankruptcy Code.  Further Buyer shall be liable for all Claims and Liabilities arising in connection with the Purchased Assets arising after the Closing.

2.5    <u>Structure of Sale</u>.  Notwithstanding any provision in the Agreement, nothing herein shall impair the Parties' right and ability to agree to an alternative structure to the transaction as contemplated herein, subject to two limitations: (i) any alternative transaction may not reduce the

Purchase Price to be received by the Seller, which must be paid in in full at closing, and (ii) any alternative transaction shall not be prohibited by any Export control laws, including but not limited to 22 U.S.C. §§ 2751–2796 (Arms Export Control Act), 22 C.F.R. §§ 120–130 (International Traffic in Arms Regulations), 50 U.S.C. §§ 2401–2420 (Export Administration Act), and/or 15 C.F.R. §§ 768–799 (Export Administration Regulations) and their successor and supplemental Laws.

### III.    CLOSING.

3.1    <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in <u>Article IX</u>, and <u>Article X</u> (or the waiver thereof by each Party entitled to waive that condition), the closing of the sale of the Purchased Assets contemplated hereby (the "***Closing***") will take place remotely via the exchange of electronic documents and signatures by electronic mail (or wet signatures, to the extent required) on the date that is two (2) Business Days after the satisfaction or waiver of the conditions set forth in <u>Article VIII</u>, <u>Article IX</u> and <u>Article X</u> (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another place, date or time is agreed to in writing by Seller and Buyer.  The date and time at which the Closing actually occurs is hereinafter referred to as the "***Closing Date***."

3.2    <u>Payments on the Closing Date</u>.  At the Closing, in addition to such other actions as may be provided for herein, Buyer shall pay to Seller, by wire transfer of immediately available funds, an amount equal to the Purchase Price, plus all Cure Costs.  Further, effective at the Closing, the Buyer shall waive all claims against the Seller's estate, other than those claims and obligations specifically created by this Agreement.

3.3    <u>Tax Returns</u>.  Each Party will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes (if any) borne and paid by such Party.

3.4    <u>Allocation of Purchase Price</u>.  All of the Purchase Price shall be allocated to the Purchased Assets in accordance with Section 1060 of the Code (and any similar provision of state, local or foreign law, as appropriate) (the "***Allocation***").  Each Party will report, act and file Tax Returns (including IRS Form 8594) in all respects and for all purposes consistent with the Allocation.  No Party will take any position (or will allow any of their respective Affiliates to take any position) (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Allocation, except, in each case, to the extent otherwise required by Applicable Law.

### IV.    REPRESENTATIONS AND WARRANTIES OF SELLER.

Except as set forth in the correspondingly numbered section of the Schedules, on the date hereof and as of the Closing Date (or as of such specific date as may be specified in the applicable representation and warranty), Seller hereby represents and warrants to Buyer as follows:

4.1    <u>Existence; Power</u>.  Seller is a corporation duly organized and validly existing under the laws of the State of Delaware.  Subject to the limitations imposed on Seller as a result of the Bankruptcy Case, Seller has the requisite corporate power and authority and all governmental licenses, authorizations, permits, consents, and approvals required to carry on the Business as conducted.

4.2     <u>Authorization; Enforceability</u>.

4.2.1     Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, Seller's execution, delivery, and performance of this Agreement and the Master Assignment, and the consummation of the transactions contemplated hereby and thereby, are within Seller's capacity, power and authority and have been duly authorized by all necessary corporate action on the part of Seller.

4.2.2     Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, Seller has the requisite capacity, power and authority, and has taken all requisite corporate actions necessary to execute and deliver this Agreement and the Master Assignment, and to consummate the transactions contemplated by this Agreement and the Master Assignment.  This Agreement has been, and at the Closing, the Master Assignment will be duly executed and delivered by Seller.  Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, this Agreement will constitute a legal, valid and binding agreement of Seller, enforceable against Seller in accordance with its and their respective terms, subject to applicable bankruptcy, insolvency or other similar laws relating to or affecting the enforcement of creditors' rights generally and general equitable principles (regardless of whether such enforceability is considered in a proceeding at Law or in equity) (collectively, "***Equitable Principles***").

4.3     <u>Governmental Authorization; No Conflict</u>.

4.3.1     Except as disclosed on <u>Schedule 4.3</u>, Seller is not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery by Seller of this Agreement or the Master Assignment or the consummation or performance by Seller of any of the transactions contemplated hereby and thereby, except for such notices, filings or consents that would not have a Material Adverse Effect.

4.3.2     When the consents and other actions described in the preceding <u>Section 4.3.1</u>, including entry of the Sale Order, have been obtained and taken, the execution and delivery by Seller of this Agreement and the Master Assignment and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Seller under (a) the certificate of incorporation, bylaws or other governing documents of Seller, or (b) any Applicable Law, except in the case of this clause (b), such breaches, violations, defaults, conflicts, and accelerations that would not have a Material Adverse Effect.

4.4     <u>Finders' Fees</u>.  Except for any Person(s) whom Seller shall be solely responsible for any fees or commissions owing, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Seller who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement or the Master Assignment except from the Seller after approval of such fees or commissions by order of the Bankruptcy Court.

4.5    Title to Assets.  Except as listed in Schedule 4.5, Seller will have at Closing good and marketable title to, or a valid leasehold interest in, the Purchased Assets free and clear of all Encumbrances.  Upon consummation of the transactions contemplated hereby, Buyer will acquire title to all of the Purchased Assets, free and clear of all Encumbrances.  The Claims of any party asserting a Lien on the Purchased Assets, except for any Liens related to the Encumbrances set forth on Schedule 4.5, are adequately protected by having their Claims and Liens attach to the proceeds of the sale, with the same validity, force and effect, and in the same order of priority, which such Claims and Liens have as of the Petition Date, subject to any rights, claims, and defenses the Bankruptcy Court may possess with respect thereto.

4.6    Taxes.  After giving effect to the Sale Order and upon the Closing, there are no Tax related Encumbrances (i) affecting or attached to the Purchased Assets, (ii) threatened in writing that could attach to or affect the Purchased Assets, or (iii) to the Knowledge of Seller, otherwise threatened that are reasonably likely to attach to or affect the Purchased Assets.  The Sale Order shall contain customary provisions that provide that the Purchased Assets will be transferred to Buyer free and clear of all Tax related Encumbrances.

4.7    Compliance with Laws.

4.7.1    To the Knowledge of Seller, Seller is not in violation of any Law applicable to the Purchased Assets or the conduct of the Business, except for violations which would not have a Material Adverse Effect.

4.8    Proceedings.  Except as disclosed on Schedule 4.8, as of the date hereof, to the Knowledge of Seller, there is no action, suit, investigation or proceeding pending against, or threatened against or affecting, the Seller that is reasonably likely to have a Material Adverse Effect on the Transactions.

## V.    REPRESENTATIONS AND WARRANTIES OF BUYER.

On the date hereof and as of the Closing Date (or as of such specific date as may be specified in the applicable representation and warranty), Buyer represents and warrants to Seller as follows:

5.1    Existence; Power.  Buyer is duly formed, validly existing, and in good standing as a corporation under the laws of the Commonwealth of Pennsylvania.

5.2    Authorization; Enforceability.

5.2.1    Buyer's execution, delivery, and performance of this Agreement and the Master Assignment, and the consummation of the transactions contemplated hereby and thereby, are within Buyer's capacity, power and authority and have been duly authorized by all necessary corporate action.

5.2.2    Buyer has the requisite capacity, power and authority, and has taken all action necessary to execute and deliver this Agreement and the Master Assignment and to consummate the transactions contemplated by this Agreement.  This Agreement has been, and on the Closing Date the Master Assignment will be, duly executed and delivered by Buyer.  This

Agreement constitutes and on the Closing Date the Master Assignment will be a legal, valid and binding agreement of Buyer, enforceable against Buyer in accordance with its and their respective terms, subject to the Equitable Principles.

5.3     <u>Financing</u>.  Buyer or an Affiliate thereof (i) has funds in an amount at least equal to the Purchase Price or (ii) has obtained Financing from a Financing Sources that provide funds to Buyer or such Affiliate in an amount at least equal to the Purchase Price.

5.4     <u>Governmental Authorization; No Conflict</u>.

5.4.1     Except for the entry of the Sale Order, none of the execution, delivery and performance by a Buyer of this Agreement or the Master Assignment requires or will require any action by or in respect of, or filing with, any Governmental Authority.

5.4.2     The execution and delivery by Buyer of this Agreement and the Master Assignment and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) the certificate of incorporation, operating agreement, bylaws or other governing documents of Buyer, or (b) any Applicable Law.

5.4.3     Buyer understands and acknowledges that certain Purchased Assets are subject to export controls under 22 U.S.C. §§ 2751–2796 (Arms Export Control Act), 22 C.F.R. §§ 120–130 (International Traffic in Arms Regulations), 50 U.S.C. §§ 2401–2420 (Export Administration Act), and/or 15 C.F.R. §§ 768–799 (Export Administration Regulations) and their successor and supplemental Laws (collectively, <u>Export Control Laws</u>).  Buyer and its employees are U.S. Persons, as defined in 22 CFR § 120.15, and are authorized to receive and access information and assets controlled under Export Control Laws.  Buyer has not disclosed information related to Purchased Assets subject to Export Control Laws to non-U.S. Persons without the authority of an export license or applicable exemption or exception.

5.5     <u>Adequate Funds</u>.  At the Closing, Buyer will have adequate funds available to it in order to consummate the transactions contemplated by this Agreement and to perform its obligations hereunder.

5.6     <u>Finders' Fees</u>.  There is no investment banker, broker, finder, or other intermediary that has been retained by or is authorized to act on behalf of Buyer or any Affiliate of Buyer, who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

## VI.     BANKRUPTCY MATTERS.

6.1     <u>Bankruptcy Court Approval</u>.  Seller and Buyer each acknowledge that this Agreement and the sale of the Purchased Assets to Buyer are subject to Bankruptcy Court approval. Buyer acknowledges that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and/or otherwise best offer possible for the Purchased Assets,

and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and, if necessary, conducting the Auction.

6.2    <u>Stalking Horse Status</u>. Seller confirms that it is critical to the process of arranging an orderly sale of the Purchased Assets to proceed by selecting Buyer as its "stalking horse" (the "***Stalking Horse***") to enter into this Agreement in order to present the Bankruptcy Court with arrangements for obtaining the highest realizable price for the Purchased Assets and that, without Buyer having committed substantial time and effort to such process, Seller's estate would have to employ a less orderly process of sale and thereby incur higher costs and risk attracting lower prices. In recognition of the foregoing Seller acknowledges that Buyer would not have invested the effort in negotiating and documenting the transaction provided for herein and incurring the obligations to pay its outside advisors and legal counsel if Buyer were not paid the Break-Up Fee and the Expense Reimbursement, in the event that Buyer does not purchase the Purchased Assets due to the termination of this Agreement as a result of an Alternative Transaction.

6.3    <u>Sale Procedures Order and Sale Order</u>. Buyer agrees that it will take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Procedures Order and Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Seller agrees that after entry of the Sale Order, it shall not take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

6.4    <u>Bidding Procedures</u>. Notwithstanding anything else contained herein to the contrary, Buyer agrees and acknowledges that, upon its entry, Seller, including through its Representatives, is bound by the Sale Procedures Order, and may continue soliciting inquiries, proposals, or offers from Third Parties for all or any part of the Purchased Assets, and is and may continue discussing and negotiating such inquiries, proposals or offers and providing information to Third Parties in connection therewith, as contemplated by the Sale Motion and the Bidding Procedures.

6.5    <u>Conflicts</u>. The provisions set forth in the Sale Order or any plan of reorganization or liquidation shall be consistent in all respects with the terms of this Agreement, including, but not limited to, section 9.8 hereof.  If any conflict arises between the terms of this Agreement, on the one hand, and the Sale Order, on the other, the terms of the Sale Order shall control in all respects.

## VII.    ADDITIONAL AGREEMENTS.

7.1    <u>Conduct of Business</u>.  Except (i) as otherwise expressly contemplated by this Agreement, (ii) as may be required by the Bankruptcy Court, (iii) as required by Applicable Laws, (iv) with the prior written consent of Buyer (which shall not be unreasonably withheld conditioned or delayed), or (v) for the consequences resulting from the Bankruptcy Case, from the date hereof until the Closing Date, unless this Agreement is terminated, Seller shall (a) use commercially reasonable efforts to continue operating and preserve intact the Purchased Assets; and (b) refrain

from doing any of the following in respect of the Purchased Assets: (i) disposing of, or transferring, any Purchased Asset, (ii) granting any rights with respect to or otherwise disposing of or transferring any right in any Purchased Assets, or (iii) terminating, amending or modifying the terms of the Purchased Assets.

7.2    Efforts; Cooperation.  Unless this Agreement has terminated, Seller shall promptly inform Buyer in writing of the occurrence of any (i) Material Adverse Effect or (ii) event that will, or is reasonably expected to, cause the failure of any of Buyer's conditions to Closing set forth in Article X.  Subject to the other provisions hereof, and unless this Agreement has terminated, each Party shall use commercially reasonable efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under Applicable Laws to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and shall cooperate in a commercially reasonable manner with each other Party and its Representatives with any step required to be taken as a part of its obligations hereunder.

7.3    Access to Information; Reporting. Subject to the terms of the Confidentiality Agreement, from the date hereof until the earlier of the Closing and the date on which this Agreement is terminated in accordance with Article XI, Seller shall cooperate reasonably with Buyer and shall (a) give Buyer and its Representatives (including Buyer's accountants, lenders, consultants, counsel and employees) reasonable access to the properties, Contracts, equipment, employees, affairs, books, documents, records and other information of Seller, in each case to the extent relating to the Purchased Assets, the Retained Liabilities of Seller that arise from or relate to the Purchased Assets (the "***Relevant Liabilities***"), and the consummation of the transactions contemplated hereby; and (b) shall, subject to the final sentence of this Section 7.3, cause its Representatives to furnish to Buyer all available documents, records and other information (and copies thereof) that Buyer may reasonably request, in each case to the extent that such documents, records and other information relate to the Purchased Assets, the Relevant Liabilities, and the consummation of the transactions contemplated hereby. Notwithstanding anything else contained herein to the contrary, Buyer acknowledges and agrees that all access granted to, and any investigations conducted by, Buyer and/or its Representatives pursuant to this Section 7.3 shall be granted and/or conducted during normal business hours upon reasonable advance written notice to Seller, under the supervision of Seller's personnel, at Buyer's sole cost and expense, in accordance with the terms of the Confidentiality Agreement, and in such a manner as to not materially interfere with the conduct of the Business.  Seller shall not disclose any confidential, proprietary or non-public books and records relating to the Purchased Assets to any Third Party without the prior written consent of Buyer or further order of the Bankruptcy Court.  Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to disclose any information to Buyer if Seller determines that such disclosure would be reasonably likely to jeopardize any attorney-client or other legal privilege, or contravene any Applicable Law or Contracts entered into prior to the date hereof; provided, however, that each of the Parties shall cooperate in good faith to provide substantially the information the other Party requests in such a manner as to not waive any attorney client or other legal privilege or contravene Applicable Law or Contracts.

7.4    Further Assurances.  Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry

out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Master Assignment.

7.5     No Outside Reliance. Notwithstanding anything contained in any provision of this Agreement to the contrary, Buyer covenants, acknowledges and agrees that the representations and warranties made by Seller to Buyer in Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "**Express Representations**") are the sole and exclusive representations, warranties, and statements of any kind made by Seller to Buyer in connection with the transactions contemplated by this Agreement. Buyer acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in that certain data room administered by Seller and/or its Representatives, any projections, meetings, calls or correspondence with management of Seller and its Representatives, or any other Person on behalf of Seller or any of its Affiliates or Representatives and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, contracts, and prospects of Seller, or the quality, quantity or condition of Seller's assets, including, without limitation, the Purchased Assets, are, in each case, except in the case of fraud or intentional misrepresentation, specifically disclaimed by Seller, and that, except in the case of fraud or intentional misrepresentation, Buyer has not relied on any such representations, warranties or statements. On Buyer's reliance on the Express Representations, Buyer will accept the Purchased Assets at the Closing "AS IS," "WHERE IS" and "WITH ALL FAULTS" and nothing in this Section 7.5. shall affect Buyer's rights arising out of this Agreement with respect to the Express Representations. Buyer further acknowledges and agrees that it has had an opportunity to review the Seller's data room and the Purchased Assets, and neither Seller nor any of its Affiliates shall have any Liability to Buyer after the Closing for any failure on the part of Buyer or any of its Affiliates to comply with any agreements or terms and conditions associated with the Purchased Assets, provided that any agreement, term, or contract affecting the Purchased Assets was available in the data room as of the execution of this Agreement.

7.6     Pre-Closing Confidentiality. Each of the Parties shall hold, and shall cause its Representatives, its Affiliates, and its Affiliates' Representatives to hold, in confidence all documents and information furnished to it by or on behalf of any other Party in connection with the transactions contemplated by this Agreement in accordance with the terms of the Confidentiality Agreement, which shall continue in full force and effect until the Closing, at which time such Confidentiality Agreement shall automatically terminate with no further right or obligation thereunder. If for any reason this Agreement is terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section 7.6 shall nonetheless continue in full force and effect in accordance with the terms hereof and thereof.

7.7     Public Announcements. Neither Buyer nor Seller shall make any public announcements or statements concerning the transactions contemplated by this Agreement without the prior written consent of the other Party (which consent may not be unreasonably withheld, condition or delayed). Notwithstanding anything contained in this Agreement or in the Confidentiality Agreement to the contrary, Buyer acknowledges and agrees that (i) Seller may

provide copies of this Agreement to parties in interest in the Bankruptcy Case and to those parties to whom Seller determines it is necessary to provide copies in connection with soliciting higher or better bids for the Purchased Assets or as otherwise necessary or desirable in connection with the Bankruptcy Case; and (ii) Seller shall also be entitled to file copies with the Bankruptcy Court or as otherwise required by Law and shall be entitled to publish notice of the transactions contemplated by this Agreement in any newspaper selected by Seller.  Further, in the event that the Buyer enters into any employment agreement with any of the Seller's officers or directors, the Seller, shall disclose such agreement to the official committee of unsecured creditors (if appointed), the Office of the United States Trustee, and supplement its motion for approval of the contemplated transaction with the Bankruptcy Court to disclose such agreements.

## VIII.   CLOSING DELIVERABLES.

8.1     <u>Closing Deliverables of Seller</u>.  At the Closing, Seller hereby agrees to deliver the following documents, or hereby cause the following documents to be delivered, to Buyer:

8.1.1     the Master Assignment duly executed (and acknowledged, where applicable) by Seller and, where applicable, notarized;

8.1.2     such other instruments of assignment or conveyance duly executed by the Seller as shall be reasonably requested or reasonably necessary to transfer the Purchased Assets to Buyer in accordance with this Agreement;

8.1.3     the certificate of Seller required to be delivered under <u>Section 9.2</u>, signed on behalf of Seller, by a duly authorized officer.

8.1.4     evidence of the existence, organization and authority of Seller and of the authority of the persons executing documents on behalf of Seller reasonably satisfactory to Buyer;

8.1.5     possession of all electronic, printed or other tangible copies or other embodiments of all Purchased Assets in any medium to the extent necessary to evidence the transactions contemplated by this Agreement;

8.1.6     a copy of the Sale Order, certified by the Bankruptcy Court (for recording purposes); and

8.1.7     such other usual and customary documents, instruments, and certificates as Buyer may reasonably request.

8.2     <u>Closing Deliverables of Buyer</u>.  At the Closing, Buyer hereby agrees to deliver the following documents, or hereby cause the following to be delivered, to Seller:

8.2.1     all payments required to be made pursuant to <u>Section 3.2</u>;

8.2.2     the Master Assignment duly executed (and acknowledged, where applicable) by Buyer; and

8.2.3    the Certificate of Buyer required to be delivered under <u>Section 10.2</u>, signed on behalf of Buyer, by a duly authorized officer.

## IX.    CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE.

Seller's obligation to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by the Seller, at or prior to the Closing, of each of the following conditions:

9.1    <u>Accuracy of Representations</u>. The representations and warranties of Buyer contained in <u>Article V</u> shall be true and correct in all material respects (<u>provided</u>, that any such representation or warranty that is subject to any "materiality," "material adverse effect" or similar qualification shall be true and correct in all respects after giving effect to any such qualification) at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date.

9.2    <u>Buyer's Performance</u>. (i) Buyer shall have performed in all material respects its covenants that it is required to perform pursuant to this Agreement prior to the Closing, and (ii) Seller shall have received a certificate of Buyer certifying the satisfaction of the conditions set forth in <u>Section 9.1</u> and the preceding clause (i) of this <u>Section 9.2</u> signed by a duly authorized officer thereof.

9.3    <u>Buyer's Deliveries</u>.  Each of the deliveries required to be made to Seller pursuant to <u>Section 8.2</u> will have been delivered (or Buyer will make such deliveries at the Closing).

9.4    <u>Government Orders</u>.  There shall not be in effect any order, writ, injunction, judgment or decree entered by a Governmental Authority, or any Law preventing, enjoining, restraining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement.

9.5    <u>No Injunction</u>.  There must not be in effect any Laws or any injunction or other Order that prohibits the sale of the Purchased Assets by Seller to Buyer.

9.6    <u>Buyer's Eligibility to Receive Export Controlled Material</u>.  Buyer and its Representatives and Employees must be U.S. Persons, as defined in 22 CFR § 120.15, or be authorized to receive and access information and assets controlled under Export Control Laws pursuant to an export license or applicable exemption or exception.

9.7    <u>Entry of Sale Order</u>.  The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not be subject to a stay pending appeal. All conditions contemplated by the Sale Order to consummate the transactions contemplated hereby shall have been satisfied or waived.

9.8    <u>Release of SpaceX by Seller.</u>  The Sale Order shall include a release of SpaceX by the Seller in the following form:

Effective upon entry of the Sale Order, the Seller, on behalf of itself, its estate and any trustee, its predecessors, successors, direct and indirect parent companies, direct and

indirect subsidiary companies, companies under common control with any of the foregoing, affiliates and assigns, and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, advisors, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting by, through, under, or in concert with them, and each of them (collectively, the *"Seller Releasing Parties"*), hereby release and discharge SpaceX, together with its predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates and assigns and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, advisors, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting by, through, under, or in concert with them, and each of them (collectively, the *"SpaceX Released Parties"*), from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, wages, of any nature whatsoever, known or unknown, which the Seller Releasing Parties have, or may have had, against the SpaceX Released Parties, whether or not apparent or yet to be discovered, or which may hereafter develop, for any acts or omissions from the beginning of time until present arising from or relating to (i) the LSA, (ii) the SpaceX Credit, (iii) the Credit, (iv) the Credit Letter, (v) the Purchased Assets, (vi) the SpaceX Contract or (vii) the Bankruptcy Case.  Notwithstanding the foregoing, in the event SpaceX files a proof of claim or asserts an informal claim against the Seller or its bankruptcy estate, Seller retains the right to object to, resolve or settle any such claim.

## X.  CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE.

Buyer's obligation to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Buyer, at or prior to the Closing, of each of the following conditions:

10.1  Accuracy of Representations. The representations and warranties of Seller contained in Article IV shall be true and correct in all material respects (provided, that any such representation or warranty that is subject to any "materiality," "Material Adverse Effect" or similar qualification shall be true and correct in all respects after giving effect to any such qualification contained therein) at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date.

10.2  Seller's Performance. (i) Seller shall have performed in all material respects its covenants that it is required to perform pursuant to this Agreement prior to the Closing, and (ii) Buyer shall have received a certificate of Seller certifying the satisfaction of the conditions set forth in Section 10.1 and the preceding clause (i) of this Section 10.2 signed by a duly authorized officer thereof.

10.3  Seller's Deliveries.  Each of the deliveries required to be made to Buyer pursuant to Section 8.1 will have been delivered (or Seller will make such deliveries at the Closing).

10.4    <u>Government Orders</u>.   There shall not be in effect any order, writ, injunction, judgment or decree entered by a Governmental Authority, or any Law preventing, enjoining, restraining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement.

10.5    <u>No Injunction</u>. There must not be in effect any Laws or any injunction or other Order that prohibits the sale of the Purchased Assets by Seller to Buyer.

10.6    <u>SpaceX Credit</u>.  SpaceX shall have given its written consent to the transfer of the Credit to Buyer.

10.7    <u>Liens, Claims, and Encumbrances</u>.  Any and all liens, claims, and encumbrances listed on Schedule 4.5 shall have been resolved and released, or resolved through the Seller's bankruptcy case in a manner reasonably satisfactory to the Buyer.  Notwithstanding the foregoing, nothing in this section addresses resolution or release of any claims or liens of the Buyer as a result of claims arising under a certain credit agreement dated August 10, 2022.

10.8    <u>Entry of Sale Order</u>.  The Sale Order, in form and substance reasonably satisfactory to Buyer, shall have been entered by the Bankruptcy Court, shall have become a Final Order, and shall be in full force and effect, and all conditions contemplated by the Sale Order to consummate the transactions contemplated hereby shall have been satisfied or waived.

10.9    <u>No Material Adverse Effect</u>.  There shall be no Material Adverse Effect.

## XI.    TERMINATION AND REMEDIES.

11.1    <u>Termination Events</u>.  Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

11.1.1    by written mutual consent of Seller and Buyer;

11.1.2    by either Buyer or Seller, if the Closing has not occurred on or prior to 5:00 p.m. (E.T.) on September 9, 2022 (the "***Outside Date***"); <u>provided</u>, <u>however</u>, that if the Closing shall not have occurred on or before the Outside Date due to a breach of any representation, warranty, covenant or agreement contained in this Agreement by Seller or Buyer, then the breaching Party may not terminate this Agreement pursuant to this <u>Section 11.1.2</u>;

11.1.3    by either Buyer or Seller, upon written notice to the other Party, if the other Party is in material breach or default of any provision of this Agreement, which breach is not cured within ten (10) Business Days after written notice thereof is received by the breaching Party; <u>provided</u>, <u>however</u>, that the terminating Party is not in material breach or default of this Agreement;

11.1.4    by either Buyer or Seller if (i) the sale is disapproved by the Bankruptcy Court, (ii) Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any final and non-appealable applicable Law which is in effect and has the effect of making the Sale illegal or otherwise restraining or prohibiting consummation of the Sale and which is not satisfied, resolved or preempted by the Sale Order, or (iii) to the extent

not previously terminated pursuant to another subsection of this <u>Section 11.1</u>, if Seller accepts or agrees to any Alternative Transaction (unless Buyer is a Back-Up Bidder as contemplated by the Sale Procedures Order, then in such case, upon the Closing of the Alternative Transaction);

11.1.5    by either Buyer or Seller, if, prior to Closing, the Sale Order, after being entered by the Bankruptcy Court, has subsequently been reversed, revoked, or voided, amended or modified (or required to be amended or modified) in form and substance no longer reasonably satisfactory to Buyer, by an Order of a court of competent jurisdiction;

11.1.6    by either Buyer or Seller, if the Bankruptcy Case is dismissed in whole or in part or converted to Chapter 7 of the Bankruptcy Code for any reason prior to Closing and, with respect to a conversion or dismissal, such conversion or dismissal prevents or unreasonably delays the Closing from occurring;

11.1.7    by either Buyer or Seller, upon the conclusion of the Auction, if Buyer is not selected as the Successful Bidder or Back-Up Bidder;

11.1.8    by Buyer if the Sale Procedures Order is not in form and substance reasonably satisfactory to Buyer, and such order has been entered by the Bankruptcy Court by August 29, 2022; and

11.1.9    by Buyer if the Sale Order is not in form and substance reasonably satisfactory to Buyer, and such order has not entered by the Bankruptcy Court by September 9, 2022.

11.2    <u>Effect of Termination</u>. Termination, plus any rights the Parties shall have under this <u>Section 11.2, Section  11.3 and Section  11.4,</u> regarding any Break-Up Fee and Expense Reimbursement, and any rights a party may have at law (subject to the limitations of liability set forth in Section 11.4) shall be the sole remedy of the Parties for a breach of this Agreement.  In the event of an Alternative Transaction, the Break-Up Fee and Expense Reimbursement shall be directly and immediately paid to Buyer at the closing of the Alternative Transaction from the proceeds of the Alternative Transaction. If the Closing does not occur for any other reason, Buyer shall not be entitled to receive the Break-Up Fee or the Expense Reimbursement.

11.3    <u>Injunctive Relief</u>.  Each Party agrees that any breach of this Agreement would constitute irreparable harm and damages at law are an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, either Party is entitled to injunctive relief with respect to any such breach, including specific performance of such covenants or obligations or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants or obligations contained in this Agreement. Each Party hereby waives any requirement for the securing or posting of any bond in connection with any such injunctive relief.  The rights set forth in this <u>Section 11.3</u> shall be in addition to any other rights that a Party may have at law or in equity pursuant to this Agreement.  Notwithstanding the foregoing, nothing herein shall impair or affect the Seller's ability to offset any damages against Buyer arising from or related to any obligations of the Seller to the Buyer arising from or related to the certain credit agreement between the Buyer and Seller dated August 10, 2022, and any order of the Bankruptcy Court approving such agreement.

11.4    [Reserved]

11.5    <u>Remedies Cumulative</u>.  Subject to <u>Section 11.2 and</u> <u>Section 11.3</u> of this Agreement, all remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

## XII.    MISCELLANEOUS.

12.1    <u>Survival</u>. None of the representations or warranties of the Parties set forth in this Agreement, or any other agreement or certificate executed in connection with, or delivered pursuant to, this Agreement shall survive the Closing.  Other than the requirements of further assurances and actions specifically identified to be taken post-Closing, all other covenants of the Parties shall expire upon Closing.  This <u>Section 12.1</u> shall not limit any covenant or agreement of any Party which, by its term, contemplates performance after the Closing, but only to the extent such covenants and agreement are to be performed, or prohibit actions, subsequent to the Closing. The obligations, limitations and rights provided for under <u>Section 7.5</u>, <u>Section 7.6</u>, <u>Section 11.2</u> through <u>Section 11.5</u>, and this <u>Article XII</u> shall survive any termination of this Agreement.

12.2    <u>Notices</u>.  Notices. All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given (i) when delivered by hand (with written confirmation of receipt), (ii) when sent by email (with read receipt received), (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), or (iv) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses and Representatives (if applicable) set forth below (or to such other addresses and Representatives as a Party may designate by notice to the other Parties).

If to Seller, then to:

Masten Space Systems, Inc.
Attn: Michael Adams and Sean Bedford
1570 Sabovich Street
Mojave, CA 93501
Email: madams@masten.aero; sbedford@masten.aero

With a copy (which will not constitute notice) to:

Morris James, LLP
Attn:  Jeffrey R. Waxman and Sarah M. Ennis
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
E-mail: jwaxman@morrisjames.com; sennis@morrisjames.com

and

Alston & Bird LLP
Attn: Leah Fiorenza McNeill and Christopher K. Coleman
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, Georgia 30309
E-mail: leah.mcneill@alston.com; chris.coleman@alston.com

If to Buyer, then to:

Astrobotic Technology, Inc.
Attn: John Thornton
1016 North Lincoln Avenue
Pittsburgh, PA 15233
Email: john.thornton@astrobotic.com


With a copy (which will not constitute notice) to:

Babst, Calland, Clements and Zomnir, P.C.
Attn: Justine M. Kasznica
Two Gateway Center, 6th Floor
Pittsburgh, PA 15222
Email: jkasznica@babstcalland.com

and

Whiteford, Taylor & Preston, LLP
Attn: Michael Roeschenthaler and David Gaffey
11 Stanwix Street, Suite 1400
Pittsburgh, PA  15222
Email: mroeschenthaler@wtplaw.com; dgaffey@wtplaw.com

12.3    <u>Amendments and Waivers</u>.  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by Seller and Buyer (or by any successor to such Party), or in the case of a waiver, by the Party against whom the waiver is to be effective (except as expressly provided otherwise in this Agreement). No failure or delay by any Party in exercising any right, power, or privilege under this Agreement will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies provided will be cumulative and not exclusive of any rights or remedies provided for in this Agreement by Law.

12.4    <u>No Presumption Against Drafting Party</u>.  No provision of this Agreement will be interpreted in favor of, or against, any of the Parties by reason of the extent to which any such

21

Party or its counsel participated in the drafting of this Agreement or by reason of the extent to which any such provision is inconsistent with any prior draft of this Agreement or any provision of this Agreement.

    12.5   <u>Expenses</u>.

    12.5.1   Subject to the obligations of Seller with respect to the Expense Reimbursement that may arise under <u>Article XI</u>, each Party shall bear the costs of fees and expenses incurred by it incident to this Agreement and in preparing to consummate and consummating the transactions contemplated by this Agreement, including reasonable out-of-pocket costs and expenses (including the out-of-pocket fees, disbursements and other charges of legal counsel, consultants and accountants) and fees and expenses of brokers, finders, financial advisors and investment bankers.

    12.5.2   In the event of any Proceeding brought to enforce or interpret this Agreement, or arising out of its negotiation, performance, or subject matter, the Party who prevails will be entitled to recover its reasonable attorneys' fees, costs and expenses, including those incurred at trial, in any bankruptcy or other proceeding, on appeal, and in enforcing any judgment, as determined by the applicable court of competent jurisdiction.

    12.6   <u>Successors and Assigns</u>.  The provisions of this Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other Party to this Agreement.  Any attempted or purported assignment in violation of this <u>Section 12.6</u> will be deemed void *ab initio*.

    12.7   <u>Entire Agreement</u>.  This Agreement (including the Schedules and Exhibits hereto and thereto) constitute the entire agreement among the Parties with respect to the subject matter of this Agreement.  This Agreement (including the Schedules and Exhibits) supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement.

    12.8   <u>Severability</u>.  The provisions of this Agreement will be deemed severable, and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability.

    12.9   <u>No Third-Party Beneficiaries</u>.  Except for the release of SpaceX provided for in Section 9.8, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein expressed or implied will give or be construed to give to any Person, other than the Parties and such permitted assigns, any legal or equitable rights under this Agreement.

12.10   <u>Governing Law</u>. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

12.11   <u>Consent to Jurisdiction</u>. Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, each of the Parties agrees that any proceeding brought to enforce the rights or obligations of any Party under this Agreement or the Master Assignment shall be commenced and maintained in the Bankruptcy Court, and the Bankruptcy Court shall have exclusive jurisdiction over any such proceeding.  Each of the Parties consents to the exercise of jurisdiction over it and its properties, in accordance with the terms of this Section, with respect to any proceeding arising out of or in connection with this Agreement, the Master Assignment or the transactions contemplated hereby or thereby, or the enforcement of any rights under this Agreement or the Master Assignment.  In the event that the Bankruptcy Court is determined not to have jurisdiction or authority to hear a dispute between the Parties pursuant to this section, or abstains from hearing a dispute for any reason, such proceeding shall be brought in the United States District Court for the District of Delaware.

12.12   <u>WAIVER OF JURY</u>.  EACH PARTY HERETO EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF OR ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH PARTY HAS REVIEWED THIS WAIVER AND KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

12.13   <u>Counterparts</u>.  This Agreement and any amendment hereto may be executed (by hand or electronically) in one or more counterparts, each of which will be deemed to be an original of this Agreement or such amendment and all of which, when taken together, will constitute one and the same instrument. Notwithstanding anything to the contrary in <u>Section 12.2</u>, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by email attachment or other electronic transmission will be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.14   <u>Time of the Essence</u>.  Time is of the essence for purposes of this Agreement and the rights and obligations of the Parties hereunder.

*[Signature Page Follows]*

With the intention to be legally bound by the terms of this Agreement, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

**ASTROBOTIC TECHNOLOGY, INC.**

By:_____

    Name: John Thornton

    Title: CEO

**SELLER:**

**MASTEN SPACE SYSTEMS, INC.**

By:_____

    Name:

    Title:

[Signature Page to Asset Purchase Agreement]

With the intention to be legally bound by the terms of this Agreement, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

**ASTROBOTIC TECHNOLOGY, INC.**


By:_____
    Name:
    Title:



**SELLER:**

**MASTEN SPACE SYSTEMS, INC.**

By:_____
    Name: Sean Bedford
    Title:  General Counsel

[Signature Page to Asset Purchase Agreement]

Error! Unknown document property name.

## **Schedule 2.2.1**

**Contracts to be Assumed and Assigned to Buyer**

| Counter Party Name and Descriptions | PO/Contract Number | Program | Subsystem | Cure Cost |
|---|---|---|---|---|
| NASA Contract No. 80HQTR19D0016 (CLPS IDIQ) | 80HQTR19D0016 | MM1 / XL-1 | Prime Contract | $0.00 |
| NASA Contract No. 80JSC020F0262 (CLPS Task Order 19C) | 80JSC020F0262 | MM1 / XL-1 | Prime Contract | $0.00 |
| NASA Contract No. 80NSSC21P0494 (Regolith Collection) | 80NSSC21P0494 | MM1 / XL-1 | Prime Contract | $0.00 |
| NASA Contract No. 80AFRC21D0004 (Flight Opportunities IDIQ) | 80AFRC21D0004 | FOP | Prime Contract | $0.00 |
| Draper Contract No. PO001-0001064387 (Flight Opportunities Flight) | PO001-0001064387 | FOP | Draper FOP | $0.00 |
| NASA Contract No. 80AFRC21C0006 (Xogdor Tipping Point) | 80AFRC21C0006 | Xogdor | Prime Contract | $0.00 |
| NASA Contract No. 80AFRC21C0009 (MOWS Tipping Point) | 80AFRC21C0009 | MOWS TP | Prime Contract | $0.00 |
| NASA Contract No. 80NSSC20C0177 (MOWS SBIR Phase II) | 80NSSC20C0177 | MOWS SBIR Ph II | Prime Contract | $0.00 |
| NASA Contract No. 80NSSC19C0227 (PermiAM SBIR Phase II) | 80NSSC19C0227 | PermiAM SBIR Ph II | Prime Contract | $0.00 |
| NASA Contract No. 80NSSC21C0068 (PISCES STTR) | 80NSSC21C0068 | PISCES STTR | Prime Contract | $0.00 |
| NASA Contract No. 80NSSC22PB086 (RDRE SBIR Phase I) | 80NSSC22PB086 | RDRE SBIR Ph I | Prime Contract | $0.00 |
| NASA Contract No. 80NSSC22PB087 (RocketM SBIR Phase I) | 80NSSC22PB087 | RocketM SBIR Ph I | Prime Contract | $0.00 |
| USAF Contract No. FA864921P0831 (SkyMage SBIR Phase II) | FA864921P0831 | SkyMage SBIR Ph II | Prime Contract | $0.00 |
| USAF CRADA No. 22-034-RQ-01CRADA (AFRL CRADA) | 22-034-RQ-01CRADA | AFRL | CRADA | $0.00 |
| Jacobs RAPTR Subconsultant Agreement (AFRL Tech Sprint) | - | AFRL | Jacobs Subcontract | $0.00 |
| P3 Technologies, LLC Contract No. 2020-15 (E-Pump) | 2020-15 | E-Pump | P3 Subcontract | $6,528.00 |
| MASP Building 25 Lease | - | Facilities | Lease | $5,884.00 |
| MASP Building 173 Lease | - | Facilities | Lease | $3,285.00 |
| MASP Building 49 Lease | - | Facilities | Lease | $6,540.00 |
| MASP Building 86 Lease | - | Facilities | Lease | $3,206.00 |
| MASP 16919 Firnin St. (MAB) Land Lease | - | Facilities | Lease | $3,274.29 |
| MASP Test Site Leases | - | Facilities | Lease | |
| MASP Master Lease | - | Facilities | Lease | |
| Wallace & Smith Contractors (MAB Construction) | 9921272 | Facilities | Construction | $183,658.52 |
| United Partition Systems, Inc. (MAB Large Clean Room) | PO PF599 | Facilities | Construction | $67,114.54 |
| American Electrical Services Corp. | BM111-1943 | Facilities | Bldg 86 Renovation | $24,000.00 |
| American Electrical Services Corp. | S1774-1978 | Facilities | Bldg 86 Renovation | $5,213.00 |
| Astrobotic Technology, Inc. (Opal Lite TRN) | PO PF626 | MM1 / XL-1 | GNC | |
| Psionic Technologies (NDL) | SP-040 | MM1 / XL-1 | GNC | |
| Psionic Technologies (NDL) | PO PF1000 | MM2 | GNC | |
| Airbus Space & Defence (Solar Panels) | PO PF636 | MM1 / XL-1 | EPS | $472,140.00 |
| NuSpace Inc. (Propellant Tanks) | 4/20/21 Vendor Agmt | MM1 / XL-1 | Propulsion | $1,694,738.00 |
| Frontier Aerospace (Thrusters) | PO PF444 | MM1 / XL-1 | Propulsion | $424,821.00 |
| Space Micro Inc. (Transponders) | PO PF121 | MM1 / XL-1 | Comms | $346,022.40 |
| Space Micro Inc. (Transponders) | PO PF495 | MM1 / XL-1 | Comms | |
| ABSL Power Solutions Ltd. (Batteries) | PO PF379 | MM1 / XL-1 | EPS | |
| Optisys LLC (High Gain Antenna) | 2/18/21 Vendor Agmt | MM1 / XL-1 | Comms | |
| Ecliptic Enterprise Corporation (Payload Command & Data Handling) | 8/25/20 Master Services Agmt | MM1 / XL-1 | Payload | $150,000.00 |
| ARDE Inc. (Carbon Overwrapped Pressure Vessels) | MSS-AGM-1643-001 | MM1 / XL-1 | Propulsion | $19,250.00 |
| Marotta Controls Inc. (Valves) | PO PF680 | MM1 / XL-1 | Propulsion | |
| Marotta Controls Inc. (Valves) | PO PF751 | MM1 / XL-1 | Propulsion | $34,345.74 |
| Marotta Controls Inc. (Valves) | PO PF642 | MM1 / XL-1 | Propulsion | |
| Marotta Controls Inc. (Valves) | PO PF781 | MM1 / XL-1 | Propulsion | |
| Jet Propulsion Laboratory (DSN Services) | Space Act Agmt. 33853 | MM1 / XL-1 | GNC | |
| Aethercomm Inc. (SSPA / Amplifier) | PF568 | MM1 / XL-1 | Comms | |
| MDA Space and Robotics Ltd. (Flare Laser Range Finder) | PO PF255 | MM1 / XL-1 | GNC | |
| Swedish Space Corp./SSC US (Ground Systems) | 7/20/20 Master Services Agmt | MM1 / XL-1 | Ground Systems | |

13750414/1

| Counter Party Name and Descriptions | PO/Contract Number | Program | Subsystem | Cure Cost |
|---|---|---|---|---|
| Valcor Engineering Corp. (Check Valves) | PO PF1069 | MM1 / XL-1 | Propulsion | $28,722.89 |
| Norman Filter Co. (Prop Filters) | PO PF1070 | MM1 / XL-1 | Propulsion | |
| Moog CSA Engineering (RCS Thrusters) | PO PF530 | MM1 / XL-1 | Propulsion | |
| Ansys, Inc. (Orbit / Trajectory Software) | Order 80461809 | MM1 / XL-1 | Mission | |
| L3 Harris (Upconverter Freq. Converter) | PO PF1018 | MM1 / XL-1 | Comms | |
| Narda-Miteq (Downconverter) | PO PF1200 | MM1 / XL-1 | Comms | |
| Advanced Industrial Solutions, Inc. (Gantry Crane) | PO PF1103 | MM1 / XL-1 | SI&T | |
| Norman Filter Co. (Prop Filters) | PO PF1155 | MM1 / XL-1 | Propulsion | |
| Rock West Composites, Inc. (Honeycomb Panels - Primary Structure) | PO PF1116 | MM1 / XL-1 | Structures | $124,854.00 |
| Columbia Tool & Die SC, LLC (Launch Vehicle Adapter) | PO PF1199 | MM1 / XL-1 | Structures | $53,100.00 |
| Yetispace, Inc. (Engineering Support) | PO PF1234 | MM1 / XL-1 | Thermal | $32,777.37 |
| Sheldahl Flexible Technologies, Inc. (MLI) | PO PF1168 | MM1 / XL-1 | Thermal | $18,605.90 |
| Sigma Netics, Inc. (Prop Pressure Tank Transducers) | PO PF945 | MM1 / XL-1 | Propulsion | |
| Texas A&M Engineering Experiment Station | Research Agmt M2101119 | MM1 / Plume | Analysis | |
| Space Exploration Engineering, LLC | Master Services Agmt + SOWs | MM1 / XL-1 | Mission | $61,916.67 |
| Zuken USA Inc. | PO PF742 | MM1 / XL-1 | SI&T | $8,630.00 |
| Integrated Launch Solutions, Inc. | 12/16/20 Consulting Agmt | MM1 / XL-1 | Mission | $17,640.00 |
| Astro Pak Corp. | WC0025181 | MM1 / XL-1 | Cleanroom | $28,100.00 |
| EMA Design Automation | MSS-AGM-162-002 | MM1 / XL-1 | EPS | $21,277.35 |
| farSight Technologies LLC | MSS-AGM-1610-001 | MM1 / XL-1 | EPS | $33,707.43 |
| First Resonance | 48C49DA3-0314, -0015 | MM1 / XL-1 | Software | $5,800.00 |
| Quartus Engineering Inc. | PO PF1263 | MM1 / XL-1 | Analysis | $169,043.00 |
| Saferack | PO PF1149 | MM1 / XL-1 | Cleanroom | $37,713.84 |
| Valispace GmbH | VS1286 | MM1 / XL-1 | Systems | $54,167.00 |
| Quartus Engineering, Inc. | MSS-AGM-2210-001 | Xogdor | Analysis | $121,605.78 |
| P3 Technologies, LLC (Turbopump) | MSS-AGM-2213-001 | Xogdor | Propulsion | $97,370.11 |
| Wheeler & Co. d/b/a Precision/Expedited | PO PF1281 | Xogdor | Scimitar | $13,101.26 |
| Techsouth Inc. (Welding equipment) | MSS-AGM-2210-001 | Xogdor | Welding | |
| Elementum 3D (Additive manufacturing) | PF1222 | Xogdor | 3D Printing | |
| Elementum 3D (Additive manufacturing) | PF978 | Xogdor | 3D Printing | |
| Pennsylvania State University (Testing and System Development) | MSS-1716-005 | MOWS TP | Testing & Development | $175,772.00 |
| Infinity Fuel Cell and Hydrogen, Inc. (H2 Fuel Cell) | MSS-AGM-1716-003 | MOWS TP | Fuel Cell Development | |
| Swift Enterprises, Ltd (H2O2 Fuel Cell) | MSS-AGM-1716-006 | MOWS TP | Fuel Cell Development | |
| Pennsylvania State University (TVAC Testing) | 235820 | MOWS SBIR Ph II | Testing | $53,355.00 |
| Quartus Engineering, Inc. (Engineering Support) | MSS-AGM-1717-001 | MOWS SBIR Ph II | Eng'g Support | $25,088.00 |
| Pacific International Space Center for Exploration Sciences (PISCES) | MSS-AGM-2410-001 | PISCES STTR | Paver Development | |
| Quartus Engineering, Inc. | PO PF1237 | Plume SBIR | Analysis | $28,672.00 |
| Purdue University | 20112446 | Plume SBIR | Testing | $23,500.00 |
| Leidos, Inc. (Impactors) | MSS-AGM-2110-001 | SkyMage SBIR Ph II | Impactor Design | $56,380.81 |
| ADT Commercial | - | Utilities | Security | |
| CohnReznick LLP | - | Finance | Tax | $49,909.50 |
| Gunderson Dettmer LLP | - | Legal | Outside Counsel | $80,119.50 |
| Palmeter Law LLC | - | Legal | Outside Counsel | $210.00 |
| K&L Gates LLP | - | Legal | Outside Counsel | $61,344.00 |
| **TOTAL** | | | | **$4,932,504** |

137500414-1

<u>**Schedule 2.3**</u>

**Listed Excluded Assets**

(a) All of Seller's cash and cash equivalents on hand (including all undeposited checks) and in banks or other financial institutions, including short-term marketable securities;

(b) all security deposits and deposits held by landlords, vendors or trade creditors pursuant to Non-Assigned Contracts, and, for the avoidance of doubt, all cash in Seller's Adequate Assurance Account (as defined in the Seller's Utilities Motion filed at Docket No. 120 in the Bankruptcy Cases);

(c) all Claims or causes of action of Seller (except as set forth in Section 7.7 hereof), whether arising under the Bankruptcy Code, applicable state Law or otherwise (excluding actions available to Seller under chapter 5 of the Bankruptcy Code) and the proceeds thereof, of whatever kind or nature, and whether asserted or unasserted, other than any Claims or causes of action against Buyer;  notwithstanding the foregoing, this shall not transfer any Claims or causes of action of the Seller's bankruptcy estate against Agile Space Industries, Inc.

(d) Seller's corporate seals, stock record books, minute books, and organizational documents;

(e) Non-Assigned Contracts;

(f) any directors and officers and/or workers compensation insurance policies of Seller;

(g) all rights of Seller arising under this Agreement or in connection with the Transactions;

(h) any Tax refund or reimbursement due to Seller which accrues prior to the Closing Date;

(i) all amounts owed to Seller by any one or more of Seller's Affiliates;

(j) any shares of stock or other equity interests in Seller; and

(k)  any assets, properties and/or rights identified by Buyer in writing (including any Contract previously designated as an Assigned Contract) in its sole discretion, at any time until the date that is two (2) Business Days prior to the Closing Date.

[Buyer to Provide Additional Assets to be Excluded]

Error! Unknown document property name.

## Schedule 4.3

### Required Consents

a.  This Sale is subject to the Bankruptcy Court's approval and entry of the Sale Order.

b.  Hardware, software, and technical information or data purchased pursuant to this Agreement that is subject to export controls under 22 U.S.C. §§ 2751–2796 (Arms Export Control Act), 22 C.F.R. §§ 120–130 (International Traffic in Arms Regulations), 50 U.S.C. §§ 2401–2420 (Export Administration Act), and/or 15 C.F.R. §§ 768–799 (Export Administration Regulations) and their successor and supplemental Laws may not be transferred to or otherwise disclosed to persons other than U.S. Persons, as defined in 22 CFR § 120.15, without the authority of an export license or applicable exemption or exception.

c.  U.S. Government consent, pursuant to FAR 42.1204, may be required for assignment to Buyer of contracts to which the U.S. Government is a party, together with all purchase or task orders issued pursuant thereto.

d.  Counterparty consent may be required for assignment to Buyer of Seller's Leases with the Mojave Air and Space Port.

e.  Certain executory contracts to which Seller is a party may require counterparty consent for Buyer to assume.

## Schedule 4.5

### Specified Encumbrances

1. Those certain Notices of Federal Tax Lien (File Nos. (i) 117287048402 and (ii) 117287048644) filed with the Secretary of State of California on October 6, 2011 (IRS as Secured Party, and Seller as Debtor).

2. That certain UCC Financing Statement No. 2019804399 filed with the Delaware Secretary of State on November 14, 2019 (First Corporate Solutions, as Representative, as Secured Party, and Seller as Debtor).

3. That certain UCC Financing Statement No. 20226013361filed with the Delaware Secretary of State on July 19, 2022 (Agile Space Industries, Inc. as Secured Party, and Seller as Debtor).

4. The improvements currently under construction at 16919 Finnin Street, Mojave, CA 93501 may be subject to one or more mechanic's liens held by Wallace & Smith Contractors or a subcontractor thereto.

## **Schedule 4.8**

**Proceedings**

Seller is currently a party to the following litigations:

1. *Garcia v. Masten Space Systems, Inc.*, No. BCV-21-102791, in the Superior Court for the State of California, Kern County.

2. *Agile Space Industries, Inc. v. Masten Space Systems, Inc.*, No. N22C-02-130 PRW CCLD, in the Superior Court of the State of Delaware.

3. *NuSpace, Inc. v. Masten Space Systems, Inc.*, No. BCV-22-101440, in the Superior Court for the State of California, Kern County.

4. NSF OIG Subpoena S-2022-015.

EXECUTION COPY

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

This FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "*Amendment*") is dated as of September 1, 2022 by and among MASTEN SPACE SYSTEMS, INC., a Delaware corporation ("*Seller*"), and ASTROBOTIC TECHNOLOGY, INC., a Pennsylvania corporation, ("*Buyer*"). Seller and Buyer are each referred to individually as a "*Party*," and collectively as the "*Parties*."

### RECITALS

A.    On August 10, 2022, Seller and Buyer entered into that certain Asset Purchase Agreement (the "**Agreement**") for the sale and purchase of the Purchased Assets.[1]

B.    WHEREAS, Seller and Buyer desire to amend the Agreement in the manner described herein.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained in this Agreement, the Parties hereby covenant and agree as follows:

1.    The definition of "Break-Up Fee" in Section 1.1 of the Agreement is hereby deleted and replaced as follows:

> "**Break-Up Fee**" means cash in the amount of $135,000, which is equal to 3% of the cash portion of the Purchase Price.

2.    The definition of "Expense Reimbursement" in Section 1.1 of the Agreement is hereby deleted and replaced as follows:

> "**Expense Reimbursement**" means cash in an amount of up to $90,000 (which is equal to 2% of the cash portion of the Purchase Price) on account of reasonable and out of-pocket costs and expenses that may be incurred by Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement or any previous versions thereof.

3.    Section 2.1 of the Agreement is hereby deleted and replaced as follows:

> 2.1    Purchase Price. The purchase price for the Purchased Assets under this Agreement is an amount (the "**Purchase Price**") equal to (i) Four Million, Five Hundred Thousand Dollars ($4,500,000.00), (ii) a waiver of all claims of Buyer against Seller's bankruptcy estate other than those claims specifically created by this Agreement, and (iii) Cure Costs for Assigned Contracts. The Purchase Price will be delivered by Buyer as set forth in Section 3.2.

---

[1] All capitalized terms not defined herein shall have the meanings ascribed to them in the Agreement.

**EXECUTION COPY**

4. Section VII of the Agreement is hereby amended by adding a new section 7.8 as follows:

7.8 <u>Employees</u>. Buyer presently intends to make offers of employment to substantially all of Seller's employees who are employed by Seller as of the date of the Agreement and remain employed by the Business through the Closing Date (the "**Seller Employees**"). In connection therewith, Seller shall use commercially reasonable efforts to assist Buyer in facilitating meetings between Buyer and the Seller Employees, to the extent reasonably requested by Buyer. Within five (5) business days of Closing, Buyer will provide Seller and the Official Committee of Unsecured Creditors (the "Committee) with a list of the Seller Employees to whom Buyer intends to make an offer of employment (the "Employee List"). The Employee List shall remain confidential as among Buyer, Seller, and the Committee. For the avoidance of doubt, nothing in this Section 7.8, whether express or implied, shall constitute or be deemed to be an offer of employment to any Seller Employee, or promise of employment or representation with respect to employment as to any specific Seller Employee.

5. Scheduled 2.3, titled "List of Excluded Assets," is hereby amended by deleting 2.3(c) and replacing it as follows:

(c) all Claims or causes of action of Seller and the proceeds thereof, whether arising under the Bankruptcy Code, applicable state Law or otherwise, of whatever kind or nature, and whether asserted or unasserted; including, notwithstanding anything to the contrary herein, Claims or causes of action of the Seller's bankruptcy estate against Agile Space Industries, Inc. Notwithstanding the foregoing, the Excluded Assets shall not include actions available to Seller under chapter 5 of the Bankruptcy Code or under any other similar state or common law ("**Avoidance Actions**"), or any Claims or causes of action against Buyer, which such Avoidance Actions, Claims, and causes of action shall remain among the Purchased Assets, provided that, Buyer covenants and agrees not to assert, pursue, or prosecute Avoidance Actions acquired under this Agreement, except in defense of any cause of action asserted against Buyer by a potential defendant in an Avoidance Action including, but not limited to, any counterclaims and assertion of setoff rights.

[Signatures on Following Page]

2

**EXECUTION COPY**

    With the intention to be legally bound by the terms of this Amendment, the Parties have executed this Amendment as of the date first above written.

**BUYER:**

**ASTROBOTIC TECHNOLOGY, INC.**


By: _____

    Name:  John Thornton

    Title:  CEO


**SELLER:**

**MASTEN SPACE SYSTEMS, INC.**

By: _____

    Name: *TED GAVIN, CTP, NCPM*

    Title: *Chief Restructuring Officer*

3